IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL A. BRENNAN, ANTHONY COLINO, and COURTNEY BELLOMO, individually and on behalf of all others similarly situated, | ) ) ) ) | Civil Action No. 13-CV-02939-MEM<br><br>Hon. Malachy E. Mannion |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | CLASS ACTION<br><br>Filed on behalf of Objectors |
| COMMUNITY BANK, N.A. | ) ) ) | Counsel for these Parties:<br>Richard Shenkan, Esquire |
| Defendant | ) ) ) ) ) ) ) ) | Shenkan Injury Lawyers, LLC<br>Attorney ID 79800<br>P.O. Box 7255<br>New Castle, PA  16107<br>T: (800) 601-0808<br>F: (888) 769-1774 |

## OBJECTION OF NICOLE URBAN AND OTHER OBJECTORS TO APPROVAL OF CLASS SETTLEMENT

AND NOW COME, Nicole Urban ("Ms. Urban"), Eleanor Sickler ("Ms. Sickler"), Jacob Laird ("Mr. Laird") and Donald Lenherr ("Mr. Lenherr") (collectively known as "Objectors"), by and through their counsel, and file this Objection to Approval of Class Settlement, stating as follows: [1]

---

[1] Objectors request that this Objection be considered in conjunction with the objections sent, in letter format, by Objectors Nicole Urban, Eleanor Sickler, Jacob Laird, and Donald Lenherr, pursuant to the instructions set forth in the Notice that was mailed to class members, attached hereto as **Exhibit 1**. Objectors are also represented by Howard Rothenberg, Esq. and, in the instance of Eleanor Sickler, David Chrispell, New York counsel.

**Introduction**

On June 8, 2015, the Objectors filed an Objection to the Preliminary Approval of the Class Settlement (Doc. 90). By Order dated July 6, 2015, the Court granted preliminary approval of the settlement and struck this objection, finding that it was untimely and premature. It appears that the Court did not reach the substance of this objection and struck it because it was filed at the wrong time. Class Notice was sent out, setting September 13, 2015 as the deadline for mailing objections to the proposed settlement. As now appears to be the appropriate time to file objections to the settlement, Objectors incorporate by reference the entirety of their previously-filed objection and request that the Court consider it in conjunction with the discussion found herein.

**A.    There Truly is a Conflict Between Sub-Classes**

Objectors have previously set forth at length why there is a conflict of interest between the sub-class comprising holders of "New York recent claims" and the sub-class composed of holders of Pennsylvania claims. (Doc. 90 at 7-11)). As Objectors explained, because the Pennsylvania statute of limitations is indisputably six-years, there is no uncertainty as to whether the claims held by all Pennsylvania class members are time-barred. They are not. Similarly, because the New York statute of limitations is indisputably no less than 3 years, the claims of New York residents that are less than 3 years old (the New York "recent claims"),

inherently bear no greater uncertainty of being time barred than do all of the Pennsylvania claims.   In this regard, the Pennsylvania claims and the New York recent claims have identical uncertainty and should receive identical amounts under any settlement.  The proposed Settlement provides for a higher cash payment to the holders of Pennsylvania claims than it does to the holders of New York "recent claims."

In contrast, the New York "old claims"—those that are between 3 and 6 years old—do exhibit a level of uncertainty that is tied to the uncertainty of whether the New York limitations period is 3 years or 6 years.   In their first Brief in Support of their Renewed Motion for Preliminary Approval of Class Settlement (Doc. 88), Plaintiffs cited *Newberg* for the proposition that "if differences exist between the 'likelihood of ultimate success' for different plaintiffs 'it is appropriate to weight the distribution of the settlement…in favor of plaintiffs whose claims comprise the set that was more likely to succeed.'" (Doc. 88 at 13, n. 3).  While this statement is generally true and certainly applies to the New York "old claims" when compared to the Pennsylvania claims, it does not apply to the New York "recent claims" vis-à-vis the Pennsylvania claims.

Plaintiffs' response to Objectors' foregoing position, as set forth in Plaintiffs' Supplemental Memorandum (Doc. 94), failed to recognize that there are two separate sub-classes of New York claims and, instead, casually discussed all

New York claims together.  For example, Plaintiffs claimed that: "it is better to get *the New York Class* some substantial relief…" (Doc. 94 at 9)(emphasis added); and "under Objectors' scenario, <u>the New York consumers</u> could potentially get *nothing*…" *Id.* (italics in original) (underline added).    In fact, Plaintiffs mischaracterized Objectors Objections to Preliminary Approval of the Settlement (Doc. 90, subsequently stricken) in order to blur the distinction between the two New York sub-classes.

Plaintiffs claimed that "[t]he 'Objectors' appear to recognize the uncertainty in the New York period of limitation as they repeatedly refer to *the New York* claims as 'potentially time-barred.'" (Doc. 94 at 9) (emphasis added).  This is simply not accurate.  What is *really* found at page 10 of Objectors' original Objection filed in this case, is a reference to "the two New York representative plaintiffs whose claims are potentially time barred."  It was never Objectors position that all New York claims are "potentially time-barred."  Rather, they clearly stated that the "old New York claims" of the two representative plaintiffs, are potentially time-barred. (Doc. 90 at 10).  Similarly, Plaintiffs claimed that the Objectors "note the New York claims as 'potentially time-barred.' (Doc. 90, p. 8 and n. 3)." (Doc. 94 at 9).  What footnote 3 that Plaintiffs cite to really says, however, is that "$343,200 has been allocated to Class C (New York 'old claims'), [many] of which may be time-barred." (Doc. 90 at 8, n. 3). Again, Objectors'

position has been and continues to be that the New York "old claims" are potentially time-barred, not that all New York claims are potentially time-barred, which is the basis for Objectors' position that there is a class conflict that needs to be addresses in the Proposed Settlement.

