## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL A. BRENNAN, ANTHONY COLINO and COURTNEY BELLOMO, individually and on behalf of all others similarly situated<br><br>               Plaintiffs<br><br>   vs.<br><br><br>COMMUNITY BANK, N.A.<br>               Defendant | CLASS ACTION<br><br><br><br><br><br><br><br><br><br><br>NO. 13-CV-02939 (Judge Mannion) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
## AND AWARD OF CLASS COUNSEL FEES AND COSTS

### ***

## CERTIFICATIONS AND EXHIBITS IN SUPPORT THEREOF

Cary L. Flitter
Andrew M. Milz
FLITTER MILZ, P.C.
450 N. Narberth Ave.
Suite 101
Narberth, PA 19072
(610) 822-0782

Timothy Polishan
Eugene C. Kelley
KELLEY POLISHAN &
SOLFANELLI, LLC
259 South Keyser Ave.
Old Forge, Pa 18518
(570) 562-4520

M. Scott Barrett
BARRETT WYLIE, LLC
320 West 8th Street
Suite 100
P.O. Box 5233
Bloomington, IN 47407
(812) 334-2600

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...............................................................................1

II. FACTS, PROCEDURAL HISTORY, AND MAILING OF NOTICE...............2

III. NATURE OF THE SETTLEMENT....................................................6

IV. LEGAL ARGUMENT........................................................................9

  A. Final Approval Should be Granted.................................................9

    1. The Complexity, Expense and Likely Duration of the Litigation ..............11

    2. The Reaction of the Class to the Settlement Has Been Excellent...............13

    3. The Stage of the Proceedings and the Amount of Discovery Completed...15

    4. The Risks of Establishing Liability.............................................17

    5. The Risks of Establishing Damages............................................18

    6. The Risks of Maintaining the Class Action Through Trial........................19

    7. The Ability of the Defendant to Withstand a Greater Judgment ................20

    8. *Girsh* Factors (8) the Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and (9) the Range of Reasonableness of the Settlement to a Possible Recovery in Light of all of the Attendant Risks of Litigation. ......................................................21

    9. Additional Factors All Support Grant of Final Approval ...........................23

  B. Class Representative Service Awards and *Cy Pres* .......................................23

  C. The Class Should be Certified ....................................................25

  D. Class Counsel Fees are Reasonable and Should be Approved .....................25

i

1. The Equitable Foundation for Award of Attorneys' Fees in Representative Actions ........................................................................................26

2. Plaintiffs' Fee Request From the Common Fund is Fair and Reasonable and in Line With Awards Approved in Similar Cases ....................................27

   a. The size and nature of the common fund created, and the number of persons benefited ........................................................................................29

   b. The absence of objections to the request for fees supports approval.......30

   c. The skills and efficiency of Class Counsel ...............................................31

   d. The complexity and duration of the litigation..........................................34

   e. The risk of nonpayment ..........................................................................36

   f. The amount of time devoted to the litigation...........................................37

   g. Awards in similar cases...........................................................................39

3. Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee ..............................................................................................40

4. Reimbursement of Class Counsel's Expenses ...........................................47

V. CONCLUSION ................................................................................................48

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)..........................27

*Banca Commerciale v. Northern Trust Int'l*, 1997 WL 217591
 (S.D.N.Y. Apr. 30, 1997) ..................................................17

*Banca Commerciale v. Northern Trust Int'l*, 160 F.3d 90 (2d Cir. 1998)..............18

*Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) .............................14

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ...................................26

*Campbell-Ewald v. Gomez*, --- U.S. ----, 2016 WL 228345 (Jan. 20, 2016)...........12

*Ciccarone v. B.J. Marchese, Inc.*, 2004 WL 2966932
 (E.D. Pa. Dec. 22, 2004).......................................... 8, 28, 29, 39

*Cosgrove v. Citizens Auto. Fin., Inc.*, 2011 WL 3740809
 (E.D. Pa. Aug. 25, 2011) ............................................. passim

*Coxall v. Clover Commercial Corp.*, 781 N.Y.S.2d 567
 (N.Y. Cty. Civ. Ct. 2004) ..................................................17

*Craig v. Rite Aid Corp.*, 2013 WL 84928 (M.D. Pa. Jan. 7, 2013) ................. 24, 47

*Cubler v. Trumark Fin. Credit Union*, 83 A.3d 235 (Pa. Super Ct. 2013)...... passim

*Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980)......................27

*Devlin v. Scaradelletti*, 536 U.S. 1 (2002).............................36

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010)...................13

*Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975) ............................... passim

*GMAC v. Vucich*, 15 A.D.3d 106, 787 N.Y.S.2d 745 (3d Dep't 2005) .................18

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) ...... 28, 32, 40, 46

iii

*Harlan v. NRA Group, LLC*, 2011 WL 813961 (E.D. Pa. Mar. 2, 2011)...............45

*In re AT&T Corp.*, 455 F.3d 160 (3d Cir. 2006) .............................. 27, 30

*In re Baby Products Antitrust Litig.,* 708 F.3d 163 (3d Cir. 2013) ........................25

*In re Cendant Corp. Prides Litig.*, 243 F.3d 722 (3d Cir. 2001)............... 28, 40, 43

*In re Cendant Corp.*, 264 F.3d 201 (3d Cir. 2001)....................................26

*In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009)............................27

*In re Diet Drugs Prod. Liab. Litig.,* 553 F. Supp. 2d 442 (E.D. Pa. 2008) .............30

*In re Flonase Antitrust Litig.*, 291 F.R.D. 93 (E.D. Pa. 2013) ........................ 31, 32

*In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768
   (3d Cir. 1995) ................................................................. 13, 26, 28, 34

*In re Ikon Office Solutions, Inc, Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000).........33

*In re Nat. Football League Players' Concussion Injury Litig.,* 307 F.R.D. 351
   (E.D. Pa. 2015) ...................................................................... 10, 11, 19

*In re Processed Egg Prods. Antitr. Litig.,* 2014 WL 5149087
   (E.D. Pa. Oct. 10, 2014) ......................................................................9

*In re Prudential Sales Prac. Litig.*, 148 F.3d 283 (3d Cir. 1998)................... passim

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) .............. 28, 31, 40, 41

*In re Warfarin Sodium Antitr. Litig.*, 391 F.3d 516 (3d Cir. 2004) ........................11

*Indus. Valley Bank & Trust Co. v. Nash,* 502 A.2d 1254 (Pa. Super. Ct. 1985).....17

*Johnson v. Cmty. Bank, N.A.*, 2013 WL 6185607 (M.D. Pa. Nov. 25, 2013).........24

*Lake v. First Nationwide Bank*, 900 F. Supp. 726 (E.D. Pa. 1995).........................23

*Maldonado v. Houstoun*, 256 F. 3d 181 (3d Cir. 2001).........................................45

*McCall v. Drive Fin.*, 2010 WL 4150875 (Phila. CCP July 21, 2010) .................40

*McCoy v. Health Net, Inc.,* 569 F. Supp. 2d 448 (D.N.J. 2008) ..............................16

*Mehling v. New York Life Ins. Co.,* 248 F.R.D. 455 (E.D. Pa. 2008) ......................31

*Melcher v. Greenberg, Traurig, LLP*, 23 N.Y.3d 10, 988 N.Y.S.2d 101 (2014)....17

*Perry v. Fleet Boston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) ............... passim

*Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241 (E.D. Pa. 2011) ...........................16

*Richards v. Client Servs., Inc.*, 2015 WL 5836274 (M.D. Pa. Oct. 5, 2015) ... 44, 46

*Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 468 A.2d 465 (1983) ....22

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)....32

*Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115 (3d Cir. 1990)....................................14

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ...............................21

*Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993)...............................26

*Trustees v. Greenough*, 105 U.S. 527 (1882) .........................................................26

*Wallace v. Powell*, 2015 WL 9268445 (M.D. Pa. Dec. 21, 2015) ................. passim

*Wallace v. Powell,* 288 F.R.D. 347 (M.D. Pa. 2012) .............................................21

**Statutes**

13 Pa. C.S. § 9625(c) ..............................................................................................18

15 U.S.C. § 1681c(a)..................................................................................................8

15 U.S.C. § 1681c(c)..................................................................................................8

N.Y. U.C.C. Law § 9-625(c)............................................................................ 18, 30

**Other Authorities**

Lea Shepard, *Seeking Solutions to Financial History Discrimination*,

46 Conn. L. Rev. 993 (2014) .................................................................7

Manual for Complex Litigation, Fourth, § 21.63 (2004) ..................9

*Report of the Third Circuit Task Force, Selection of Class Counsel*, 208 F.R.D.
340 (2002) ..........................................................................................41

**Rules**

Fed. R. Civ. P. 23(a) .............................................................................26

Fed. R. Civ. P. 23(b)(3) ........................................................................26

Fed. R. Civ. P. 30(b)(6) ........................................................................15

Fed. R. Civ. P. 68 ............................................................................ 12, 38

NY CPLR § 901(b) ................................................................................32

# I.    <u>INTRODUCTION</u>

Representative Plaintiffs, Carol A. Brennan, Anthony Colino, and Courtney Bellomo ("Plaintiffs") submit this memorandum in support of their Motion for Final Approval of Class Settlement.   The terms and conditions are set forth in the Amended Settlement Agreement executed March 25, 2015 (the "Settlement Agreement"), a copy of which was presented to the Court and preliminarily approved by Order entered July 15, 2015 (Doc. No. 99).   The Settlement Agreement is attached hereto as Exhibit "1."   The Agreement calls for over $19 million in monetary relief – cash plus debt forgiveness – as well as valuable equitable-type relief in correcting Class Members' consumer credit reports.