Once Plaintiffs' mischaracterization of the Objection is revealed, their argument that the allocation of funds in the proposed Settlement merely reflects the relative uncertainty in the subclasses' claims becomes untenable. Moreover, as set forth below, this problem is more than merely an issue of the relative probability of recovery associated with the claims of various subclasses. More fundamentally, it involves a serious question as to whether the Plaintiffs can fairly and adequately represent all three subclasses in this case, as required by Fed.R.Civ.P. 23(a)(4).

*In re Community Bank of Northern Virginia*, 622 F.3d 275 (3d. Cir. 2010), was a consolidation of six class actions involving predatory lending in residential mortgages. On appeal from the district court's approval of a proposed settlement, the Third Circuited vacated the district court order and remanded the case because:

> Here, there is an obvious and fundamental intra-class conflict of interest (the same we identified in *Community Bank I* [418 F.3d 277 (3d Cir.2005)): the named plaintiffs' claims—whether under RESPA, TILA, or HOEPA—are untimely, and they must rely on equitable tolling to save them. Notwithstanding that substantial hurdle to their claims, they seek to represent a sizeable subgroup of the class— approximately 14,000 persons—with timely claims. *Cf. McAnaney v. Astoria Fin. Corp.,* No. 04–CV–1101, 2007 WL 2702348, at *12 (E.D.N.Y. Sept. 12, 2007) (holding that named plaintiffs in a TILA

class action were inadequate representatives because their claims were time-barred).

*Id.* at 303.

The Court of Appeals explained the district court's error as follows: "The District Court—having determined that no other class member could assert a timely TILA/HOEPA claim under Rules 15(c) and 12(b)(6)—did not consider this intra-class conflict. It should do so on remand." *Id.* at 304. However, the Court of Appeals suggested that "[t]he most obvious remedy would be to create subclasses, as we suggested in our prior opinion. *See Community Bank I,* 418 F.3d at 310)."

On remand, the plaintiffs filed an amended complaint that included all of the potential claims against the defendants, as well as defining five subclasses. The district court found that the subclasses were necessary and appropriate and that they did, in fact, remedy the intra-class conflict that had necessitated the remand. *In re Community Bank of Northern Virginia Lending Practices Litigation,* 2013 WL 3972458 (W.D. Pa. July 31, 2013).

What differentiates the amended complaint in *Community Bank of Northern Virginia* from the Complaint in the present case is not the presence of subclasses— they are defined in both complaints. Rather, it is that in filing the amended complaint in the former case, the plaintiffs included as representative plaintiffs, at least one class member for each subclass that possessed timely claims of the type being asserted by that subclass. In contrast, in the present case, there is no New

York representative plaintiff whose claims are less than 3 years old. Without that, the existing representative plaintiffs cannot fairly and adequately represent the interests of the "New York recent claim" subclass and approval of the proposed Settlement must be denied on this basis.

However, in the present case, Objector Eleanor Sickler is a New York resident who has claims against the Bank that are less than three years old. They would, therefore, be representatives of the holders of the New York "recent claims" that could fairly and adequately represent that subclass. She is willing to function in that capacity, either through the mechanism of filing an amended complaint naming her as a representative plaintiff, through intervention in the present action under Fed.R.Civ.P. 24, or by filing a separate class action which could then be consolidated with the existing case.

In addition, there is a second, independent reason why New York class members are being treated unfairly in the Proposed Settlement. The first time that a subclass of New York residents was included in the class in the present case was when the Amended Complaint was file on July 15, 2014. The dates delineating Groups B and C are, therefore, measured from this date: 3 years for Group B (repossession after July 15, 2011) and 6 years for Group C (repossession after July 15, 2008). However, the original complaint filed in *Urban*, which included a subclass of New York residents from its inception, was filed about 7 weeks earlier,

on May 29, 2014.  The filing of the *Urban* complaint had the effect of tolling the running of the statute of limitations for the members of the New York subclass. *Leyse v. Bank of America.*, N.A., 538 Fed. Appx. 156 (3d. Cir. 2013). Accordingly, the dates defining Groups B and C should have been derived by measuring back 3 and 6 years from May 29, 2014, not July 15, 2015.  This means that "7 weeks worth of New York residents" that are now in group C should really have been placed in Group B and that an additional "7 weeks worth of New York residents" should have been included in Group C.

This error has resulted in both a procedural and substantive harm to the class. These class members are entitled to more money (even applying the framework of the settlement) and should have been afforded notice of this problem. At present, the class notice discloses the wrong statute of limitations.

**B.  The Bank's Issuance of Forms 1099-C to Class Members Under the Settlement Injures the Class while Providing no Benefit to the Bank**

*1.  The Bank Has No Obligation to Issue Forms 1099-C To Class Members Under the Settlement and Providing for the Bank to do so Unnecessarily Burdens the Members of the Class*

Plaintiffs' counsel has stated that the premise of the proposed Settlement is that as a result of the deficiency waivers, "the Bank will have to issue a 1099 and the amount of debt forgiven is thereby income to the taxpayer." (Transcript of January

27, 2015 status conference, Doc. 78 at 11-12.).   He explained this incorrect

presumption as follows:

> Well, in 2102, the world changed because the IRS took a different
> position – they had previously taken the position in their private letter
> rulings and so on that because there was some argument that it was
> discharged by operation of state law or disputed, that there would not
> have to be a 1099 issued, so there wouldn't be the cancellation of debt
> income to the class member, the taxpayer.
>
> In 2012, they reversed themselves.   They not only reversed
> themselves, they issued one of the letter rulings, which specifically said,
> We are now reversing our prior position and deem the waiver of debt to
> fall within the rubric of 6050 P, and it will be income to the taxpayer.
> There are a couple of private letter rulings on that.