Notice of the proposed class action settlement was mailed as directed by the Court to Class Member borrowers and co-obligors whose names appeared in Defendant's records.   (*See* Affidavit of Christina Peters-Stasiewicz of AB Data, Class Administrator, in connection with Notice by Mailing, dated September 18, 2015, attached hereto as Exhibit "2A.").   The Notice informed Class Members of the terms and benefits that the settlement proposes, and that they had the right to exclude themselves from the Class or object to the settlement.   (*See id.* at Ex. "A" thereto, Notice at ¶¶17-19, 22-23).   The Notice also advised Class Members that Plaintiffs would be applying for an award of attorneys' fees of up to $1,092,000 and cost reimbursement up to $20,000, subject to review and approval of the Court.   (*See id.*

at ¶21).  Out of a mailing to 3,572 Class Member borrowers (2,920) and co-obligors (652), only one (1) Class Member has requested to be excluded from the settlement and there is only one objector group of four (4) Class Members.  (*See id*. at ¶¶13, 20, 24; Exhibit "2B," Supplemental Affidavit at ¶¶11, 21).[1]  This nearly unanimous endorsement of the Class to the terms of the proposed settlement strongly favors grant of final approval of the settlement.

As discussed below, the settlement is eminently fair and reasonable, and is in the best interests of the Class.  The settlement, as proposed, satisfies all of the criteria that courts routinely apply in this Circuit for the approval of class action settlements. The settlement represents an excellent result for the consumer Class Members and should be approved, as should the awards to the Representative Plaintiffs and the application for Class Counsel fees and costs.  Finally, the Court should formally certify the Class for settlement purposes under Rule 23.

## II.     FACTS, PROCEDURAL HISTORY, AND MAILING OF NOTICE

The Court is familiar with the facts of this case, having presided over the matter since its removal from the Lackawanna County Court of Common Pleas to this court in December 2013.  In the interests of brevity, Plaintiffs incorporate the

---

[1]     The objectors, Nicole Urban, Jacob Laird, Eleanor Sickler and Donald Lenherr are, at times, referred to herein as the "Urban Objectors." The Urban Objectors are represented by the same lawyer, Richard Shenkan, and lodge identical objections to the settlement, which Plaintiffs address in a separate memorandum filed contemporaneously herewith.

Facts & Procedural History section from their April 8, 2015 Memorandum in Support of Renewed Motion for Preliminary Approval of Class Settlement at pp. 3-15 thereof. (Doc. No. 88.) This section addresses key events that followed, including the results of the mailing of notice to the Class.

### *Additional Procedural History*

On July 6, 2015, the Court issued two orders: one granting the Motion for Preliminary Approval (Doc. No. 97) and another naming the instant Plaintiffs' counsel as interim Class Counsel (Doc. No. 98).[2] An Amended Preliminary Approval Order followed on July 15, 2015, making a preliminary determination on class certification for settlement purposes and directing that Notice be mailed to the Class Members. (Doc. No. 99, Exhibit "3" hereto). Notice was mailed on August 4, 2015 to 2,920 Class Member borrowers. (Aff't of Administrator at ¶ 13, Exhibit "2A"). If Notice was returned to AB Data as undeliverable from the August 4, 2015 mailing, it was then re-mailed to an updated address after a further address search. (Id. at ¶ 14). After the mailing of initial notice, and any re-mailing, 2,775 notice

---

[2] Effective November 1, 2015, the Flitter Lorenz, PC firm has changed its name to Flitter Milz, PC.

packets were successfully mailed, a penetration rate of approximately 95%. (Id. at ¶18).

Class counsel learned, at the end of the objection/opt-out period, that although the class list originally provided by the Bank to the Administrator covered every secured transaction involved, the Bank had omitted co-obligors. Co-obligors are entitled to Notice and, under the UCC, to a share in any Class Member recovery with their co-borrower. The Bank then provided a full list of co-borrowers. Plaintiffs filed a Motion for a Limited Supplemental Notice (Doc. No. 108-109) which the Court granted by Order dated December 4, 2015 (Doc. No. 119). Supplemental notice then issued to the 652 co-obligor Class Members on December 14, 2015. (See Exhibit "2B," AB Data Aff't, Feb. 3, 2016 at ¶ 10-11). There was also a 95% penetration rate for the supplemental notice, which was successfully mailed to 623 co-borrowers. (*Id*.). Plaintiffs point out that the *content* of the first mailing was entirely correct. No remailing to the original list was required and the Court's Order provided that the recipients of the original, August 4, 2015 mailing would not need to be re-noticed, and any objections lodged need not be re-filed. (Doc No. 119, Exhibit "4" hereto).

When approved, all 3,398 Class Members (2,775 borrowers and 623 co-obligors) who have been reached (save the singular exclusion), will share the Settlement Fund. The settlement provides for payment to Class Members falling

4

into one of three tranches, based on statutes of limitations.[3]  If the Representative Plaintiffs' service awards, class counsel fees, and costs of suit are approved as set forth in the Class Notice, Class Members will receive cash payments depending on what group they are in, and whether they were also sent an allegedly defective post-sale deficiency notice.  Projected payments are as follows:

| GROUP | NUMBER OF CLASS MEMBERS | SHARE OF SETTLEMENT FUND | ADDITIONAL PAYMENT FOR DEFICIENCY NOTICE |
|---|---|---|---|
| Group A | 832 | $753 | $62 |
| Group B | 1024 | $609 | $52 |
| Group C | 1100 | $287 | $25 |

The settlement provides for checks to be mailed <u>without</u> the need for any claim form to be submitted by the Class Members.

As set forth in the Settlement Agreement and Notice, any Class Member preferring not to receive the debt forgiveness component (for income tax, personal, or other reasons) was permitted to elect not to receive that remedy.  As of February 3, 2016 (the final date for the recipients of the supplemental mailing to act), 13

---

[3]     See Exhibit "1," Sett. Agreement at ¶2.06(viii).  Group C includes four, five and six year old New York claims.  Group B are zero to three year old New York claims.  Group A are Pennsylvania Class Members whose claims are less subject to challenge in light of *Cubler v. Trumark Fin. Credit Union*, 83 A.3d 235 (Pa. Super Ct. 2013).  This issue is discussed at greater length in Plaintiffs' response to objections filed concurrently herewith.

borrowers and 3 co-obligors elected not to have any deficiency balance forgiven.

(Exhibit "2A," AB Data Aff't at ¶ 22, Exhibit "2B," AB Data Supp. Aff't at ¶ 19).[4]

## III.   <u>NATURE OF THE SETTLEMENT</u>

### *<u>Key Settlement Terms</u>*

The significant terms of the class-wide settlement are as follows:

1.      The Bank has paid Two Million, Eight Hundred Thousand Dollars ($2,800,000.00) into a settlement fund at PNC Bank.  Those funds will be used to pay Class Members, Class Counsel fees and costs, class representative service awards, as well as notice and administration expenses.  (*See* Sett. Agreement, Exhibit "1" at ¶2.06).

2.      Community Bank will request that all Consumer Reporting Agencies to which it reports <u>delete entirely</u> the tradeline from the Class Members' credit reports. (Sett. Agreement at ¶2.09).

3.      Community Bank will presumptively waive and eliminate entirely deficiency balances on Class Members' Auto Loans –debt forgiveness of over $16.3 million.  (Sett. Agreement at ¶ 2.10-11, 13).

(Exhibit "1" hereto, Sett. Agreement).

### *<u>Aggregate Value to Class Includes Debt Forgiveness and Credit Correction</u>*

The $2.8 million in cash and $16.3 million in debt forgiveness are substantial

remedies that plainly improve the financial position of every affected Class Member.

Community Bank will also request of the Credit Bureaus that the entire trade line

---

[4]      The Class Notice advised Class Members prominently that the debt forgiveness could result in the issuance of an IRS 1099C form, and could result in an income tax liability. (*See* Class Notice, ¶ 8, 10, 13, Exhibit "2A," at Exhibit A thereto).  This issue is addressed further *infra*.

(which includes any negative credit entries) for these auto loans be removed entirely as part of this settlement. (Sett. Agreement, ¶ 2.09). This adds considerable value to the $19.1 million in monetary relief attained.

The deletion of negative credit information should improve the credit rating of all the Class Members and allow each to enjoy more favorable borrowing options and interest rates in future credit opportunities. A notation of "repossession" and reporting of a deficiency balance is a <u>significant negative</u> factor in a consumer's credit report. This can adversely impact a consumer when applying for a loan, insurance, a mortgage or even a job, where credit reports are run on candidates with increasing frequency. *See* Lea Shepard, *Seeking Solutions to Financial History Discrimination*, 46 Conn. L. Rev. 993, 995 (2014) (noting that "approximately sixty percent of employers consult applicants' credit reports in making hiring decisions").