*Id.* at 42.

The private letter ruling to which Counsel was referring is attached as Exhibit

14 to Plaintiffs' Memorandum in Support of Renewed Motion for Preliminary

Approval of Class Settlement (Doc. 88) and is attached hereto as **Exhibit 2**.   That

letter ruling does, in fact, state that the waiver of a debt pursuant to the settlement of

litigation does require the issuance of a 1099-C and does result in taxable income to

the party benefitting from the waiver.   Where Counsel erred, however, is in

concluding that this private letter ruling controls in the present case.   This is because

"there is no precedential value to private letter rulings and those rulings are not

binding on any court."   *In re Comp*, 134 B.R. 544, 556 (Bankr. M.D. Pa. 1991).

"Title 26 U.S.C. § 6110(j)(3) provides that unless the Secretary otherwise establishes

by regulations, a written determination *may not be used or cited as precedent.*" *Id* (emphasis added). Indeed, the ruling itself states such clearly in its text.

Instead of following IRS letter rulings, this Court is bound to follow decisions of the Third Circuit Court of Appeals. *Thornwood Associates v. Greater New York Savings Bank (In re Thornwood Associates)*, 162 B.R. 438, 440 n. 3 (M.D.Pa. 1993) ("decisions of the Third Circuit are binding on this Court and we must apply the law as that court interprets it. We are not free to ignore Third Circuit holdings if we disagree with them."). This Court is, therefore, bound to follow *Zarin v. Commissioner of Internal Revenue*, 916 F.2d 110 (3d Cir. 1990), the holding of which is diametrically opposed to that of the private letter ruling on which Plaintiffs and the Bank rely. **Exhibit 3**.

The plaintiff in *Zarin* had accumulated almost $3.5 million in gambling debts to a casino. The casino sued him and he defended on the grounds that the debt was unenforceable under state regulations intended to protect compulsive gamblers. Ultimately, the parties settled the action for $500,000. The IRS then claimed a tax deficiency against the plaintiff, arguing that he had income of almost $1 million, representing the difference between the original amount claimed by the casino and the half-million-dollar settlement. The tax court agreed that the plaintiff had income resulting from a discharge of indebtedness in this amount.

On appeal, the Third Circuit acknowledged that Sections 61(a)(12) and 108 of the Internal Revenue Code (26 U.S.C. §§ 61(a)(12) and 108) set forth the general rule that gross income includes the income from the discharge of indebtedness. Nevertheless, the Court rejected the tax court's characterization of the plaintiff's settlement as a discharge of indebtedness.

> Instead of analyzing the transaction at issue as cancelled debt, we believe the proper approach is to view it as disputed debt or contested liability. **Under the contested liability doctrine, if a taxpayer, in good faith, disputed the amount of a debt, a subsequent settlement of the dispute would be treated as the amount of debt cognizable for tax purposes.** The excess of the original debt over the amount determined to have been due is disregarded for both loss and debt accounting purposes.

*Id.* at 115 (emphasis added). The Court of Appeals then provided an example.

> Thus, if a taxpayer took out a loan for $10,000, refused in good faith to pay the full $10,000 back, and then reached an agreement with the lendor[sic] that he would pay back only $7000 in full satisfaction of the debt, the transaction would be treated as if the initial loan was $7000. When the taxpayer tenders the $7000 payment, he will have been deemed to have paid the full amount of the initially disputed debt. Accordingly, there is no tax consequence to the taxpayer upon payment.

*Id.*

Applying the Third Circuit's reasoning to the proposed Settlement in the case at bar, if the Bank claimed that a particular class member had a $10,000 deficiency, the class member refused in good faith to pay it back, and the class member reached a settlement with the Bank to pay nothing to satisfy the debt, the transaction must be

treated as if there had been no deficiency in the first place and there can, therefore, be no tax consequence to the class member associated with the settlement.

The private letter ruling on which Plaintiffs and the Bank rely cannot be reconciled with the reasoning or the holding in *Zarin*. The letter ruling analyzes a fact pattern involving the settlement of a class action lawsuit against an entity that held consumer loan contracts of class members. As part of the settlement, the defendant agreed to write off any balances on accounts of members of the class. Rather than focusing on the income-from-discharge-of-indebtedness provisions of Sections 61(a)(12) and 108, as did the *Zarin* court, the letter ruling considers Section 6050P, which states that "[a]ny applicable entity which discharges (in whole or in part) the indebtedness of any person during any calendar year shall make a return (at such time and in such form as the Secretary may by regulations prescribe)." 26 U.S.C. §6050P. While this provision deals with a creditor's duty to inform the IRS of a discharge of indebtedness rather than the tax liability resulting from such discharge (as do Sections 61(a)(12) and 108), it is nonetheless triggered by the same types of events.

The letter ruling ultimately bases its analysis on the implementing regulations for Section 6050P, which are found at 26 C.F.R.1.6050P-1(b)(2). This regulation sets forth a series of eight "Identifiable Events" that each constitutes a discharge of indebtedness. The letter ruling focuses on the sixth of these events: "A discharge of

indebtedness pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full consideration."26 C.F.R. 1.6050P-1(b)(2)(F). The crux of the letter ruling is that the discharge of indebtedness was the result of an agreement between the parties, i.e. the settlement agreement, falling precisely within the foregoing provision, rather than the effect of state law rendering the debt invalid, as argued by the creditor that had sought the letter ruling.