Plaintiffs have engaged Thomas Tarter, a retired banker and an expert in consumer credit and consumer lending issues to address the benefits of the credit repair. Mr. Tarter's C.V. and report are Exhibit "5" hereto. Mr. Tarter opines that the credit report relief provided by this settlement should improve the credit rating of the Class Members and allow them to enjoy more favorable borrowing options and interest rates in future credit opportunities. According to Mr. Tarter, "class members will not have to deal with the negative effects of the Community Bank tradeline in the future. And their credit scores will be improved." (*Id.* at p. 17). This

can result in thousands of dollars in interest savings, and other benefits. (*Id*. at p. 18-19)

The Bank's negative credit reporting will be requested to be "cloaked" (or removed) per the Settlement Agreement. (Exhibit "1," at ¶ 2.09). This relief will benefit Class Members well into the future, as negative account data typically remains on a credit report for a period of seven and a half years from the date of first delinquency. *See* Fair Credit Reporting Act, 15 U.S.C. § 1681c(a), § 1681c(c). The repair to credit provided by this settlement will allow Class Members to improve their ability to apply for security clearances, employment opportunities, obtain insurance at lower rates, and generally increase their creditworthiness. (*See* Exhibit "5," Tarter report at p. 25).

In *Ciccarone v. B.J. Marchese, Inc.*, 2004 WL 2966932 (E.D. Pa. Dec. 22, 2004), a car dealer and its principals were sued over an identity theft scam that caused credit harm, among other damage. As part of the class-wide settlement, a fund was created at $2.45 million in cash, plus release from claimed loan obligations and the credit report correction. Judge Shapiro carefully weighed the considerable value of the credit-report correction (the same corrective credit reporting measures the Bank will take as part of this settlement). In so doing, the court recognized that a precise valuation of the credit report correction is difficult to pinpoint, *id.* at *4, but determined the value of the credit correction to be approximately equal to the

cash component. *Id.* at *9-10. Here, application of that approach would add some $2.8 million in value to the $2.8 million in cash – yielding $5.6 million in addition to the $16.3 million in debt forgiveness, for an aggregate value of some $21.9 million. Other courts have similarly recognized the considerable value in a class settlement that provides for removal of negative reporting. *See Cosgrove v. Citizens Auto. Fin., Inc.*, 2011 WL 3740809, at *7 (E.D. Pa. Aug. 25, 2011) (holding in a similar repo notice class action that the "additional obligation to correct negative entries on class members' credit reports is tangible and adds value to the settlement.").

## IV. LEGAL ARGUMENT

### A. Final Approval Should be Granted

This Court has preliminarily determined that class certification appears appropriate for settlement purposes and has preliminarily approved the settlement agreement. After notice of a proposed class action settlement is sent to the Class Members, the matter is presented to the Court for final approval. MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.63 (2004); *In re Processed Egg Prods. Antitr. Litig.,* 2014 WL 5149087, *16 (E.D. Pa. Oct. 10, 2014).

There is "an initial presumption of fairness ... where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a

small fraction of the class objected.'" *In re Nat. Football League Players'*
*Concussion Injury Litig.,* 307 F.R.D. 351, 387 (E.D. Pa. 2015) (citing cases). All
but the last of these questions was addressed at preliminary approval. (*See* Doc.
Nos. 21-22, 25). As noted, only one group of four Class Members -- out of over
3,500 consumers noticed -- has objected. All represented by Mr. Shenkan, the four
raise essentially one set of objections argued in one objectors brief. Plaintiffs rebut
each objection in a separate document, Plaintiffs' Response in Opposition to
Objections, which is being filed concurrently herewith.

The question presented on a motion for final approval of a proposed class
action settlement is whether the proposed settlement is fair in light of the following
factors (known as the "*Girsh*" factors):

> (1) the complexity, expense and likely duration of the litigation …;
> (2) the reaction of the class to the settlement …; (3) the stage of the
> proceedings and the amount of discovery completed …; (4) the risks
> of establishing liability …; (5) the risks of establishing damages …;
> (6) the risks of maintaining the class action through trial …; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery …; (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation…

*See In re NFL*, 307 F.R.D. at 388 (citing *Girsh v. Jepson,* 521 F.2d 153*,* 157 (3d Cir.
1975)). After *Girsh*, the Third Circuit has suggested additional factors to consider,
whether:  (a) the pleadings, settlement negotiations, and the class certification
motion have developed the underlying substantive issues such that all parties may

assess the merits of the claims and defenses; (b) members of the Class have had a sufficient opportunity to opt out of the settlement; (c) the awards to the Representative Plaintiffs are fair, adequate and reasonable; and (d) the procedures for processing the individual claims under the settlement are fair and reasonable. *In re Prudential Sales Prac. Litig.*, 148 F.3d 283, 323 (3d Cir. 1998); *In re NFL Players,* 307 F.R.D. at 395-96.

An evaluation of the relevant factors demonstrates that the settlement here fits well within the range of reasonableness and should be approved.

### 1.  The Complexity, Expense and Likely Duration of the Litigation

This first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re Warfarin Sodium Antitr. Litig.*, 391 F.3d 516, 535-36 (3d Cir. 2004). This case was filed in October 2013 and covers a class period reaching back to October 2007. Absent this settlement, expensive litigation would continue.

The Bank maintains *inter alia*, it has not violated the UCC, that the statute of limitations impedes recovery for the New York consumers, and that there are setoffs and counterclaims. The Bank has also raised arguments involving issues of first impression. First, the parties wrestled with a dispute over whether there was removal jurisdiction under the Class Action Fairness Act of 2006. (See Doc. Nos. 8, 9 and 18). Then, in its Answer, the Bank pleaded a class counterclaim. Plaintiffs moved

to dismiss the counterclaim for lack of jurisdiction, which the Bank opposed.  (*See e.g.* Doc. Nos. 33-34).

Next, the Bank claimed that its Rule 68 Offer of Judgment to Ms. Brennan mooted her claim and those of the Class.  It moved for judgement on the pleadings on this basis. Plaintiffs opposed and move to strike the offer of judgment.[5]  (*See e.g.* Doc. Nos. 27, 29, 32, 35, 36, 43).  Defendant also opposed the Plaintiffs' Motion to Amend the Complaint to bring in the New York Plaintiffs and Class, claiming that a three-year (not six-year) statute of limitations applied to their UCC claims.  (See Doc. Nos. 45, 46, 52, 54).  While Plaintiffs believe they have the better of these arguments, these are novel issues to be dealt with.  Settlement resolves these disputes once and for all.

It is obvious that if this case were to continue, there would need to be contested motion practice and argument over Defendant's challenges – procedurally, on the merits, and over class certification.  Dispositive motions would be filed as to liability and available damages recoverable under the UCC, and costly pre-trial briefing and trial preparation on both sides would be necessary.  As noted, the New York period of limitation has not been determined in the appellate courts of New York, and with millions of dollars at stake, a costly appeal is foreseeable.  In the meantime, Class

---

[5]      The U.S. Supreme Court only very recently resolved this thorny issue in *Campbell-Ewald v. Gomez*, --- U.S. ----, 2016 WL 228345 (Jan. 20, 2016), agreeing with Plaintiffs here that an unaccepted offer of judgment does not serve to moot.

Members would be forced to wait out this litigation – and continue to suffer the impact of their deficiency balances and the adverse credit reporting *pendente lite*.

Avoidance of this unnecessary expenditure of time and resources benefits all parties and is to be encouraged. *See In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 812 (3d Cir. 1995) (concluding that lengthy discovery and ardent opposition from the defendant were facts favoring settlement, which offers immediately benefits and avoids delay and expense); *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010) ("strong presumption in favor of voluntary [class] settlements"). As a result of the settlement, all issues in this litigation will be resolved once and for all, for the entire two-state Class.

2. The Reaction of the Class to the Settlement Has Been Excellent

On August 4, 2015, notices were mailed to the 2,920 members of the Class advising of the terms of the settlement and the right to object or exclude themselves from the Class ("First Mailing"). (*See* AB Data Aff't, Exhibit "2A," at ¶ 10-13). The deadline for Class Members to exclude or to object was 40 days later, i.e., September 13, 2015. (*See id.*). According to the Settlement Administrator only one Class Member has exercised the right to exclude himself from the case. (*See id.,* ¶ 20 at Exhibit "B" thereto, exclusion request).

After the August 4, 2015 mailing, Class Counsel learned that there was a group of Class Members, specifically co-borrowers, who were not on the class list

provided by the bank, hence not mailed a Notice. A second Notice issued on December 14, 2015, allowing the co-borrower group a fresh 40 day period to act.

There was one set of four objectors to the August 4, 2015 Notice, represented by attorneys Richard Shenkan and Howard Rothenberg. Objector Donald Lenherr, one of the four Objectors represented by attorney Shenkan, also filed an objection to the supplemental mailing, incorporating his earlier objection. (See Objection of Donald Lenherr, January 12, 2016, Doc. No. 120).

Approximately 99.9% of the Class has assented to the settlement. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n.15 (3d Cir. 1993) (following the holdings of other courts in class cases in "assuming silence constitutes tacit consent to the agreement"). This Court "has noted that a vast disparity between the number of potential class members who received notice of a proposed settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement." *Wallace v. Powell*, 2015 WL 9268445, at *13 (M.D. Pa. Dec. 21, 2015) (citations omitted). The fact that there is only one group of four (4) objectors, all represented by the same attorneys, out of some 3572 total Notices mailed is convincing evidence of the proposed settlement's fairness and adequacy. *Id.; see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (noting the second *Girsh* factor "strongly favor[ed]" settlement where only 29 of 281 Class

Members objected).  The nearly unanimous, positive reaction of the Class here weighs heavily in favor of the proposed settlement.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

For a settlement to be approved, the parties must have an "adequate appreciation" of the merits of the case.  *In re Prudential*, 148 F.3d at 319.  The settlement here comes only after Plaintiffs engaged in copious motion practice, obtained sufficient discovery to evaluate the prospects of the case for Class certification and the affirmative defenses and counterclaims.