However, the entire framework of the letter ruling's analysis is inconsistent with *Zarin*. That analysis centers on whether the discharge of indebtedness was pursuant to an agreement or by operation of law. However, *Zarin* teaches that "[i]nstead of analyzing the transaction at issue as cancelled debt, we believe the proper approach is to view it as disputed debt or contested liability." 916 F.2d at 115. As set forth above, when appropriately viewed as a contested liability, the excess of the amount originally claimed by the creditor over the settlement amount—which in both the letter ruling and here is zero—must be disregarded for purposes of tax liability. Consistently, such excess must also be disregarded for purposes of determining whether the Bank is obligated to issue Forms 1099-C, at all.

In fact, the reasoning of the letter ruling is flawed even in the context of the discharge-of-indebtedness language of the 26 C.F.R.1.6050P-1(b)(2)(F) Identifiable Event it considered: "A discharge of indebtedness pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full

consideration." In attempting to shoehorn the facts into the foregoing language, the letter ruling perfunctorily states "[t]o establish consideration, there must be a performance or a return promised [sic] which was bargained for by the parties. Restatement (Second) Contracts 71(1) (1981)." (Letter Ruling at 3). The problem with this statement is that it does not deal with the requirement that the discharge be "at less than *full* consideration." (emphasis added).

The letter ruling incorrectly assumes that "full consideration" is the amount originally claimed by the creditor. However, this assumption entirely ignores the fact that the debt is a disputed debt. In *Zarin,* the Third Circuit explained that "the settlement served only to fix the amount of the debt." 916 F.2d at 115. Thus, in the case of the settlement of a contested liability, the settlement amount fixes what constitutes "full consideration." Under *Zarin,* by definition, "full consideration" is the settlement amount and the settlement amount for a contested liability can never be "at less than full consideration."

Pursuant to the controlling authority of *Zarin:* 1) the Bank has no obligation to issue Forms 1099-C; and 2) class members have no tax liability associated with the waiver of the deficiency balances. The proposed settlement unnecessarily exposes class members to such tax liability. Across the class, this is likely a significant but needless burden. For this reason the proposed Settlement should not be approved.

During the January 27, 2015 status conference,[2] the Court made clear that it was very attuned to the Bank's position that the deficiency waiver "may be taxable income, and that, for bank regulatory purposes, they would rather err on the side of notifying the IRS than taking it upon themselves to not notify the IRS and the consequences that come from that, that may be a 200-dollar penalty..." (Transcript of January 27, 2015 status conference, Doc. 78 at 28-29).   The reality, however, is that the Bank bears no risk at all as a result of not issuing Forms 1099-C under the settlement.   It is true that the Internal Revenue Code provides for penalties for the failure to file a required information return, such as a 1099-C.  26 U.S.C § 6721.   However, such penalties are waived if the failure to file was due to "reasonable cause." 26 U.S.C § 6724; 26 C.F.R. § 301.6724-1.

Pursuant to the clear authority of *Zarin*, there is absolutely no reason for the Bank to issue Forms 1099-C.   Even assuming, *arguendo*, that the Bank was obligated to supply these forms, there *still* would be no basis for the IRS to assess penalties against it for failing to do so.  The Bank's reliance on *Zarin* as a basis for not issuing 1099-C's, would undoubtedly satisfy the "reasonable cause" requirement for waiving any penalty.   If that reliance were buttressed by an Order of this Court that: 1)

---

[2] In deference to this Court, just prior to the status conference, Objector's counsel had filed the Affidavit of John McGovern in the companion case, *Urban, et al., v. Community Bank*, 3:14-CV-01039, along with the Affidavit of David Stivers and the Brief in Opposition to Defendant's Motion for Continuation of Stay – all of which are incorporated herein. While these tax matters were addressed in the Affidavit of John McGovern and the brief, a full discussion of *Zarin* and its implications to the subject private letter ruling were not addressed at the status conference.

specifically holds that *Zarin* governs; and 2) approves a settlement of this action that does not provide for the Bank to issue 1099-C's, the Bank would clearly have no risk of penalties being assessed.

Under the Internal Revenue Code, "reasonable cause means nothing more than the exercise of ordinary business care and prudence." *Sanderling, Inc. v. C.I.R.,* 571 F.2d 174, 179 (3d. Cir. 1978).   The Bank's reliance on this Court's Order, which, in turn, is based on a binding decision of the Third Circuit, certainly would satisfy such an "ordinary care and prudence" standard.   Viewed from a different perspective, reasonable cause may arise from, *inter alia*, "reliance on the mistaken legal opinion of a competent tax advisor, lawyer, or accountant that it was not necessary to file a return." *United States v. Meehan, 2011 U.S. Dist. LEXIS 86920,* at *23-4 (E.D. Pa. Aug. 4, 2011) (*quoting, Marrin v. Comm'r, 147 F.3d 147, 152 (2d Cir. 1998)).   A fortiori,* it is "reasonable cause" for the Bank to rely on a valid Order of a District Court concluding that it is not necessary to issue 1099-C's when that Order correctly interprets a controlling decision of a Court of Appeals.

As set forth above, the private letter rulings upon which Plaintiffs and the Bank rely, must give way to *Zarin.*  Accordingly, the law on this issue is clear, the Bank has no duty to issue 1099-C's.  However, if, for the sake of argument, the law on this issue is considered unsettled, the Bank would *still* have no risk of IRS penalties, because "[r]easonable cause has been found to exist in the instance of…. 'conflicting rulings or

decisions or ambiguities in the law.'" *In re Acme Music Company, Inc.*, 196 B.R. 925, 936 (Bankr. W.D. Pa. 1996).