Plaintiffs proffered interrogatories and requests for documents primarily targeted at learning the Bank's standardized practice regarding repossessions and notice, seeking the loan files of potential Class Members, and determining class membership.  The Bank objected to some and responded to some of the written discovery.  Ultimately, Community Bank produced thousands of pages of files on class members drawn from a random sampling.  Class Counsel spent dozens of man-hours in the painstaking manual review and cataloging of these files.  (*See* Exhibit "6," Flitter Certification, ¶27).  All of this was required to evaluate whether Community Bank's repo notices to that consumer violated the UCC, and if so, the statutory damages to which they were entitled, as well as the deficiency claimed due.

Class co-counsel Scott Barrett traveled to the Bank's offices in Canton, New York to depose a Rule 30(b)(6) witness, Pamela Dent.  Plaintiffs were thereby able

to identify the common claim of improper notice(s) and able to identify the total statutory damages and deficiencies at play in the case. From this discovery, and from affidavits and summaries provided by the Bank, Class Counsel learned about the types of notices of disposition utilized by the Bank, the types of deficiency notices used by the Bank, the size of the Class, and the overall nature of the class-wide violations of the UCC that Plaintiffs have alleged.

As a result of the Plaintiffs' efforts, the litigation had reached the stage where "the parties certainly [had] a clear view of the strengths and weaknesses of their cases." *Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241, 252 (E.D. Pa. 2011); *McCoy v. Health Net, Inc.,* 569 F. Supp. 2d 448, 461 (D.N.J. 2008). By the time of the mediation with Judge Welsh in September 2014, considerable discovery and substantive motion practice had already taken place. Continued litigation here would have resulted in contentious class certification and merits motion practice, including the first-impression issue of the New York statute of limitation. *See infra*. Instead, this classwide settlement – deftly facilitated and recommended by Judge Welsh – has resulted in the secure deposit of $2,800,000.00 into PNC Bank, plus the cessation of collections (Sett. Agreement §2.10(a)), the promise of debt forgiveness, judgment satisfactions, and credit repair. This factor strongly favors settlement.

4. <u>The Risks of Establishing Liability</u>

This factor surveys the possible risks of litigation in order to balance the likelihood of success and potential damages against benefit of settlement. *In re Prudential*, 148 F.3d at 319. Plaintiffs maintain that liability in this case is strong, *i.e.*, that Defendant sent out statutorily required notices of disposition of collateral and deficiency calculation notices that did not provide important information required by the UCC.

The law supports Plaintiffs in their claims that Defendant failed to provide "reasonable authenticated notice of disposition of collateral" as required by New York's and Pennsylvania's UCC sections 9-610 and 9-611. *See e.g. Indus. Valley Bank & Trust Co. v. Nash,* 502 A.2d 1254 (Pa. Super. Ct. 1985); *Cubler v. Trumark Fin. Credit Union,* 83 A.3d 235, 236 and n.1 (Pa. Super Ct. 2013); *Coxall v. Clover Commercial Corp.,* 781 N.Y.S.2d 567 (N.Y. Cty. Civ. Ct. 2004). Accordingly, Plaintiffs' UCC claims are well-founded and should succeed on the merits.

However, this has not stopped the Bank from arguing that any statutory award can be offset by deficiency balance claims owed, and other substantial defenses – including the bar of the New York statute of limitations. This was fully briefed at the Plaintiffs' motion for leave to amend, and opposition thereto. (Doc. Nos. 45-46, 52, and 54). *Compare Banca Commerciale v. Northern Trust Int'l*, 1997 WL 217591 (S.D.N.Y. Apr. 30, 1997) and *Melcher v. Greenberg, Traurig, LLP*, 23 N.Y.3d 10,

988 N.Y.S.2d 101 (2014) (supporting generally argument for six year limitation) <u>with</u> *GMAC v. Vucich*, 15 A.D.3d 106, 109, 787 N.Y.S.2d 745, 747 (3d Dep't 2005); *Banca Commerciale v. Northern Trust Int'l*, 160 F.3d 90 (2d Cir. 1998) (proffered by the Bank in support of three year limitation). Unfortunately, there is no controlling appellate authority that addresses the period of limitation for an Article 9 claim such as this, and this uncertainty creates a significant litigation risk.

Defendant has raised numerous arguments as to why Plaintiffs claims should fail. While Plaintiffs are confident of their positions on these issues, this is not without risk. This *Girsh* factor supports final approval.

### 5. The Risks of Establishing Damages

Plaintiffs' legal theory invoked the mandatory statutory damages provisions of Pennsylvania's and New York's UCC, 13 Pa. C.S. § 9625(c), N.Y. U.C.C. Law § 9-625(c). These uniform sections provide that in the event of a violation of Chapter 6 of Article 9 (here the requirement of proper notice of disposition), the consumer is entitled to "not less than the credit service charge plus 10% of the principal amount of the obligation or the time price differential plus 10% of the cash price." *Id; see Cubler*, 83 A.3d at 237. This statutory damage provision is easy to apply, and its

application would have been readily extended across the entire class to prove statutory damages at trial or by summary judgment.

While damages may be uniform and easily applied across the class, Community Bank has asserted a right to set-off the deficiency balances it alleges many Class Members owed. The Bank filed a Class counterclaim for these deficiency balances. (Doc. No. 33). A motion to dismiss the counterclaim was deferred pending the mediation. This settlement obviates this contested issue entirely by securing deficiency forgiveness for any class member who wants it, in addition to the cash payment. Plus, Community Bank has agreed to cease collection efforts on these accounts. (Exhibit "1," Sett. Agreement at ¶2.10).

### 6. The Risks of Maintaining the Class Action Through Trial

This Court made a preliminary determination on Class for purposes of preliminary approval (Doc. No. 99). *See In re NFL Players Concussion Injury Litig*., 775 F.3d 570 at 586 (3d Cir. 2014). Plaintiffs believe each of the elements for class certification under Rule 23 are readily met here and that the Class could have been certified on contest, and should be finally certified here for settlement.

However, during this litigation, Community Bank indicated it would challenge the certifiability of this class and raise the possibility that some Class Members should be excluded for reasons such as their statute of limitations, over 500 existing judgments against class members, and other reasons. Additionally, the

Bank attempted to inject counterclaims for deficiency balances, to *inter alia*, upset commonality and predominance. (Doc. No. 24). Settlement eliminates the need to litigate these issues which might have posed a threat to certification. While Plaintiffs believe they have the better of these arguments, as this case is a paradigm class case based on failure of a uniform notice sent by the Bank, this *Girsh* factor favors approval of the settlement.

### 7. The Ability of the Defendant to Withstand a Greater Judgment

As noted, this settlement calls for Defendant to pay a total of $2.8 million in cash, to erase over $16.3 million in claimed deficiencies, and to correct negative credit reporting on the Class Members. Community Bank is a large regional bank in New York and Pennsylvania. According to the Bank's investor fact sheet, Community Bank, N.A., has over $7 billion in assets and a market value of $1.6 billion. http://ir.communitybanksystem.com/Cache/1001187172.PDF?Y=&O=PDF&D=&fid=1001187172&T=&iid=100185 (last visited Feb. 4, 2016). It therefore appears the Bank could certainly withstand a greater damage figure. However, due to the elimination of the deficiencies and the credit repair – which might not have been available at trial, even a "greater" damages verdict may not have rendered a greater net benefit to the consumers in this Class. *See Cosgrove,* 2011 WL 3740809, *8 (noting the uncertainty of awarding deficiency cancellation and credit report relief at trial). This factor weights neutral.

8. _Girsh_ Factors (8) the Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and (9) the Range of Reasonableness of the Settlement to a Possible Recovery in Light of all of the Attendant Risks of Litigation.

An assessment of the reasonableness of a proposed settlement requires analysis of the present value of the damages a plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing. _In re Prudential_, 148 F.3d at 322. "[I]n conducting the analysis, the Court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." _Wallace v. Powell,_ 288 F.R.D. 347, 370-71 (M.D. Pa. 2012) (_quoting Sullivan v. DB Investments, Inc._, 667 F.3d 273, 324 (3d Cir. 2011)).

The _best possible recovery_ on Plaintiffs' claims (effectively ignoring defenses or setoffs) would be statutory damages of approximately $19,587,000 (the total maximum aggregate statutory damages of the Pennsylvania and New York Class Members, assuming a six year New York period of limitation).[6] This settlement comes very close to this "home run" amount when factoring the cancelled deficiency balances, even before taking the valuable credit repair into the equation. The

---

[6] This figure is based on data and documents provided by the Bank and represents $18,118,000.00 for the New York and Pennsylvania Classes and approximately $1,469,000.00 for the Deficiency Notice Subclasses. (_See_ Flitter Cert. at ¶24).

settlement provides $19.1 million in monetary relief by a common fund in the substantial amount of $2.8 million in cash and $16.3 million in debt forgiveness. Plaintiffs recognize that debt cancellation or waiver is extremely valuable to some, less to others. However, a pure UCC remedy would not necessarily eliminate the Class Member's "deficiency." *See Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 468 A.2d 465, 467-68 (1983) (in challenge to reasonableness of auction sale price, the failure to prove commercial reasonableness establishes a rebuttable presumption that sale price satisfies debt obligation, but not absolute bar). The credit reporting relief contemplated by this settlement will improve the credit rating of all the Class Members and allow them to enjoy more favorable borrowing options, interest rates and even employment opportunities. (*See* Exhibit "5," Tarter Report).