Speaking of the Bank's issuance of 1099-C's, the Court stated, "the bank is doing this out of its own abundance of caution because it believes that it may be taxable to the IRS, but the individual person who receives it is entitled to, you know, view that with their tax advisor as they deem appropriate." (Transcript of January 27, 2015 status conference, Doc. 78 at 29).   The problem with the Court considering the Bank's position as merely acting in an abundance of caution is that it only views the situation from the vantage point of the Bank and fails to consider the standpoint of the class.   Conservatively assuming an average tax bracket for the entire class of 15%,[3] the Bank's waiver of more that $16 million in deficiencies, accompanied by the issuance of the corresponding 1099-C's, results in a facial class-wide tax liability of $2.4 million. (*See* Supplemental Affidavit of John McGovern, filed concurrently herewith, at ¶16, **Exhibit 3**). Obviously, the Bank's issuance of the 1099-C's cannot be seen as an abundance of caution from the viewpoint of the class.

Just to provide some perspective, the maximum penalty the Bank could suffer from an improper non-issuance of 1099-C's is $250.00 per person. 26 U.S.C. § 6721(a)(1).   With a class numbering approximately 3,000, the Bank's exposure for penalties can be no more than about $750,000.   This is on the order of half of the

---

[3] The 15% tax bracket applies to Single Filers with income of $9,225 to $37,450 and Married Joint Filers with income of $18,450 to $74,900.

aggregate detriment to the class of unnecessarily issuing these forms. What may be caution from the Bank's perspective is reckless detriment from the perspective of the class.

The Court contemplated that an individual class member's ability to meet with his/her tax advisor would mitigate any tax problems suffered by class members.[4] However, structuring a settlement that contemplates individual class members fighting the IRS on an individual basis, in order to prevent an unfair result that could easily have been avoided through the structure of the settlement, runs counter to the ideals of class litigation under Rule 23.

2.  *Even if Zarin Did Not Compel the Conclusion that the Bank Has No Obligation to Issue Forms 1099-C to All Class Members, the Manner in Which the Bank Issued the Forms 1099-C Under the Settlement Could Significantly Affect Individual Class Members*

Even if *Zarin* did not categorically dispense with the Bank's alleged obligation to issue Forms 1990-C to all class members, there exist other regulatory provisions that would exempt certain class members from having to receive them.

As set forth above, the IRS has identified a series of eight "events," each of which is deemed to constitute a debt-forgiveness that triggers a creditor's obligation to issue a Form 1099-C. (*See*, 26 C.F.R. 1.0605P-1(b)(2). The sixth one of these—discharge of indebtedness pursuant to an agreement—has been

---

[4] The cost of hiring a tax professional could easily approach or exceed the amount of benefit to be achieved through his/her services, if not the entire benefit from the settlement to the class member.

discussed above and under *Zarin* does not require the issuance of a Form 1099-C in cases of a disputed debt.

There are, however, seven other "events" that could trigger the Bank's obligation to issue a Form 1099-C.  Two of these are relevant to the Bank's obligation to issue a Form 1099-C to a class member under the proposed Settlement.   These are 26 C.F.R. 1.0605P-1(b)(2)(G)—"A discharge of indebtedness pursuant to a decision by the creditor, or the application of a defined policy of the creditor, to discontinue collection activity and discharge debt; and 26 C.F.R. 1.0605P-1(b)(2)(H)—"In the case of [certain types of entities of which the Bank is one] ….the expiration of the non-payment testing period, as described in § 1.6050P–1(b)(2)(iv)."

Pursuant to Subparagraph (G), if the Bank has a defined policy (which includes its established business practices) as to when it will stop attempting to collect a deficiency, the cessation of collection efforts pursuant to such policy would also mandate that the Bank issue a Form 1099-C in the year of such cessation.  In fact, a representative of the Bank has already testified that the Bank has precisely such a policy. Pamela Dent, a recovery supervisor for the Bank, testified that the Bank determines if a non-paying borrower has any assets.  If the debtor has potentially recoverable assets, then the Bank sends the debtors' file to a collection lawyer to obtain a judgment.  If the debtor is deemed to be insolvent,

then the Bank would continue to send letters, hoping that the borrower would respond and set up a payment plan. (*See*, Dep. Transcript of Pamela Dent at 31-32)(**Exhibit 4**).

However, it is well-settled that "bona fide collection activity does not include nominal or ministerial collection activity, such as automatic mailing." *Kleber v. Commisioner of Internal Revenue*, T.C. Memo 2011-233, *5 (Sept. 28, 2011). Accordingly, when the Bank determined that a class member did not have sufficient assets to justify seeking a judgment, and decided not to send the file to an attorney, the Bank had effectively discontinued collection efforts and at that point in time, the debt was deemed discharged under the IRS regulations. Also at that time, the Bank had an obligation to submit a Form 1099-C for the class member.

Ms. Dent also testified to a second, and even more definitive, policy of the Bank. She stated that when the statute of limitations for the Bank's breach-of-contract claims against a borrower (six years in New York and four years in Pennsylvania) had run, the Bank halted even its ministerial letter-writing efforts and then shipped the file for that borrower off to storage. (*See*, Dep. Transcript of Pamela Dent at 32-33). Thus, the running of the statute of limitations is the latest possible time that could be ascribed to the Bank's policy of halting collection efforts. This is critical because the statute of limitations for contract actions are, for

Pennsylvania class members, two years less than the six (6) year statute of limitations for the Article 9 UCC claims asserted in the *Brennan* and *Urban, supra*. *See, Cubler v. TruMark Financial Credit Union*, 83 A.3d 235, 239 (Pa. Super. 2013)(holding the statute of limitations in an Article 9 claim is 6 years).

Similarly, under Subparagraph H, if a class member has not made any payment to the Bank for a 36-month period measured back from the last day of a year, the debt is considered forgiven at the conclusion of that 3-year period, and the Bank is required to issue a Form 1099-C for the tax year in which such 36-month period expired.