The aggregate relief discussed, coupled with satisfaction of over 500 judgments totaling over $2M against class Members constitutes relief on par with, or better than, the very best-case trial scenario of $19.6 million. Of course, a final litigated resolution could be years away with uncertainty throughout trial and appeal. Here, there is real value in immediate relief.

Class Counsel endorse this settlement because it is very favorable for the Class for the reasons just described. (*See* Flitter Cert. at ¶24). The opinion of experienced Class Counsel that settlement is in the best interest of the Class is entitled to "significant weight." *Wallace*, 2015 WL 9268445, at *14 ("When the settlement

results from arm's–length negotiations, the court will afford considerable weight to the views of experienced counsel regarding the merits of the settlement.") (citing cases); *accord Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) (endorsement by experienced class counsel is entitled to "significant weight.").

### 9. Additional Factors All Support Grant of Final Approval

In considering the relevant factors discussed in *In re Prudential*, 148 F.3d at 323, and this record (*see* the foregoing discussion), the Court should find that (a) the pleadings, settlement negotiations, and the examination of factors related to potential class certification have developed the underlying substantive issues such that all parties appreciate the merits of the claims; (b) members of the Class have been noticed, and have had a sufficient opportunity to opt out of the settlement; (c) the award to the Representative Plaintiffs, discussed below, is fair, adequate and reasonable; and (d) the cash distribution (without any need for claim form) here assures every Class Member reachable can participate in the recovery with minimal burden. And, there is no reverter of any undistributable funds to Defendant. (Exhibit "1," Sett. Agreement at ¶2.06(v)).

In conclusion, the factors discussed above tip heavily in favor of approval of the proposed settlement of this consumer Class Action.

### B. Class Representative Service Awards and *Cy Pres*

The Settlement Agreement permits the three named Plaintiffs to receive a service award of $5,000.00 each from the Settlement Fund for serving as Representative Plaintiffs. (Exhibit "1," Sett. Agreement at ¶1.17). The Plaintiffs each personally met with counsel several times, engaged in many phone conversations about the status of their case, kept abreast of discovery, and other matters mailed to them, reviewed and commented on several versions of the Settlement Agreement, and generally went out of their way to serve the best interest of the Class at their own expense of time and energy. Ms. Brennan and Ms. Bellomo traveled to Philadelphia for the mediation and intend to appear for the final approval hearing. Each will testify to their adequacy and service awards if necessary.[7]

The awards to Carol Brennan, Courtney Bellomo and Anthony Colino are appropriate and comport with similar incentive or service awards in representative actions in this District and in other districts in this circuit. *See e.g., Johnson v. Cmty. Bank, N.A.*, 2013 WL 6185607, at *5 (M.D. Pa. Nov. 25, 2013) ($5,000 awards in overdraft fee class litigation); *Craig v. Rite Aid Corp.*, 2013 WL 84928, at *13 (M.D. Pa. Jan. 7, 2013)(awards of $5,000-$7,500 in Fair Labor Standards Act case); *see*

---

[7] New York Plaintiff Anthony Colino is suffering from some unfortunate health issues and does not expect to be able to travel to Scranton for the final approval hearing.

*also Cosgrove,* 2011 WL 3740809, *10 ($7,500 service award in UCC repo notice class action under Pennsylvania law).

*Cy Pres*

In the event there are any uncashed checks pursuant to the terms of the Settlement Agreement, those funds are to be disbursed as a *cy pres* distribution in equal one-third shares to North Penn Legal Services, National Consumer Law Center, and Empire Justice Center of New York for use in consumer credit education and counseling, advocacy on behalf of low-income consumers and similar uses. (*See* Exhibit "1," Sett. Agreement at ¶ 3.05 and Exhibit 13, funding letters from *cy pres* recipients). These institutions are worthy beneficiaries. Funding letters are filed herewith where the beneficiary describes the organization and commits to using the residual funds for the specific consumer uses described in Sec. 3.05 of the Agreement. *See In re Baby Products Antitrust Litig.,* 708 F.3d 163, 172 (3d Cir. 2013) (*cy pres* distribution of excess settlement funds to a third party to be used for a purpose related to the class injury)*; Perry v. Fleet Boston Fin. Corp.*, 229 F.R.D. 105, 117 (E.D. Pa. 2005).

## C. <u>The Class Should be Certified</u>

Plaintiffs' argument for class certification was set forth at length in the Motion for Preliminary Approval. As noted, Plaintiffs will not reiterate these arguments here. The only new factor to be addressed is the response of the Class to the Notice

of settlement. At only one group of four objectors (all represented by the same attorneys) and one opt-out, the response of the Class can only be deemed excellent. This, of course, supports the grant of certification for purposes of implementing the instant settlement. Plaintiffs incorporate their arguments in support of class certification made at preliminary approval (Doc. No. 88), where each of the Rule 23(a) and 23(b)(3) elements is addressed, supplementing the record with the overwhelmingly positive (by silence) response of the Class to the Class Notice.

### D. Class Counsel Fees are Reasonable and Should be Approved

#### 1. The Equitable Foundation for Award of Attorneys' Fees in Representative Actions

The United States Supreme Court has long held that one who successfully pursues a lawsuit that creates a common fund is entitled to reasonable compensation from the fund as a whole. *Trustees v. Greenough*, 105 U.S. 527 (1882). *See also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The underlying justification for attorney reimbursement from a common fund, as explained by the Supreme Court in three early cases, is that unless the costs of litigation are spread to the beneficiaries of the fund, they will be unjustly enriched by the attorney's efforts." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) (*citing* cases). Our Circuit is in accord. *In re General Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995); *In re Cendant Corp.*, 264 F.3d 201, 256-57 (3d Cir. 2001). The financial inducements offered by the class action

procedure have played an important role "in vindicating the rights of individuals who might otherwise not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980).

The importance of contingent fee-based litigation is particularly evident in the context of consumer protection cases such as this one. The Courts have consistently recognized the value of private litigation as a necessary and desirable tool to assure the effective enforcement of the consumer protection, securities and antitrust laws. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 781 (3d Cir. 2009); *see also Perry*, 229 F.R.D. at 123 (many consumer claims would be ignored but for the consumer class action.)

The requested fee here is well within the parameters set by Third Circuit jurisprudence, the "percentage of recovery" basis, and as adjudged against the lodestar/multiplier approach as a "cross-check." *See Wallace,* 2015 WL 9268445, *17-20 (awarding fee request under application of percentage of recovery with a lodestar cross check).

    2.  <u>Plaintiffs' Fee Request From the Common Fund is Fair and Reasonable and In Line With Awards Approved in Similar Cases</u>

"In common fund cases such as this one, the percentage-of-recovery method is generally favored because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure," *In re AT&T Corp.*, 455

F.3d 160, 164 (3d Cir. 2006), quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *accord In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 734 (3d Cir. 2001) ("The percentage-of-recovery method has long been used in this Circuit in common-fund cases."). The "percentage of recovery approach is usually appropriate where the efforts of counsel have generated a "common fund" from which the class and counsel are to be compensated." *Ciccarone*, 2004 WL 2966932 at *3, *citing In re General Motors*, 55 F.3d at 821.

In *Gunter v. Ridgewood Energy Corp.*, the Third Circuit set forth the factors for the district court's fee-award consideration, 223 F.3d 190, 195 (3d Cir. 2000) (overturning a decision that reduced to 18% a requested fee of 25% of the recovered fund). Notably, the *Gunter* factors "need not be applied in a formulaic way because each case is different, and in certain cases, one factor may outweigh the rest." *Wallace,* 2015 WL 9268445*, *17.

The *Gunter* factors include (a) size of the fund created and number of persons benefiting from the settlement; (b) presence/absence of substantial objections to the fee; (c) skill of plaintiffs' counsel; (d) complexity and duration of the litigation; (e) risk of nonpayment; (f) amount of time devoted to the litigation; and (g) awards in similar cases. *Gunter*, 223 F.3d at 195. As described below, analysis of the *Gunter* factors supports the requested fee of $1,092,000, plus reimbursement of litigation expenses of $20,000.

As noted, the common fund here consists of cash of $2.8 million. In addition, there is over $16.3 million in debt forgiveness, and valuable credit report correction. As noted, in *Ciccarone*, 2004 WL 2966932, the Court considered the value of a very similar provision in a class settlement for credit report correction. Having considered several approaches, Judge Shapiro concluded that "the most straightforward method for estimating the value of the equitable relief is to have it equal the value of the monetary relief [the cash component]." *Id.* at *10. By this measure – admittedly imprecise, but found reasonable – the aggregate value of the settlement would be $21.9 million ($2.8 cash + $2.8 credit reparation + $16.3 debt forgiveness). By this benchmark, Class Counsel fees requested represent just under 5% of the aggregate value (and 39% of the common fund cash). If fees and costs are approved as requested, each Class Member stands to receive a check ranging from $287 (for New York "older" consumers whose claim may be time-barred) to $609 (for New York consumers whose claim is less than three years old and doubtless timely) to $753 (for Pennsylvania consumers, where the six year period of limitation is firmly established).[8] Subclass Members, *i.e.*, those who received a deficiency notice that Plaintiffs assert is non-compliant, are entitled to between $25

---

[8] *Cubler*, 83 A.3d at 240-41.

and $62 more.  Co-borrowers will evenly split settlement checks.  The cancelled

deficiency balances amount to an estimated average benefit of about $6,000 per loan

for those Class Members with a deficiency balance claimed due by the Bank.