The reason that these other two triggering events are important is not because either of them is triggered by the Settlement itself.  They are important because the occurrence of either of these events in tax years *prior* to 2015, the presumed date of the Settlement of this case, would have triggered the Bank's duty to issue a Form 1099-C in that tax year.  Based on conversations with the Bank's counsel, the Bank has yet to issue any Forms 1099-C to any class members, apparently, working under the assumption that, to date, no triggering "event" for debt-forgiveness has occurred.  Pamela Dent's testimony, however, illustrates that, at a minimum, the triggering event set forth in Subparagraph G has likely occurred for many class members.

If the Bank failed to issue Forms 1099-C in prior years despite the existence of triggering events, then the deficiencies of, hundreds of class members may have already been discharged.  The statute of limitations for IRS assessments is three (3) years after the return was filed. 26 U.S.C.   §6501(a). Therefore, if the class member failed to report the cancellation of indebtedness (when such was due) in 2008, 2009, 2010, or 2011, then the statute of limitations for the IRS to collect the tax has likely lapsed.  Accordingly, a large number of class members should have a valid defense to a tax claim that is based on a pre-2012 "event," even though no Form 1099-C was issued for that tax year.  In contrast, if, as is contemplated by the Settlement, the Bank were to issue, in blanket-form, Forms 1099-C to all class members for tax year 2015, despite fact that the debt that was actually forgiven in 2008-2011 when the Form 1099-C should have been sent, the class member is unnecessarily harmed because s/he will—absent disproportionate time, money and effort—be unable to assert the 3-year limitations period as a defense.

To obviate this problem, if *Zarin* is not followed, the Bank should simply issue the Forms 1099-C for the tax year when the triggering event actually occurred. To do otherwise would be to unnecessarily deprive class members of a potentially valid defense to a stale tax assessment and/or to be faced with a tax when such tax is (or was) not due. To date, the Bank has not identified class members who have (or should have had) a Form 1099-C sent to them because s/he

had a triggering event (i.e., Subparagraphs G or H) in prior years. Even putting aside the "*Zarin* problem" with the proposed settlement, approving the Settlement, in its present form, will likely deprive class members of their defense to a tax liability and, in effect, serve to ratify potentially improper procedures of the Bank relating to the issuance of 1099-C forms.

3.  *The Bank Should Provide Detailed Information on an Individual Basis Concerning Triggering Events for the Issuance of a Form 1099-C*

Objectors detailed these additional 1099-C-related concerns in their Objection, filed on June 8, 2015. (Doc. 90). [5] Thereafter, by Order dated July 6, 2015, the Court struck this objection as being untimely and premature. However, before it was stricken, Plaintiffs filed their Supplemental Memorandum in Support of Preliminary Approval. (Doc. 94). Therein, instead of offering any explanation as to what is incorrect about the Objectors' discussion of the potential pitfalls associated with the Bank's Issuance of Forms 1099-C, Plaintiffs elected to not "wade deep into the regulations." (*Id.* at 18).[6] They merely asserted that the

---

[5] These "first" objections were filed in *Urban, et al., v. Community Bank*, 3:14-CV-01039, in the form of Brief in Opposition to Defendant's Motion for Continuation of Stay and where discussed at length at the status conference that took place that day. Additionally, the Affidavit of David Stivers and the Affidavit of John McGovern were also filed on January 27. The Brief and Affidavits are incorporated herein both for their substantive affect and to establish the benefit conferred on the class. On June 8, 2015, the Objectors filed a "second" Objection to the Preliminary Approval of the Class Settlement (Doc. 90).

[6] Objectors submit that Plaintiffs' counsel has a fiduciary obligation to the class to wade into the regulations, especially in light of the substantial fees that they seek.

statements in the class Notice that "this settlement has potential tax implications for you," are sufficient to cure all the 1099-C problems.

Objectors' response to this contention is twofold.   First, such vague statements about "potential tax implications" are not sufficient to adequately disclose these problems to class members.   Second, the problems arising from the issuance of the Forms 1099-C go beyond mere lack of proper disclosure.   The issuance of these forms by the Bank has the potential to create adverse tax consequences for class members that *cannot be avoided, even if the disclosures were adequate.* (*See*, Supplemental Affidavit of John J. McGovern in Support of Urban's Objection).

At a minimum, therefore, the notice to class members must be improved. In order to provide adequate disclosure to each class member, it is necessary to know precisely which class members would be affected by the Bank's not having issued such a Form 1099-C in response to pre-2012 forgivenesses.  In order to assure that the correct Form 1099-C is provided to each class member, the Bank must provide the date when the breach-of-contract limitations period expired for each class member, because it was the Bank's policy to halt all collection efforts at that time. As to those class members where it is relevant, the Bank must also provide the year in which the 36-month non-payment of Subparagraph H expired.

In addition to assuring that the appropriate Form 1099-C is provided to each class member, the Settlement should also require the Bank to provide an IRS Form 8275 Disclosure Statement to each class member. *Id.* Form 8275 is used by taxpayers to disclose positions that are not otherwise adequately disclosed on a tax return in order to avoid certain penalties.   As it pertains to this Settlement, a completed Form 8275 should be provided to each class member, along with his/her Form 1099-C, and should contain generic explanations of the circumstances under which the Form 1099-C was issued and the defenses that the class member could assert to any IRS claim of increased tax liability.   The class member (or his tax preparer) would then better understand the reason for the 1099-C and have some basis for a bonafide defense to the taxability.