Further, any judgment taken by Community Bank will be deemed satisfied.

(Sett. Agreement at ¶ 2.09-2.11).  Over 500 judgments, with a total balance

exceeding $2.7 million, will be vacated or satisfied.  It is questionable whether these

latter benefits – the credit report correction and judgment satisfaction – would be

available to the Class had this case gone to trial, as the UCC sections 9-625(c) and

(e) invoked do not provide for such remedies.

The strong numbers here weigh heavily in favor of granting the fee request.

*See In re AT&T*, 455 F.3d at 179 (holding that the trial court properly concluded that

the settlement was an "excellent" result in light of the risks).

> b.  The absence of objections to the request for fees supports
>     approval

The second factor focuses on the reaction of the Class to the requested

attorney fees.  The "absence of large numbers of objections mitigates against

reducing fee awards."  *Perry*, 229 F.R.D. at 123-24; *In re Diet Drugs Prod. Liab.

Litig.,* 553 F. Supp. 2d 442, 473 (E.D. Pa. 2008) (dearth of objections "signifies that

the requested award has been viewed by interested parties to this action as fair"); *see*

*also In re Rite Aid*, 396 F.3d at 305 (affirming district court's finding that the filing of but two objections weighed in favor of awarding fee).

The Class Notice stated that Class Counsel would apply for an award of fees and expenses out of the settlement proceeds of up to $1,092,000 plus up to $20,000 in expenses. (*See* Exhibit "2A," AB Data Aff't at Ex. "A" thereto, Notice). While there is one group of four objectors who raise essentially identical objections, none of those objections challenged the reasonableness of the attorneys fees sought. (*See, e.g.,* Lenherr Obj. at *passim*). The lack of any objection to fees favors approval of the attorney fees sought here.

### c. The skills and efficiency of Class Counsel

The "single clearest factor reflecting the quality of Class Counsels' services to the Class are the results obtained." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013). Related factors include "the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 465 (E.D. Pa. 2008) (internal citations and quotations omitted). The goal under our Circuit's precedent is to ensure "that competent counsel continue to undertake risky, complex and novel litigation" for the benefit of large numbers of Class

Members who might otherwise lack reasonable access to justice. *Gunter*, 223 F.3d at 198.

Here, Class Counsel have obtained a very substantial and definite monetary benefit for thousands of Pennsylvania and New York consumers as efficiently as possible considering the Bank's defenses, counterclaims and extant judgments. In the absence of this litigation, most of the Class members would have lacked any reasonable access to legal representation to pursue their modest statutory claims under the UCC, or the wherewithal to defend a state court deficiency action by Community Bank. This reality is perhaps borne out by the fact that the Bank has already obtained deficiency judgments against over 500 Class Members. It is unlikely that any New York class action could have been brought or certified at all in the New York state courts. *See Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 397-98 (2010).[9] Plaintiffs faced opposition from able defense counsel as Class Counsel worked to steward this novel, two-state class action under the UCC to a successful resolution.[10]

---

[9] *See* Plaintiffs' Response to the Objections, filed separately today, for a discussion of *Shady Grove* and New York's prohibition on class actions. For a minimum measure of recovery created or imposed by statute (NY CPLR § 901(b)).

[10] Class Counsel are unaware of prior consumer class actions in this circuit which sought recovery on behalf of a New York class in addition to a Pennsylvania class on the authority of *Shady Grove*. As noted, a goal "of the percentage fee award is to ensure that competent counsel continue to undertake risky, complex and novel litigation." *In re Flonase*, 291 F.R.D. at 104, *citing Gunter*, 223 F.3d at 198.

As set forth in the Certifications of Cary L. Flitter, Andrew M. Milz, Timothy P. Polishan and M. Scott Barrett, Class Counsel have considerable experience litigating consumer class actions such as this one and are recognized as having expertise in the field. (*See e.g.* Exhibits "6" through "9".). *See e.g. Cosgrove v. Citizens Auto. Fin., Inc.*, 2011 WL 3740809, at *9 (E.D. Pa. Aug. 25, 2011) ("Class counsel [Flitter and Milz] submitted high-quality work to the Court throughout this litigation, and they pursued the case vigorously against able opposing counsel.").

Class Counsel's experience and skill are also evident in the very effective and efficient prosecution of the claims, including the substantial settlement, against well-matched, well-financed opponents. *See In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (recognizing as a "significant factor" the "quality of representation"). Although the Court chose not to issue or publish its ruling, Brennan beat back the attempt by the Bank to pick-off the named Plaintiffs. (Doc. Nos. 27, 29, 32, 35, 36, 43). Counsel fully briefed the New York statute of limitations issues, ultimately persuading the Bank to permit the amendment to the Complaint to add the New York Class (while preserving all defenses for later, if necessary). (Doc Nos. 45, 46, 52, 54). During the pendency of this case, class counsel were successful in securing a reversal in *Cubler*, which then cemented the instant period of limitations in Pennsylvania at six (not two) years. 83 A.2d at 240-

41.[11]  And, counsel were successful in reaching this excellent settlement through mediation, dealing with the difficult issues and delays occasioned by the copycat case, then stewarding this settlement through preliminary approval.  Throughout this case, Community Bank has been represented by highly skilled and experienced attorneys from Bond, Schoeneck & King, PLLC, a prominent New York law firm. These factors militate in favor of approval of the requested fees.

### d.  The complexity and duration of the litigation

Complexity and duration of the litigation is another factor the Court considers in analyzing Class Counsel fees.  *See In re General Motors*, 55 F.3d at 821.   For the reasons discussed in the preceding section, this litigation has not been facile, and it has become only more complicated by the copycat/turned-objector(s).

The resultant Settlement Agreement attained relief which, in the aggregate, arguably exceeds the quantum of relief available at trial in this matter.  The effort to forge a settlement that combined substantial cash <u>and</u> debt forgiveness <u>and</u> credit report correction was not simple and in some ways added a complexity that a "litigation only" approach would not have.

The debt forgiveness also raised income tax issues.  Counsel reviewed arcane tax regulations and IRS private letter rulings and consulted with CPAs to ultimately

---

[11]      Of course, Class Counsel does not seek compensation for any work associated with the *Cubler* matter in the state courts.

conclude that each class members should receive presumptive debt waiver, but have the option to elect out of that relief if they had tax concerns. There was much negotiation with defense counsel and counsel for objectors over this issue, some of which ended up on this Court's doorstep, the Court will recall. The tax issues continue to be argued, now by the objectors. The ample tax considerations and regulations shall be addressed in the Plaintiffs' Response to Objections, which is being submitted concurrently herewith (but separately filed). Nonetheless, analysis of the applicable regulations, court decisions and private letter rulings of the IRS has been and will be required as part of the settlement and final approval process. Class co-counsel, Scott Barrett is a (retired) Certified Public Accountant and tax lawyer whose expertise has proven quite valuable. (*See* Barrett Cert, Exhibit "8" hereto). Class co-counsel, Timothy Polishan denotes a significant portion of his practice to tax disputes and has also provided the Class with value by his specialized expertise.

It is also noteworthy that final approval does not end the complexities (or work) to be faced by Class Counsel. If recent experience is any indication of the post-approval work that is to follow in this case, Class Counsel can expect to deal with a stream of future phone calls and letters from Class Members and their family or lawyers related to: non-receipt or incorrectly addressed checks, credit reporting that had not yet been corrected, judgments that had not yet been satisfied, perhaps ongoing (if rogue) collection efforts, and the like. (*See* Exhibit "6," Flitter Cert. at

¶28, attesting to continued post-approval work in recent case(s)). Assuring the settlement terms are carried out will require additional work and attention. (*See also* Cert. of Timothy Myers*, Exhibit "10" at ¶18).

Moreover, there are objections pending (Doc. Nos. 100 and 120). These objections, while lacking any merit, have required and will require considerable investigation, tax research, briefing and argument in this Court. The ruling on these objections is subject to appeal. *See Devlin v. Scaradelletti*, 536 U.S. 1 (2002). Class Counsel will not make any additional application for fees after Final Approval, whether or not there is an appeal. This factor further supports the fee application, and the reasonableness of the request.

### e. The risk of nonpayment

Class Counsel undertook this action on an entirely contingent fee basis, assuming a substantial risk that counsel would have to devote a significant amount of time and incur expenses in prosecuting this action without any assurance of being compensated for their efforts. Indeed, Class Counsel have not been compensated for any of their time or efforts since this matter was filed in 2013, while expending over $30,000 in costs for filing fees, mediation fees, experts, air travel, depositions and the like. As recognized by this Court, where class counsel incurs thousands of dollars in costs and expenses while facing the risk of not being reimbursed[,] "[t]he

risk of nonpayment, therefore, weighs in favor of granting the requested fee award." *Wallace,* 2015 WL 9268445 at *19.