## C.     The Settlement Does Not Reflect the Existence of Additional, Valuable Claims Against the Bank

As set forth above, in the other pending class action against the Bank, in addition to the UCC statutory claims asserted here, the Urban Complaint states claims under the FCEUA and unjust enrichment.   Notwithstanding that the class members here possess those same claims against the Bank, the settlement fund in this case was, seemingly, derived as a percentage of the value of the UCC statutory claims only, and in exchange, expressly waives the benefit of those claims as well as a considerable conversion claim. See Affidavit of David Stivers, **Exhibit 5**. These claims have significant value.

25

1.   _Unjust Enrichment Claim_

One of the claims against the Bank is that because its notices did not comply with the UCC, any deficiency remaining after the sale of a class member's vehicle was void a*b initio*. If that legal proposition could be established, class members would never have had an obligation to make payments on such deficiencies in the first place. While many class members made no such payments, a subset of the class did pay towards these arguably invalid debts. Objector Donald Lenherr is one of them. In most cases the amounts paid by these individuals in a good faith effort to pay off what they believed was a valid debt far exceed the cash payments proposed under the settlement. Just since the time that the Bank and Plaintiffs reached an agreement-in-principle to settle this matter in September (at which time the Bank had every reason to believe that the deficiency balances would be waived), Mr. Lenharr has paid and the Bank has accepted and appreciated more than $2,400 towards a debt that is being cancelled. (*See*, Affidavit Letter of Donald Lenherr, **Exhibit 1**). As a practical matter, the Bank is funding a settlement with the Class by using amounts it has collected from the Class since September of last year.

Although no discovery has been completed to reveal the amounts collected from class members on these arguably invalid deficiencies, those amounts could be substantial, and those class members that have made these payments appear to

have a very legitimate claim of unjust enrichment against the Bank.  That claim has been *left on the table by the Plaintiffs.*

2.  *Conversion Claim / Actual Loss* [7]

As part of the process of re-titling a repossessed vehicle in its own name, a repossessor must complete a PennDOT MV-217A (*Application for Certificate of Title by Financial Institution or Dealer*).  The Bank completed such a form for each Pennsylvania vehicle that it repossessed.  That form required the Bank to certify that in the repossession process, it had "complied with all applicable laws and regulations of Pennsylvania."

However, because the Bank did not comply with the UCC notice requirements, its certification on each PennDOT form MV-217A that it had complied with all laws and regulations was false.  The falsity of this certification, in turn, rendered the transfer of the title from the class member a legal nullity. (*See* Affidavit of David Stivers, **Exhibit 5**, at ¶15).  Therefore, when the Bank subsequently sold the repossessed vehicle, it was selling a vehicle which still belonged to the class member.  Each Pennsylvania class member should, therefore,

---

[7] The conversion claim has been identified <u>after</u> the mediation by auto industry expert, David Stivers, whose affidavit is filed contemporaneously herewith. Therefore, this claim could not have been afforded any weight in the negotiations due to after-discovered evidence. While neither the *Brennan* nor *Urban* cases have pled a separate conversion claim, each has a claim for damages available through UCC 9-625 and NY UCC9-625 which, includes a minimum statutory damages though does not preclude actual damages, which will likely far exceed the minimum statutory damages.

be able to collect the value of his/her repossessed vehicle on a theory of conversion.

Finally, there is considerable reason to believe that the Bank has systematically engaged in the illegal practice of "title-washing" which results in an understatement of the amount credited to a loan account when a repossessed vehicle is resold. *Id.*

**D.   Certain Class Members did not Even Receive Notice of the Settlement**

Mr. Laird and Mr. Lenherr are co-obligors on a single loan used to purchase a single vehicle.  When the class notices were mailed, the Bank and Plaintiffs failed to assure that Mr. Lenherr and other co-obligors were sent a copy of the class Notice. (*See*, Affidavit Letter of Donald Lenherr, **Exhibit 1**).  This omission is a violation of Rule 23(e)(1), which provides:  "The court must direct notice in a reasonable manner to *all class members* who would be bound by the proposal." (emphasis added).  There is no exception for class members that are co-obligors. The due process implications of certain class members not receiving *any* notice of the settlement at all are obvious. The failure to send the Class Notice to Mr. Lenherr is particularly troubling because Plaintiffs and the Bank were clearly aware that some of the loans had more than one borrower, as evidenced by the statement in the class Notice that "if you were a co-borrower with another person, the cash payment will be split evenly between each co-borrower."  Ironically,

however, only one of the co-borrowers on a loan would even have been informed of this split of the cash payment.

**E.     Objectors and Their Counsel have Conferred Considerable Benefit on the Class**

While it is true that awarding counsel fees to counsel for objectors is not the norm, "objectors are entitled to compensation for attorneys' fees and expenses if the settlement was improved as a result of their efforts." *McDonough v. Toys "R" Us, Inc., 2015 WL 263562* ,at\*24 (E.D. Pa. Jan. 21, 2015) (*Citing, In re Prudential Ins. Co. of Am. Sales Practices Litigation,* 273 F.Supp. 563, 565 (D.N.J. 2003)). There can be little dispute that the settlement has already been significantly improved as a result of the efforts the Objectors and those of their counsel.

The Third Circuit has recognized the ability of district courts to award attorneys' fees to objectors who materially benefit a class. *In re Cendant Corp. PRIDES Litigation,* 243 F.3d 722, 744 (3d. Cir. 2001)(vacating district court's order denying attorneys' fees to objector who raised issues with class counsel's fee award and remanding for reconsideration). *See also, Manual for Complex Litigation (Fourth)* § 21.643 (2004)("An objector who wins changes in the settlement that benefit the class may be entitled to attorney fees, either under a fee-shifting statute or under the 'common-fund' theory."); *Id.* § 21.71.