While Plaintiffs remain confident in the strength of their case, and of their ability to prove damages, this action, indeed all litigation, involves substantial risks and the ultimate outcome cannot be predicted with certainty, especially in a case that in many ways was novel. Accordingly, the risk of non-payment in this case weigh in favor of approving the fees sought in this Motion.

### f.  The amount of time devoted to the litigation

While not seeking fees based upon a lodestar approach, through the filing of this Motion, February 11, 2016, Class Counsel (all three firms) have spent about 1,742 hours (to date) prosecuting this case on behalf of the Class, for an aggregate lodestar of over $895,260.00, and have incurred $30,483.97 in expenses. A table reflecting the time incurred by each firm is set forth below:

| Law Firm | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Flitter Milz, PC | 910.4 | $535 (blended) | $487,260 |
| Kelley, Polishan & Solfanelli, LLC | 331.8 | $359 (blended) | $119,264 |
| Barrett Wylie, LLC | 500.4 | $577 (blended) | $288,736 |
| TOTAL LODESTAR | $895,260 | | |

Among other important tasks associated with this litigation, Class Counsel incurred significant time on: client intake, legal research, background research on defendant, and drafts before filing the Class Complaint; legal research and drafting of the opposition papers to a dispositive motion to dismiss and motion for judgment on the pleadings; drafting supporting brief and motion to dismiss the Bank's deficiency counterclaims; drafting of written discovery requests; reviewing responses to discovery; reviewing, analyzing, and cataloguing thousands of pages of class member documents provided by the Bank; researching and drafting motion to strike the Rule 68 Offer; substantial research and briefing support for Plaintiffs' motion to amend to include the New York plaintiffs and class (and fending off the Bank's statute of limitations arguments in opposition); participating in conferences and hearings before the Court; compiling class data and drafting the motion for class certification and supporting memoranda (unfiled); moving for appointment as interim Class Counsel; engaging in the mediation and settlement discussions, drafting and re-drafting the settlement agreement; dealing with objector counsel and addressing objections; moving for preliminary approval; overseeing appointment of a certified Class Administrator and mailing of notice; requesting and overseeing

limited remailing of Notice; setting up the bank accounts; and moving for final approval and for the award of attorney fees and costs. (*See* Flitter Cert. at ¶27).

In light of the discovery completed, the motion practice and legal briefing, and the extensive work devoted to negotiating and structuring the settlement, and future work (which has, and counsel anticipates will continue to include calls from class members and assorted legwork associated with overseeing administration of the settlement), this factor supports Class Counsels' fee request.

### g. Awards in similar cases

As noted, the value of the settlement here is approximately $21.9 million – $2.8 million in cash, over $16.3 million in debt forgiveness, and valuing the credit repair at an additional $2.8 million. (Sett. Agreement at ¶2.09-2.11).

The $1,092,000 fee award requested in this case is just under 5% of the total value of the relief obtained. The credit repair (and the satisfaction of any outstanding judgments) is quite valuable to the Class Member, as described in the expert report of Thomas Tarter, Exhibit "5" hereto. *See Ciccarone*, 2004 WL 2966932, *9-10 (acknowledging value of credit correction and adding value to settlement for calculation of approved fee).

Even evaluating the $1,092,000 requested fee as a percentage of the $2.8 million cash fund alone – which does not adequately evaluate the extent of the settlement value – reveals a percentage of 39%. This is still well within the range of

reasonable fees requested and awarded by courts in this Circuit. *See Cendant*, 243
F. 3d at 736 (fee awards range from 19% to 45%); *accord Cosgrove v. Citizens Auto,*
2011 WL 3740809, *8-9.

The 5% of the aggregate relief (or 39% of the cash) is indeed less than Class
Counsel fee awards sought and approved in similar class cases involving improper
repossession practices. *See e.g. Cosgrove,* 2011 WL 3740809, *8-9 (approving fees
at 11.7% of aggregate relief; 43% of cash); *McCall v. Drive Fin.*, 2010 WL 4150875
(Phila. CCP July 21, 2010) (7% of aggregate relief, 42.5% of cash); *Cubler v.
Trumark Fin. Credit Union*, C.C.P. Phila. No. 120401800 (final approval dated July
14, 2015) (16% of aggregate relief, 40% of cash).

A comparison of the fee sought here with fees awarded in recent class actions
militates strongly in favor of granting the Fee Petition. All the *Gunter* factors are
clearly satisfied; the request for fees should be granted.

3. Lodestar Cross-Check Confirms the Reasonableness of the
   Requested Fee

While the percentage of the fund approach is preferred especially in class
actions that do not arise under fee-shifting statutes, the Court of Appeals has
recommended that district courts employ a lodestar cross-check. *Rite Aid,* 396 F.3d
at 305-06. This compares Class Counsel's billings on an hourly basis for time
expended (lodestar) against the fee as computed on a percentage basis. Lodestar

"multipliers ranging from one to four are frequently awarded in common fund cases employing the lodestar method." *Perry,* 227 F.R.D. at 122.

The Third Circuit has instructed that "the lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid*, 396 F.3d at 306-07. Moreover, the "lodestar cross-check is 'not a full-blown lodestar inquiry' and a court 'should be satisfied with a summary of the hours expended by all counsel at various stages with less detailed breakdown than would be required in a lodestar jurisdiction.'" *Id.* (quoting *Report of the Third Circuit Task Force, Selection of Class Counsel*, 208 F.R.D. 340, 423 (2002)).

Following the requirements of the Third Circuit articulated in *Rite Aid,* Plaintiffs set forth a summary of the tasks involved in this litigation in Subsection D.2.f. above.[12] (*See also* Flitter Cert., Exhibit "6" at ¶27). A summary of the hourly rates employing the fee structures of all the attorneys and staff working on the case is listed below, which yields a lodestar of $895,260.00.

**Flitter Milz, P.C.**

| Lawyer | Hours | Hourly Rate | Amount |
|---|---|---|---|
| Cary L. Flitter | 590 hours | $645.00 | $380,550.00 |
| Andrew M. Milz | 258.50 hours | $345.00 | $89,182.50 |

---

[12]  Although the Court of Appeals jurisprudence calls for summaries, counsel's detailed timesheets can certainly be made available to the Court, if requested.

| | | | |
|---|---|---|---|
| Theodore E. Lorenz | 18.50 hours | $490.00 | $9,065.00 |
| Joseph Mullaney (contract attorney for doc review) | 13.25 hours | $195.00 | $2,583.75 |
| Joan M. Raughley | 30.15 hours | $195.00 | $5,879.25 |
| **LODESTAR TO DATE** | | | **$487,260.25** |

(Flitter Cert., Exhibit "6" at ¶26).

### Kelley, Polishan & Solfanelli, LLC

| **Lawyer** | **Hours** | **Hourly Rate** | **Amount** |
|---|---|---|---|
| Timothy Polishan | 299.40 hours | $366.00 | $109,580.40 |
| Eugene Kelley | 8.50 hours | $366.00 | $ 3,111.00 |
| Patrick Walsh | 23.90 hours | $275.00 | $ 6,572.50 |
| **LODESTAR TO DATE** | | | **$119,263.90** |

(Polishan Cert., Exhibit "9" at ¶4).

### Barrett Wylie, LLC

| **Lawyer** | **Hours** | **Hourly Rate** | **Amount** |
|---|---|---|---|
| M. Scott Barrett | 456.7 hours | $615.00 | $280,870.50 |
| Rachel M. Johnson | 43.7 hours | $180.00 | $7,866.00 |
| **LODESTAR TO DATE** | | | **$288,736.50** |

(Barrett Cert., Exhibit "8" at ¶12).

| **TOTAL LODESTAR FOR ALL FIRMS** | **$895,260** |
|---|---|

At $1,092,000 in fees requested, this results in a modest multiplier of about 1.2 – before accounting for future services in administration, check and payment issues, class member and administrator issues involving address and check payees, credit report correction, lingering credit reporting issues that impede future credit granting to class members, lingering or even rogue collection efforts by collectors unaware of the settlement, addressing the (mostly New York) state court collection cases that need to be shepherded to conclusion or judgments satisfied. Nor does this account for any ongoing work over the objections or any appeal to the Court of Appeals. This added time, while admittedly hard to quantify in advance, will increase the lodestar and depress or eliminate any multiplier. The 1.2 multiplier is far lower than the multiplier of 3.0 articulated by the Third Circuit as reasonable in *In re Cendant*, 243 F.3d at 734. An examination of approved multipliers reveals that the multiplier requested here is well within the appropriate range for approval. *See, e.g.*, *Perry,* 229 F.R.D. at 122-23 (approving 1.5 multiplier and recognizing 3d Circuit standard range of one to four); *Wallace v. Powell*, 2015 WL 9268445, at *20 (Judge Caputo approving multiplier of 1.34); *Cosgrove*, 2011 WL 3740809 (Judge Schiller approving multiplier of 2.14 in UCC repo notice class case).

To further inform the Court's application of the lodestar cross check, Class Counsel have included evidence of the reasonableness of their billing rates to calculate their lodestars in this matter. In particular, Class Counsel have filed

herewith their own certifications (Exhibits "6" through "9").   In addition, Plaintiffs offer the Certification of Timothy Myers, an experienced class practitioner with 30 years' experience in class action matters and attorney fee billing rates in this market. Mr. Myers attests that Flitter Milz's requested rates are in keeping with those commonly charged by experienced commercial litigation counsel and staff with commensurate experience at the bar.  (See Myers Cert., Exhibit "10" at ¶¶12-18).