The significant improvement in the settlement is the jettisoning of the original opt-in mechanism for a class member to obtain the benefit of a deficiency

waiver in favor of the opt-out mechanism reflected in the latest version of the Settlement.  It is well-known that in a typical class action, the percentage of class members taking any affirmative action to exercise a right to opt in or opt out of any aspect of a settlement is quite low.  Many class members simply set the notice aside and never take any action.  In the original version of the settlement in this case, class members were required to affirmatively opt in to the deficiency balance waiver.  Because only a small fraction of the class could be expected to exercise that opt-in right, a high percentage of the class would miss out on this valuable benefit, simply because they were too busy or confused to act.  By changing the "presumption" in the settlement to be that a class member would get a deficiency balance waiver and requiring that he/she affirmatively act in order to forego that benefit, the percentage of class members receiving this benefit undoubtedly increased markedly.

Brennan's counsel has reported that in similar prior cases with settlements containing an opt-in waiver provision, only 20% of the class affirmatively elected to receive the deficiency waiver benefit.  Assuming that, under the revised opt-out procedure, virtually the entire membership of the class will enjoy the deficiency waiver, the net increase in the number of class members benefitting from the deficiency waiver would be 80%.  According to the class Notice that was mailed, the aggregate deficiency is approximately $16.3 million.  Based on these

assumptions, the total benefit conferred on the class as a result of the change in structure of the deficiency waiver is on the order of $13 million, representing 80% of $16.3 million).

If the Court adopts Objectors' position that *Zarin* prevents the Bank from having any duty to issue Forms 1099-C, or any of the other positions espoused herein, there will be further benefit to the class of approximately $2.4M. (*See* Supplemental Affidavit of John McGovern at ¶16). This will include the monetary benefit of avoiding any tax liability, as well as a significant simplification of the process that individual class members will have to face. By way of illustration, assuming most class members fall within the 15% tax bracket, the additional benefit to the class would be $2,445,000 (15% x the aggregate deficiency of $16.3 million).[8]

A detail of exactly what benefit Attorneys Richard Shenkan and Howard Rothenberg believe they have already conferred on the class is set forth in the attached Verified Declaration of Attorney Richard Shenkan in Support of Objection to Approval of Class Settlement. **Exhibit 6**).

While the deficiency waiver opt-in/opt-out improvement, and the non-issuance of 1099C's to the members of the class are the most significant as well as

---

[8]The 15% tax bracket applies to Single Filers with income of $9,225 to $37,450 and Married Joint Filers with income of $18,450 to $74,900. This analysis and conclusion assumes that a class member is not insolvent or utilizes IRS Form 982 effectively.

the most suited to being quantified, Objectors have been and hope to be additionally responsible for other enhancements to the settlement. Among these are:

a. **The Elimination of Tax Liabilities**: Objectors' position that controlling Third Circuit case law holds that the Bank should not be issuing 1099-C's to any class member in connection with the waiver of his/her deficiency, This position, if adopted, has a value to the class in the form of income tax savings of an additional $2.4 million. (*See* Supplemental Affidavit of John McGovern at ¶16). Indeed, adopting this position would have the curative effect to eliminate the deficiency waiver opt-out feature, thereby providing all class members with the waiver, including the assurance of no future litigation against them.

b. **The Elimination of the Standing and Issue**: The unjustified payment of class members with New York "recent claims" at a lower rate than holders of Pennsylvania claims, along with the concomitant offer of one of the Objectors to act as a representative plaintiff on behalf of this subclass to cure the standing problem suffered by the current named plaintiffs, whose claims may be, admittedly, time-barred; and,

c. **The Proper Application of the Statute of Limitations and the Curative Effect of Correcting a Material Inaccurate Disclosure in the Class Notice**: The statute of limitations for the settled claims improperly applied a statute of limitations cut-off of July 15, 2011 for Group B (Recent New York Claims). However, due to the filing of the *Urban* case on May 29, 2014, the statute of limitations was tolled from May 29, 2011, not July 15, 2011. *American Pipe and Const. Co. v. Utah*, 414 U.S. 538 (1974)(the filing of a class complaint tolls the statute of limitations for purported class members). Therefore, Class Members whose claims arose between May 29, 2011 through July 15, 2011 should be in Group B, not Group C. Affected Class Members were not afforded any notice of this dilemma and will suffer a financial loss as a result of this non-disclosure, particularly because Group B's claims (Recent New York) are the same as Group A's claims (Pennsylvania) and should be compensated in parity, though presently are not.

d. **The Value of Additional Claims**: The failure of the settlement to, in any way, recognize the value of any of the class's claims other than the claim for statutory damages under the UCC such as unjust enrichment, FCEUA, and conversion. Objectors object to any settlement that fails to recognize the benefit to the class for which they and their counsel are responsible.

## D. Conclusion

For the reasons set forth above and in their previously-filed Objection (Doc. 90), Objectors request that the Court deny approval of the proposed Settlement.

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.


Richard Shenkan
Counsel for Objectors

33

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this pleading was sent to all counsel of

record via first-class mail on September 12, 2015 to the following:

Jonathan B. Fellows, Esq.
Kate Reid, Esq.
Bond, Schoeneck& King, PLLC
One Lincoln Center
Syracuse, NY 13202

Cary Flitter, Esq.
Theodore Lorenz, Esq.
Andrew Milz, Esq.
Flitter Lorenz, P.C.
450 N. Narberth Ave., Suite 101
Narberth, PA  19072

A.B. Data, Ltd.
Community Bank, N.A. Repo Settlement
600 A.B. Data Drive
Milwaukee, WI

SHENKAN INJURY LAWYERS, LLC.

_____
Richard Shenkan
*Attorney for Plaintiffs*