Plaintiffs further offer in support of counsel's rates the Community Legal Services (CLS) fee schedule dated September 12, 2014.  (See Exhibit "11" hereto, also available at: http://clsphila.org/about-cls/attorney-fees).  Judge Caputo recently relied on the CLS fee schedule in awarding counsel fees at 2015 rates of $635 for Mr. Flitter and $325 for Mr. Milz.  *Richards v. Client Servs., Inc.*, 2015 WL 5836274, at *3 (M.D. Pa. Oct. 5, 2015) (noting Flitter's "extensive experience" in consumer class actions).   Mr. Milz's rate of $345 is slightly higher than the range for attorneys with 6-10 years' experience ($265 to $335) but his specialized experience and scholarly authorship warrants it.  (*See id*.).  Mr. Flitter's rate of $645 is consistent with rates for counsel with 25 plus years' experience ($600-$650). (Id.).  Mr. Polishan's rate of $366 is appropriate for his 20 plus years, and Mr. Barrett's rate of $615 is appropriate for his 30 plus years' experience.  (Id.).  While the CLS fee schedule is more than a year old, does not account for specialization in a particular field, and is but one measure of hourly rate, the CLS fee schedule "has

been approvingly cited by the Third Circuit as being well developed and … a fair reflection of the prevailing market rates in Philadelphia." *Maldonado v. Houstoun*, 256 F. 3d 181, 187 (3d Cir. 2001) (internal citations omitted).  But the CLS schedule is only a guide and other factors such as specialized expertise in a niche area of practice, authorship, faculty appointments and prominence at the bar may and should also be considered.

Finally, Plaintiffs offer the January 13, 2014 market rate survey by the respected *National Law Journal*.

See http://www.nationallawjournal.com/id=1202636785489 (last visited Jan. 25, 2016).[13]  As set forth in the *NLJ* Survey, Mr. Milz's rate of $345 an hour is lower than the "low" partner or "average" associate rates charged by the surveyed Philadelphia area firms.  (*See id.* at entries for Blank Rome, Pepper Hamilton, Stevens & Lee, Duane Morris, Morgan Lewis reporting "average" associate rates greater than $350 and "low" partner rates at $430 and above).  Mr. Flitter's requested rate of $645 comports with the "average" partner rates at these local firms (which list "high" partner rates ranging from $700 to over $900).  Mr. Polishan's rate of $366 and Mr. Barrett's rate of $615 comport with these averages as well.  It bears

---

[13]    The *National Law Journal* Survey was cited approvingly in a fee award in *Harlan v. NRA Group, LLC*, 2011 WL 813961 (E.D. Pa. Mar. 2, 2011) (Rufe, J.) where the instant counsel (Mr. Milz & Mr. Flitter) were awarded their 2011 rates on contest.

note that this *NLJ* Survey reflects rates from two years ago. For all the reasons set forth above, and in the attached certifications, the rates sought by class counsel here are reasonable and adequate.

Class Counsel recognizes that this case proceeds in the Middle District of Pennsylvania and not the Eastern (or other) District where hourly rates of counsel are generally higher. But this case raised an unusual claim (under Article 9 of the UCC) in a class action setting covering two states, with many arcane procedural and substantive issues. There is a very thin "class action bar" in the district and certainly no previous repossession class actions in this court have been prosecuted to certification or class settlement in this court. Mr. Polishan testifies that he sought the special expertise of out-of-district counsel here in this case. (*See* Exhibit "9," Polishan Cert. at ¶ 13). In such circumstances, it is appropriate to utilize the rates from Class Counsel's home district. This is exactly what Judge Caputo found in *Richards v. Clients Services*, *supra*., approving the Flitter Milz firm's (E.D. Pa.) rates for class settlement.[14]

The requested fees (i) have not met with any objection from a Class Member, (ii) satisfy all the *Gunter* factors, (iii) comport with market measures for typical contingent fee representation, (iv) reflect a lodestar multiplier that is well within the

---

[14] Arguably, the reliance of counsel's home forum rates is even less significant here as the rates are only utilized for the lodestar cross-check (not a statutory fee) and the lodestar multiplier is modest in either case.

range of multipliers typically approved by courts in the Third Circuit, and (v) reflect the high level of success achieved. Accordingly, Class Counsel respectfully submit that this Fee Petition should be approved, and fees awarded from the common fund in the sum of $1,092,000.

### 4. Reimbursement of Class Counsel's Expenses

It is axiomatic that counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case. *Craig v. Rite Aid Corp.*, 2013 WL 84928 *11 (M.D. Pa. Jan. 7, 2013).

Class Counsel, in the prosecution of this case, expended a total of $30,483.97 in costs. The bulk of the expense ($23,736.17) was incurred by the Flitter Milz firm, as summarized in the Flitter Certification. (*See* Flitter Cert., Exhibit "6" at ¶29). Plaintiffs employed the services of two experts in this matter: Thomas Tarter, an expert in consumer finance and consumer credit (Mr. Tarter's CV is appended to his expert report, Exhibit "5" hereto), and David Glusman, CPA, who rendered an expert opinion regarding the tax implications of the settlement relief. (*See* Exhibit "12," Glusman Report complete with Mr. Glusman's CV). Other expenses included costs for the mediation at JAMS, drafting of class notice by Kinsella Media, document copying, court fees, and travel expenses. (Exhibit "6", Flitter Cert. at ¶29). Barrett Wylie incurred $5,535.48 in costs for travel, copies, mailing and deposition fees.

(Exhibit "8," Barrett Cert. at ¶13). Kelley, Polishan incurred $1,212.32 in travel, UPS and court reporter transcription services. (Exhibit "9," Polishan Cert. at ¶13).

These expenses were critical to Class Counsel's success in achieving the settlement and were reasonable. While actual costs far exceed the amount sought here, Counsel has agreed to cap its costs request at $20,000. Class Counsel's application for reimbursement of these expenses should, therefore, be granted.

## V.    **CONCLUSION**

For the reasons detailed herein, Plaintiffs, Carol A. Brennan, Courtney Bellomo and Anthony Colino respectfully request that this Court grant their Motion for Final Approval and for the Award of Attorneys' Fees and Expenses.

Respectfully submitted:

Date:  2/11/16

/s/ Cary L. Flitter
CARY L. FLITTER
Counsel for Plaintiffs and the Class

| | | |
|---|---|---|
| Cary L. Flitter | Timothy Polishan | M. Scott Barrett |
| Andrew M. Milz | Eugene C. Kelley | BARRETT WYLIE, LLC |
| FLITTER MILZ, P.C. | KELLEY POLISHAN & | 320 West 8th Street |
| 450 N. Narberth Ave. | SOLFANELLI, LLC | Suite 100 |
| Suite 101 | 259 South Keyser Ave. | P.O. Box 5233 |
| Narberth, PA 19072 | Old Forge, Pa 18518 | Bloomington, IN 47407 |
| (610) 822-0782 | (570) 562-4520 | (812) 334-2600 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL A. BRENNAN, ANTHONY COLINO, and COURTNEY BELLOMO, individually and on behalf of all others similarly situated,<br><div align="right">Plaintiffs,</div><br><div align="center">vs.</div><br>COMMUNITY BANK, N.A.<br><div align="right">Defendant.</div> | NO. 13-CV-02939<br><br><br>JUDGE MANNION<br><br><br>CLASS ACTION |

## <u>CERTIFICATE OF SERVICE</u>

I, CARY L. FLITTER, hereby certify that a copy of Plaintiffs' Memorandum in Support of Motion for Final Approval of Class Settlement and for the Award of Attorneys' Fees and Expenses has been electronically filed with the Clerk of Court using the CM/ECF system, which sent notification of such filing to:

<div align="center">

Jonathan B. Fellows, Esquire
Suzanne O. Galbato, Esquire
BOND, SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, NY 13202

Jane T. Smedley, Esquire
Joseph E. Kluger, Esquire
HOURIGAN, KLUGER & QUINN, P.C.
600 Third Avenue
Kingston, PA 18704

**Attorneys for Defendant**

</div>

Richard Shenkan, Esquire
SHENKAN INJURY LAWYERS
6550 Lakeshore Drive
West Bloomfield, MI 48323

Howard A. Rothenberg, Esquire
345 Wyoming Avenue, Suite 210
Scranton, PA 18503

**Attorneys for Objectors**


Date: 2/11/16              */s/ Cary L. Flitter*
                                  CARY L. FLITTER


Said document is available for viewing and downloading from the ECF system.


Date: 2/11/16              */s/ Cary L. Flitter*
                                  CARY L. FLITTER


## CERTIFICATE OF CONCURRENCE


I hereby certify that I sought concurrence of Defendant Community Bank, NA, and the Defendant concurs with the relief sought in Plaintiffs' Motion for Final Approval.



Date: 2/11/16              */s/ Cary L. Flitter*
                                  CARY L. FLITTER

## **LOC. RULE 7.8(b) CERTIFICATION**

     I hereby certify that the foregoing brief, at 11,788 words, exceeds 5000 words. Plaintiffs have sought leave to file a brief in excess of the local word limits.


Date:  2/11/16                                    */s/ Cary L. Flitter*_____
                                                                  CARY L. FLITTER