# EXHIBIT "12"



**MARCUM**
ACCOUNTANTS & ADVISORS

February 11, 2016

Cary L. Flitter, Esquire
Flitter Milz, P.C.
450 N. Narberth Ave., Suite 101
Narberth, PA 19072

Timothy P. Polishan, Esquire
Kelley, Polishan & Solfanelli, LLC
259 South Keyser Avenue
Old Forge, PA 18518

M. Scott Barrett, Esquire
Barrett Wylie, LLC
320 West 8th St, Suite 100 (47404)
P.O. Box 5233
Bloomington, Indiana 47407-5233

**Re:**  ***Objection of Nicole Urban and other Objectors to***
***Approval of Class Settlement***
U.S. District Court for the Middle District of
Pennsylvania – Civil action No. 13-CV-02939-MEM

Dear Messrs. Flitter, Polishan and Barrett:

In your capacity as counsel for the Plaintiff Class, Flitter Milz, P.C., Kelley, Polishan & Solfanelli,
LLC and Barrett Wyle, LLC ("Counsel"), have retained Marcum LLP ("Marcum") to determine
if Community Bank has an obligation to issue Form 1099-C for the Cancellation of Debt (COD)
in connection with the settlement of the above referenced matter. I have reviewed the amended
class action Settlement Agreement and Release, dated March 15, 2015 in the matter Brennan v.
Community Bank, N.A. Docket No. 13-CV-2939 and the expert affidavits of John J. McGovern,
Jr.



MARCUM GROUP
MEMBER

Marcum LLP

Bala Cynwyd □ 3 Bala Plaza East □ Suite 700 □ Bala Cynwyd, Pennsylvania 19004-3492 □ Phone 484.270.2500 □ Fax 484.270.2501
Philadelphia □ 1600 Market Street □ 32nd Floor □ Philadelphia, Pennsylvania 19103 □ Phone 215.297.2100 □ Fax 215.297.2101
King of Prussia □ 455 South Gulph Road □ Suite 306 □ King of Prussia, Pennsylvania 19406 □ Phone 610.268.6300 □ Fax
610.268.6301
www.marcumllp.com

Cary L. Flitter, Esquire
Timothy P. Polishan, Esquire
M. Scott Barrett, Esquire
February 11, 2016
Page 2

I have attached my Curriculum Vitae to this report as Appendix A, setting forth my professional experience, articles authored and presentations made. My opinions are based on my experience as a Certified Public Accountant, including having provided accounting and forensic accounting services to clients in the automobile dealership business. I have identified the documents considered in Appendix B. I reserve the right to amend or alter my opinions should additional or different information become available.

Neither I nor Marcum LLP has any present or contemplated financial interest in any of the parties to this litigation. Marcum's fees for this engagement are based on the firm's regular hourly billing rates and are in no way contingent on the outcome of the analyses or the case. I have no responsibility to update this report for any events or circumstances arising after the date of this report, but I reserve the right to do so if requested.

## BACKGROUND

Flitter Milz, P.C. Kelley, Polishan & Solfanelli, LLC and Barrett Wyle, LLC represent The Plaintiff Class ("The Class") in litigation against Community Bank. The Class has challenged the commercial reason of the repossession and disposition of their vehicles. As part of the proposed resolution of the litigation, the financial institution agrees to waive the unpaid Deficiency Balance of the debtor and intends to issue a Form1099-C to the debtors (Plaintiffs) for the amount of the COD. The Amended Class Action Settlement Agreement waives the account balance (Deficiency Balance) remaining after the proceeds from repossession and disposition of the Member's vehicle.

The amount to be reflected as COD on Form 1099-C shall be the Deficiency Balance. Deficiency Balance is defined as the principal balance shown as due on the books of Community Bank (excluding repossession and auction expenses, interest or ancillary charges) as of the business day prior to the date of the auction, less (a) auction proceeds and (b) payments made on account by any Member post-auction.

As stated in the Settlement Agreement the plaintiffs and the members dispute the commercial reasonableness of Defendant's repossession practices including the legality of the repossession notice. The amount of underlying consumer debt included in the Deficiency Balance is not in dispute, so far as the bank is concerned. While the Settlement Agreement is the culmination of negotiation, and the Deficiency Balance is the balances of the Class Members consumer debt, Community Bank's position is that cancelled debt must be reported on Form 1099-C in accordance with IRS regulations and in particular Treasury Regulation 1.6050P-1. (see Exhibit A)

John J. McGovern, Jr. ("Mr. McGovern") submitted an affidavit dated September 12, 2015 that is a supplement to his affidavit dated January 27, 2015. Mr. McGovern reviewed the amended Class Action Settlement Agreement and release, and its exhibits filed, as well as the class Notices received by the Objectors.

Mr. McGovern claims that a 1099-C is not required because the Deficiency Balance is a disputed debt. Mr. McGovern further contends that if the Bank sends 1099-C for the allegedly discharged debt, class members will be forced to either pay taxes or at a great expense to themselves, have to

Cary L. Flitter, Esquire
Timothy P. Polishan, Esquire
M. Scott Barrett, Esquire
February 11, 2016
Page 3

defend this issue with the IRS. Mr. McGovern states that the Bank should not issue 1099-C forms for any class member in respect to his/her deficiency waiver, as he/she has no tax liability because the settlement agreement has reduced the amount of the disputed debt to zero, *Zarin*. [1] There was no basis provided for that opinion.

OPINION

Based upon our review of the identified documentation and analyses performed, I offer the following opinions to a reasonable degree of professional certainty as a Certified Public Accountant:

- All Members with a Deficiency Balance had COD as indicated in the settlement agreement since the debt was fixed and determinable. The Deficiency Balances cancelled were the Plaintiff's account balances remaining after applying the auction proceeds from repossession. The 1099-C to be issued is for the amount of the unpaid principal balance of the loans.

- This settlement agreement is an identifying event under IRS Regulation §1.6050P-1(b)(2)(i)(F).

- The Private Letter Rulings (PLR's) issued by the IRS and the IRS regulations under IRC §6050 P require the bank to issue 1099-Cs for the COD.

- Private Letter Rulings (PLRs) are valuable reference materials that tax practitioners rely on to discern the IRS's view on a particular issue in order to advise their clients. From that perspective it is of no consequence that a PLR has no precedential value. The IRS's clearly stated position in the 2012 and 2013 PLRs is that the COD found in the Settlement Agreement is an identifiable event under Treas Reg. § l.6050P-l (b)(2)(i)(F) that triggers the Form 1099-C reporting requirement.

- The *Zarin* case cited by Mr. McGovern in support of his opinion was a matter wherein the underlying debt was not determinable. The *Zarin* decision is not consistent with the fact pattern in this matter where the Community Bank debt was determinable.

- The issuance of the information Form 1099-C does not control whether the COD is taxable or not. Further, each taxpayer's situation is different and they should consider all their facts and circumstances to determine if the COD is taxable to them. COD income must be considered by a taxpayer whether or not a 1099-C is filed.

- Mr. McGovern also states that the Class Members respective duties would incur great expense to dispute the discharged debt issue. The issuance of the 1099-C is based on the

---

[1] *Zarin v. Commissioner*, 916 F. 2nd 110, 115 (3d Cir. 1990) (Copy attached as Exhibit B).

Cary L. Flitter, Esquire
Timothy P. Polishan, Esquire
M. Scott Barrett, Esquire
February 11, 2016
Page 4

     IRS's tax rules and regulations and is independent from the Class Member duties for tax compliance.

- Mr. McGovern concludes his affidavit by saying the 1099-C should not be issued by the Bank since no tax liabilities exist for the Member. The filing requirement for 1099-C is independent from tax liability. The IRS Regulations say that discharged indebtedness must be reported on Form 1099-C regardless of whether the debtor is subject to tax on the discharged debt. The issuer of the 1099-C, the Bank, has no ability to determine whether any given member of the Class (individually) will or will not have an ultimate tax liability.

## FINDINGS

A financial institution described in IRC section 581 or 591(a) (such as a domestic bank, trust company, building and loan or savings, loan association and a credit union) which discharges (in whole or in part) the indebtedness of any person during any calendar year generally is required to file form 1099-C with the Internal Revenue Service if the discharge amount is $600 or more. [2]

Indebtedness means any amount owed to the financial institution, including stated principal, fees, stated interest, penalties, administrative costs and fines. The amount of indebtedness discharged may represent all, or only a part, of the total amount owed to the applicable entity. [3]

Indebtedness is considered discharged, and reporting is required under IRC section 6050P, on the occurrence of certain identifiable events. The supporting Regulations provide an exclusive list of eight (8) identifiable events for purposes of the reporting requirement for debt discharges. Regulation 1.6050P-1(b)(2)(i)(F) was used in our current fact pattern to determine if an "identifiable event" occurred. [4]

- (F) a cancellation or extinguishment of an indebtedness under an agreement between the applicable entity and a debtor to discharge an indebtedness at less than full consideration.

The IRS Regulations §1.6050P-1(a)(3) state that discharged indebtedness must be reported regardless of whether the debtor is subject to tax on the discharged debt under sections 61 and 108 or otherwise. Section 108 addresses the insolvency rules.[5]

This issue was addressed in IRS Letter Ruling 201217001 (Apr. 27, 2012). (Copy attached as Exhibit D.) The IRS held that the agreement *was* an identifiable event described in the IRS Regulation 1.6050P-1(b)(2)(i)(F), triggering the reporting requirement, because the financial institution and the debtor-class members agreed to discharge the indebtedness for less than full consideration as part of the settlement agreement.

---

[2] 6050P(c)(1)(2) – see Exhibit C
[3] Reg 1.6050P-1(c) – see Exhibit A
[4] Reg 1.6050P-1(b)(2)(i)(F) ) – see Exhibit A
[5] Reg. 1.6050P-1(a)(3) Exhibit A

Cary L. Flitter, Esquire
Timothy P. Polishan, Esquire
M. Scott Barrett, Esquire
February 11, 2016
Page 5

The IRS also addressed the issue in Letter Ruling 201408001 (Feb. 21, 2014). (Copy attached as
Exhibit E.)Where parties entered into a settlement agreement regarding the write-off of balances
and charges, the IRS ruled that the agreement was an identifiable event. Though the terms of the
agreement were incorporated into a final court order, the voluntary discharge of the debt was not
converted into one forced by operation of state law. Therefore, the IRS stated the Bank was
required to file Form 1099-C.

## MCGOVERN REPORT AND MARCUM REBUTTAL

The McGovern report cites *Zarin* to support the non-filing of the 1099-C's to the Members. Mr.
McGovern has misapplied the facts of the Community Bank settlement to the *Zarin* case. The debt
in the settlement agreement is not disputed as was the debt in *Zarin*. The following paragraph
explains the difference and why Mr. McGovern's methodology and application of *Zarin* to the
Community Bank settlement is wrong.

The reduction or cancellation of indebtedness generally results in COD income to the debtor.
However if a taxpayer, in good faith, disputes the amount of a debt, a later settlement of the dispute
is treated as the amount of debt for income tax purposes. Under these circumstances, the settlement
doesn't give rise to COD income. However, "disputed debt" applies only to debt that isn't certain
and where the dispute centers on the debt's validity or enforceability. Taxpayers' debt isn't
"disputed" where they merely contest the amount of interest charged and never challenged the
original amount of the debt.[6] The origin of allegations against the Bank stem from its repossession
practice not the underlying debt. The Deficiency Balance is not a disputed debt. Therefore, the
McGovern report is incorrect that 1099-C's should not be remitted. The Internal Revenue Service
requires 1099-C's to be remitted where COD is $600 or more and an identifiable event occurs.

The bank's settlement agreement with the debtors is an identifiable event under Reg. 1.6050P-
1(b)(2)(i)(F), which provides that an identifiable event exists when the applicable financial entity
and debtor agree to discharge the indebtedness for less than full consideration. To establish
consideration, there must be a performance or a return promised which has been bargained for by
the parties. This is the scenario the bank and the debtor-class members agreed to by accepting the
settlement as the satisfaction of any remaining debts owed to the bank for the vehicle loans and
related fees. The parties did agree to accept an amount less than full consideration. This is, on its
face, an identifiable event described in subsection (F) of the regulations.

Tax return preparers and the individual members of the Class will need to determine the
appropriate applicability of the law, possibly including the completion of IRS Form 982, when
providing tax return preparation services. The preparation of Form 982 is routine for any
competent professional tax return preparer and class members that are insolvent who would, and
probably should in appropriate circumstances, file this form eliminating, in whole or in part, the
ultimate taxability of the debt forgiveness.

---

[6] Exchange Security Bank v. U.S., (1972, DC AL) – Exhibit F

Cary L. Flitter, Esquire
Timothy P. Polishan, Esquire
M. Scott Barrett, Esquire
February 11, 2016
Page 6


## CONCLUSION

As set forth above, the fact pattern and the research cited above establish that the Plaintiffs were not protected under the contested liability doctrine and thus, the Bank is required to file form 1099-C to the Member debt holders.  Counsel for the Plaintiff Class claim, effectively that the Member debt holders had forgiveness of debt as indicated in the settlement agreement. Further, this settlement agreement is an identifying event under IRC Regulation 1.6050P- 1(b)(2)(i)(F). The *Zarin* case, as cited by John J. McGovern, Jr., does not fit within the fact pattern in this matter where the debt is not in dispute and as a result the Bank is not relieved of its statutory obligation to file 1099-C under the contested liability doctrine cited in Zarin. Therefore, Zarin is not applicable in determining that 1099-Cs do not have to be filed by the Bank in 2016 based on the settlement agreement. The PLR's and the IRS Regulations under IRC §1.6050.P require the bank to issue 1099-C for the cancelled debt.

Accordingly, based on facts and circumstances known to me in this case, as well as the terms of the settlement agreement, it is my opinion to a reasonable degree of professional certainty that Community Bank is justified in remitting 1099-C forms to all members of the Plaintiff Class who had a Deficiency Balance cancelled.  Indeed, if I were advising Community Bank on this matter, I would advise it to remit 1099-C forms to all members of the Plaintiff Class who had a Deficiency Balance cancelled.

I hold all opinions stated in this report to a reasonable degree of professional certainty.

Very truly yours,

Marcum LLP

David H. Glusman, CPA/CFF, DABFA, CFS

DHG: sbs

Appendix A

## DAVID H. GLUSMAN, CPA/CFF, DABFA, CFS
### *Curriculum Vitae*

**Business:**

> Partner
> Marcum LLP
> 3 Bala Plaza East Suite 700
> Bala Cynwyd, PA 19004
> 484.270.2700
> david.glusman@marcumllp.com

> Healthcare Services Group
> Partner in Charge – Philadelphia region (2009-2014)
> Modern Family & LGBT Services Practice Group

**Education:**

> Pennsylvania State University, B.S. Accounting, June 1971

**CPA Certification:**

> Commonwealth of Pennsylvania, Certificate Number CA-010029-L
> State of New Jersey, Certificate Number 20CC01804100
> State of Connecticut, Certificate Number CPAC 0054291 OUT

**Professional Associations:**

> American Institute of Certified Public Accountants, Member, (1974 to present)
>    Communications Council (1986-1988)
> Pennsylvania Institute of Certified Public Accountants, Member
>    Speaker's Bureau of the Philadelphia Chapter, Chairman (1979-1982);
>    Committee on Public Service, State Society, Member (1983-1986);
>    Committee on Public Service, State Society, Chairman (1986-1988);
>    Executive Committee Philadelphia Chapter, Member (1984);
>    Distinguished Public Service Award Committee, Chairman (1984-1985);
>    Committee on Forensic and Litigation Services, Member (1992-Present); Chairman
>    (1998 – present)
>    Conference on Forensic and Litigation Services, Chairman 1993;
>    Members Consultation Service Committee, Member 1993-1994;
> American Society of Appraisers
> Association of Certified Fraud Specialists, Certified Fraud Specialist
> BKR International – Chair Forensic & Litigation Support Committee (2005- 2009)
> Institute of Business Appraisers
> American Health Lawyers Association

**Curriculum Vitae**
**David H. Glusman, CPA**
**Page 2**

Delaware Valley Healthcare Council

Medical Group Management Association

The American College of Forensic Examiners, Diplomat, Certified Forensic Accountant (Cr. FA) Member  - Editorial Advisory Board – *The Forensic Examiner* (2006- ) Member, American Board of Forensic Accounting within the American College of Forensic Examiners Institute (2007-2008 term).

Editorial Advisory Board, Harcourt Brace's *The Health Niche Advisor,* Member – (1987 – 2000)

Practice Development Institute - Editorial Board

*Litigation Support News Letter* - Editorial Board

**Publications and Presentations:**

October 2006 – *Accountants' Roles and Responsibilities in Estates and Trusts* (formerly titled *Fiduciary Duties and Liabilities: Tax and Trust Accountant's Guide*, with Gabriel Ciociola, JD, CCH press (additional editions 2008-2009-2010-2011)

July 2007 - **Fraud Casebook Lessons from the Bad Side of Business** (The Trusting Business Owner, Chapter 13), published by John Wiley & Sons 2007 by the Association of Certified Fraud Examiners, Inc.

March 2005, *Understanding Changes in Office Costs*, Physician's News Digest

April 2005, *Financial Statements for Lawyers,* Unisys office of General Counsel, CLE, with David A. Anderson, CPA, MBA, MSE.

May 2005, *Financial Statements for Lawyers,* Cozen O'Connor, Continuing Legal Education Program, With Robert Salvitti, CPA.

August 2005, *Economic Considerations of Medical Practice*, Hospital of the University of Pennsylvania, Division of Plastic and Reconstructive Surgery.

September, 2005, *Physician Practice Accounts Receivable Management Issues,* Margolis & Company Healthcare Roundtable Meeting, with Larry S. Simon, CPA.

September, 2005, University of Pennsylvania Preceptorship - *Embryonic Stem Cells, issues of Science, Money, Morals and Government*, with Patricia A. Labosky, PhD.

October, 2005, *Entity vs. Personal Goodwill,* Pennsylvania Institute of Certified Public Accountants 2005 Divorce Conference, with Leon I. Butler, CPA, R. Victor Haas, Jr., ASA, CPA, David N. Hofstein, Esquire

October, 2005, *How to find Assets, Income and Fraud,* Pennsylvania Institute of Certified Public Accountants 2005 Divorce Conference, with The Honorable Rhonda Lee Daniele, Saul Levit, Esquire and Gary L. Ziffer, CPA, ABA.

November 2005, *Circular 230*, The Weidner University MBA Program, Visiting Lecturer for Professor Sandra Miller.

November 2005, *Administrative Issues Impacting Malpractice Claims Being Filed*, with Ruth Wessel, Esquire, Margolis & Company Healthcare Administrators Roundtable.

February 2006, *An Overview of Business Valuation Uses and Methodologies and Forensic Accounting Issues*, James E. Beasley School of Law, Temple University, Lecture by Invitation.

Curriculum Vitae
David H. Glusman, CPA
Page 3

March 2006, *Trouble at the Top*, Pennsylvania CPA Journal, Spring 2006.

October, 2006, *Estate and Trust Issues* Pennsylvania Institute of Certified Public Accountants 2006 Divorce Conference, with Mark S. Blaskey, CPA, JD and David N. Hofstein, JD

October 2006, *Reading and Understanding Financial Statements*, Continuing Legal Education, Law Offices of Neal Jacobs, with Arthur Scherr, CPA

November 2006, *Reading and Understanding Financial Statements*, Continuing Legal Education, Zarwin, Baum, DeVito, Kaplan, Schaer, Toddy, P.C with Joseph DeSimone, CPA

November 2006, *Spoliation; Attorney's Perspective, Accountants' Issues*, with William K. Pelosi, Esq. and Gary M. Samms, Esq., Pennsylvania Institute of Certified Public Accountants 2006 Litigation and Forensic Services Conference.

February 2007, *An Overview of Business Valuation Uses and Methodologies and Forensic Accounting Issues*, James E. Beasley School of Law, Temple University, Lecture by Invitation.

April 2007, *Why Use a Forensic Accountant*, Family Advocate – American Bar Association Section of Family Law, Spring 2007.

June 2007, *Adding a Non-Physician Practitioner to Your Team's Roster*; Practice Pulse

September 2007, *Stop the Ride I Want to Get Off*; Practice Pulse

November 2007, *Analysis of a Fraud; Philadelphia Seaport Museum Fraud by John S. Carter*; Pennsylvania Institute of CPAs Fraud educational conference.

November 2007, *Analysis of Assets Available for Equitable Distribution – the Discovery Process,* Pennsylvania Institute of Certified Public Accountants 2007 Divorce Conference, with Mitchell Benson, CPA

December 2007, *Advanced Spoliation*, with William Antheil, Esquire and William MacMinn, Esquire, Pennsylvania Institute of Certified Public Accountants 2007 Litigation and Forensic Services Conference

April 2008, *How to Prevent Theft and Fraud in Your Office*, Delaware, Montgomery and Philadelphia County Medical Societies, PA Chapter of the American College of Physicians and Delaware County Chapter – Professional Association of Health Care Management Combined Annual Meeting

June 2008, *The Deal Gone Bad; The Case of Internet Video Systems*. The Legal Write, Spring-Summer 2008

October 2008, PICPA Divorce Conference, *Interesting Experiences* with Robert J. Grossman, CPA/ABV, ASA, CVA, CBA and Lee S. Lawrence CPA, CMA, CIA

November 2008, *The Changing Landscape for Physician Compensation Plans*, Practice Pulse, Fall 2008.

February 2009, *Reading and Understanding Financial Statements*, The James E. Beasley School of Law, Temple University, Adjunct Faculty – Planning for the Family that Owns and Operates a Business, LLM Program. (repeated by invitation February 2010)

May 2009 - Moderator - Electronic Health Records Roundtable - Margolis & Company P.C.

**Curriculum Vitae**
**David H. Glusman, CPA**
**Page 4**

June 2009 - *Accounting Issues and Due Diligence in Merger Opportunities*; Pennsylvania Bar Institute, with Joseph L. DeSimone, CPA, CVA

October 2009, Pennsylvania Institute of CPAs Annual Divorce Conference, *Finding Fraud and the Next Steps* with Levi S. Wolf, Esquire and Robert Brennan, CPA

November 2009, Pennsylvania Institute of CPAs Annual Forensic and litigation Services Conference, *Marketing Your Forensic Practice*, with Charles S. Lunden, CPA, John E. Mitchell, CPA and Lisa A. Myers, CPA

December 2009 *The Role of the Fiduciary in the Estate and Trust Arena* By Stephen Lassar, CPA, JD and David H. Glusman, CPA *The Legal Intelligencer* - December 07, 2009

October 2010, Pennsylvania Institute of CPAs Annual Divorce Conference Forensic *Review of Client Accounts*, with David N. Hofstein, Esquire, David Ladov, Esquire and David Kaplan, CPA, JD

November 2010 Pennsylvania Institute of CPAs Annual Forensic Accounting Conference, *Forensic Accounting Boot Camp* with Michael Molder, CPA, JD, CFF, CFA, and Eric Milby, Esquire

February 2011 Pennsylvania Institute of CPAs Forensic and Litigation Committee meeting, CPE: *Litigation Support: Moving from Accountant to Expert Witness (Analysis of a Healthcare Fraud)*

October 2011 Pennsylvania Institute of CPAs Annual Divorce Conference – *Personal Goodwill - Theory and Practice*, with Mark Momjian, Esquire

January 2012, *Fundamentals of Construction Accounting*, Continuing Legal Education, Cohen Seglias Pallas Greenhall & Furman P.C. with Joseph DeSimone, CPA, CVA and Michael Ostafy, CPA, MT

June 2012, Marcum News Flash/Web article, *Hospitals, Physicians and Others Continue to be Impacted with Supreme Court Affirmation of Affordable Care Act*, with Matt Bavolack

September 2012 *The Legal Intelligencer* Litigation Summit- *What's Hot in Litigation – Working Effectively with Economic Damage Experts,* with Michael Adler, Esquire

October 2012, Pennsylvania Institute of CPAs Annual Divorce Conference – Co-presentation *Initial interview with Expert and Annual Case Law Update*, with Mary Cushing Doherty, Esquire and Joo Park, Esquire

January 2013, The Advisory Board Winning is Everything Practice Management Conference – Panelist "CGO:M&A – Seller's Panel" with Allan Koltin, Paul Argy and Todd Fentress

October 2013, Pennsylvania Institute of CPAs Annual Divorce Conference – Co-presentation Legal and Forensic Issues in Divorce with The Honorable Rochelle Grossman, Chester County (PA) Master

November 2013 – Weidner University Accounting Society – *Introduction to Forensic Accounting*

Curriculum Vitae
David H. Glusman, CPA
Page 5

January 2014 – *Critiquing and Defending Business Valuations*, Continuing Legal Education at Eckert Seamans with Michael J. Molder, JD, CPA, CFE, CVA, CFF

January 2014, Supreme Court's *Daubert* Guidance Is Alive and Well, with Michael J. Molder, JD, CPA, CFE, CVA, CFF – *The Legal Intelligencer*

March 2014, "Forensic Accounting Considerations in Med Mal Litigation," *The Legal Intelligencer*, with Michael J. Molder, CPA, JD, CFE, CVA, CFF

April 2014, Reading the Semaphore of the Red Flags of Fraud, with Michael J. Molder, CPA, JD, CFE, CVA, CFF, *The Legal Intelligencer*

June 2014, Tax Advice for Pennsylvania's LGBT Spouses-to-Be, *Philadelphia Business Journal*

July 2014, Financial Oversight and the Institutional Investor, with Michael J. Molder, CPA, JD, CFE, CVA, CFF, *The Legal Intelligencer*

August 2014, Co-Management: A Win-Win Model for Hospital and Physician Relationships, *Philadelphia Business Journal*

September 2014, Ethical Issues that May Arise When Using an Expert Witness, *The Legal Intelligencer* 2014 Litigation Summit, with Michael J. Molder, CPA, JD, CFE, CVA, CFF

October 2014, The Trials and Tribulations of the Innocent Spouse, with Matthew D. Lee, Esquire, PICPA 2014 Divorce Conference

November 2014, Valuation Issues Unique to the Health Care Marketplace, PICPA 2014 Business Valuation Conference

November 2014, Business Valuation is Litigation and Shareholder Disputes, PICPA 2014 Business Valuation Conference

January 2015 -- Not Even Taxes Are Certain in Valuation of Pass-Through Entities, *Legal Intelligencer*, with Michael J. Molder, CPA, JD, CFE, CVA, CFF

April 2015 Rolling the Dice With Monte Carlo Simulations, *Legal Intelligencer*, with Michael J. Molder, CPA, JD, CFE, CVA, CFF

April 2015; 11 LGBT Tax Planning Tips; Huffington Post "Huffpost Gay Voices"

April 2015, Innocent Spouse Tax Relief in Same-Sex Married Couples, *New York Law Review*, with Janis Cowhey, CPA, JD

June 2015, Tax Planning Tips for married same-sex couples; *Philadelphia Gay News*

July 2015, 'Innocent Spouse' Tax Relief: Facts and Circumstances Will Prevail; *The Legal Intelligencer*

September 2015, Post-Merger and Acquisition Disputes *The Legal Intelligencer* 2015 Litigation Summit, with Eric Milby, Esquire

Curriculum Vitae
David H. Glusman, CPA
Page 6

September 2015; <u>What to Expect in the Future with the Supreme Court's Decisions Regarding Same-Sex Marriage;</u> CPA Now (PICPA blog)

October 2015 <u>The High Price of Healthcare Fraud Likely to Keep Getting Higher;</u> *Metropolitan Corporate Counsel*, with Thomas W. Reinke

January 2016 <u>Payment Models Dictate New Physician Compensation Arrangements</u> *The Legal Intelligencer*

**Testimony Given:**

January 2005, *Ford vs. Ford*, Court of Common Pleas, Bucks County, PA, Civil Action A06-02-64057-D-19, testimony before Arbitrator Michael Fingerman, Esquire regarding valuation of Medical Practice, physician compensation and related issues

April 2005, T*homas Armstrong, M.D. vs. Ophthalmology Associates, PC and Frank Clark, M.D.*, American Arbitration Association Case No. 141800813302, additional expert witness testimony regarding valuation of medical practice, goodwill and damages related to practice separation.

July 2005, *Redmond vs. Blue Visual Effects, Inc. and Howard McCabe*, Commerce Case Management Program, October Term 2004, No. 001430, The Honorable Darnell Jones, presiding, Affidavit and attendance at hearing on discovery issues.

September 2005, *Harold Yang and Michael Holman v. The Milton S. Hershey Medical Center, et al.*, Court of Common Pleas, Dauphin County (PA), Civil Action 5193 S 2000, The Honorable Scott A. Evans, presiding, expert testimony on damages in physician claim of wrongful termination and defamation of character.

January 2006, In re *The Estate of Grace E. Kearney*, The Honorable Daniel J. Lawler, presiding, Bucks County (PA) Court of Common Pleas O.C. File No. 20050139 Hearing on the appointment of a receiver and the demand for an accounting, expert testimony on accounting policies and procedures and loan documentation.

December 2007, Deposition Testimony in *Consolidated Rail Corporation, Green Acquisition Corporation v. EquiServe and EquiServe, Inc., v. Norfolk Southern Corporation and CSX Corporation* – US District Court for the Southern District of New York, 05 Civ. 2932 (DC)regarding damages in a matter regarding a transfer agent's alleged malfeasance.

December 2007, *Baraka v. Hashemian*, Master's Hearing on Income Available for Support, Expert testimony, Commonwealth of Pennsylvania, County of Philadelphia, Court of Common Pleas No. 02-86352, Master Howard S. Kaplan, presiding

December 2007, In re *The Estate of Grace E. Kearney*, The Honorable C. Theodore Fritch, Jr., presiding, Bucks County (PA) Court of Common Pleas O.C. File No. 20050139 Hearing on the removal of the co-executor and appointment of a receiver, expert testimony on accounting policies and procedures, loan documentation and business valuation.

December 2007, *Pusey vs. Pusey*, Hearing re Income available for support, Expert testimony, in the Court of Common Pleas, Chester County, PA No 00718N2005, The Honorable James P. MacElree, II, Presiding.

March 2008, Deborah L. *Pierce, D.O. v. Abington Emergency Physicians Associates, P.C.* National Health Lawyers Association Arbitration #A-020907-497 before Vasilios J. ("Bill") Kalogredis, J.D., CPBC, CFP, Expert testimony regarding alleged damages in a case of alleged gender discrimination in a medical group.

May 2008, Expert testimony in Legal Malpractice Case – *Daubert* Hearing, *Reis and Katz vs. Barley Snyder, Senft & Cohen LLC*, in the Eastern District Court for the Eastern District of Pennsylvania before the Honorable James Knoll Gardner, Civil Action 05-CV-01651

September 2008, Expert testimony in Legal Malpractice Case regarding business valuation and lost profits, *Reis and Katz vs. Barley Snyder, Senft & Cohen LLC*, in the Eastern District Court for the Eastern District of Pennsylvania before the Honorable James Knoll Gardner, Civil Action 05-CV-01651.

October 2009, Expert testimony in Legal Malpractice Case regarding lost profits, *Winner Logistics v. LLM and Fitzgerald, Lentz and Bubba*, Philadelphia Common Pleas Court, before the Honorable Mark I. Bernstein, October Term 2006 No.2164.

February 2010, Trial testimony in *Fredman v Fredman* – Court of Common Pleas, Centre County, Pennsylvania, Civil Case #2007-406; expert testimony on business valuation, forensic accounting and income and estate tax issues, the Honorable Thomas Kistler, presiding.

March 2010, Deposition expert testimony regarding valuation of a partner's interest in a dissociated shareholder's matter, *Eigles v. Kim*, U.S. District Court for the E.D. of Maryland Civil Action No. 1:07-CV-2223

January 2011, FINRA Dispute Resolution—Arbitration Number 09-00257, Expert testimony regarding valuation of a deceased partner's interest before Arbitration Panel, John James McGovern, Jr., Esquire, Catherine S. Kopley, Esquire and Ethan L. Lewis, Ph.D; *DSX, et al v Estate of Ralph P. DiDonato, Et al*.

November, 2011, *Robert M. Reardon v. Paul G. Boylan and LeClair Ryan, P.C.*, Middlesex (Mass), Superior Court, CA No. 08-3721, The Honorable Merita A. Hopkins, presiding, Expert witness relating to Business valuation and lost profits analysis in legal malpractice action

December 2011, *Mary Ann Booth, Exec. V. David J. Waltz, et al*, Superior Court, Judicial District of Hartford, CT, Docket No (X04) CV-10-6011749-S, The Honorable William Bright, Jr., presiding, hearing on Pretrial remedy, Expert testimony regarding business valuation

April 2012, *Gerald Mosca v. All Vision LLC, Greg Smith, Scott Andel, Robert Horowitz, Robert Sommer and Roger Lipitz*, Superior Court of New Jersey, Law Division – Morris County, Civil Action 1914-10, Deposition Expert Testimony on alleged unpaid bonus.

Curriculum Vitae
David H. Glusman, CPA
Page 8

April 2012, *Mary Ann Booth, Exec. V. David J. Waltz, et al*, Superior Court, Judicial District of Hartford, CT, Docket No (X04) CV-10-6011749-S Deposition Expert Testimony on valuation of business interest

April 2012, *Eric C. Rost v. Hometown Health Plan, Inc*, American Arbitration Association Case 79 116 Y 00046 10 DWPA (Nevada), Deposition Expert testimony regarding terms of contract, FMV compensation and private inurement issues.

May 2012, *Mary Ann Booth, Exec. V. David J. Waltz, et al*, Superior Court, Judicial District of Hartford, CT, Docket No (X04) CV-10-6011749-S, The Honorable William Bright, Jr., presiding, hearing on Pretrial remedy, Additional expert testimony regarding business valuation.

July 2012, *Eric C. Rost v. Hometown Health Plan, Inc*, American Arbitration Association Case 79 116 Y 00046 10 DWPA (Nevada), Arbitration Hearing Expert testimony regarding terms of contract, FMV compensation and private inurement issues

December 2012, *Barbagallo v Marcum*, United States District Court for the Eastern District of New York, The Honorable Jack Weinstein, presiding, testimony regarding partner's breach of fiduciary duty and related matters.

January 2013, *Stevens v Landmark Partners, Inc.*, United States District Court for the District of Connecticut, Case No. :3:09-cv-00498 (MPS); deposition testimony regarding business valuation and damages related to alleged wrongful termination.

March 2013, *Pinnacle Treatment Centers, Inc. et al., vs. Endeavor House North, LLC, et al.* United States District Court for the District of New Jersey, Case No. 02:11-CV-04650-WJM-MF, deposition testimony regarding medical billing, GAAP accounting and merger and acquisition issues in purchase price determination

April 2013, *Stevens v Landmark Partners, Inc.*, United States District Court for the District of Connecticut, The Honorable Michael Shay presiding, Case No.:3:09-cv-00498 (MPS), expert testimony regarding profit sharing and related plans and forensic accounting related to implementation of Equity Participation Plan.

August 2013, *Sloan. David Frascella and Larry Frascella*, United States District Court for the Eastern District of Pennsylvania, The Honorable Juan Sanchez presiding, Civil Action No.03609, expert testimony regarding business valuation, lost profits and indicia of ownership.

February 2014, *U S Accu-Measurements, LLC and Ross Consulting Group, Inc. v. Ruby Tuesday, Inc.* United States District Court for the District of New Jersey (Newark, NJ) Docket No. L-7101-10, The Honorable Kevin McNulty, presiding, expert testimony regarding alleged damages in a Common Area Maintenance audit contract dispute.

March 2014 *MedAssets Net Revenue System, LLC v. Downey Regional Medical Center* United States District Court for the Central District of California, Western Division, No. CV 13-01936-ODW, expert witness deposition testimony regarding hospital billing and collection and revenue cycle issues

Curriculum Vitae
David H. Glusman, CPA
Page 9

September 2014 *John Cancelliere et al. v. Buckno Lisicky & Company*, Court of Common Pleas, Northampton County, The Honorable Jennifer R. Sletvold, Presiding, expert testimony in business valuation/legal malpractice action at a *Frye* hearing.

September 2014 *John Cancelliere et al. v. Buckno Lisicky & Company*, Court of Common Pleas, Northampton County, The Honorable Jennifer R. Sletvold, Presiding, expert testimony in business valuation/legal malpractice action as an expert in business valuation, merger and acquisition structure, causation, and related issues.

September 2015 *Anna Dubyanskite, MD and Gary Gilman, MD*; AAA Case No. 01-14-00003426; Testimony on Business Valuation of a medical practice; Benjamin Picker, Esquire - Arbitrator

November 2015, Brandow Chrysler Jeep Company et al. vs. Reed Smith, Montgomery County Pennsylvania, Court of Common Pleas Docket 10-31009, the Honorable Gerald Corso, presiding, expert testimony on damages in an auto dealership.

**Prior Professional Positions:**

2001-2009, Principal, Margolis & Company P.C.

1997-2001, Partner, BDO Seidman, LLP

1980-1997, Shareholder, Miller, Glusman, Footer & Magarick, P.C. (formerly Shotz, Miller & Glusman, P.C.)

1977-1980, Manager, Medium Sized Regional Accounting Firm

1976-1977, Senior Accountant, Medium Sized Local Accounting Firm

1975-1976, Assistant Controller, Panelrama Corp. (OTC)

1971-1975, Staff Assistant through In-Charge Senior Accountant, International Accounting Firm

**Other Affiliations:**

Juvenile Diabetes Foundation International – (list edited),  International Board of Directors (1984-1993),  International Audit Committee (2000- present), International Treasurer (1984-1987),   International Vice-President Finance (1987-1990) International Board of Chancellors (1996 to present)    Philadelphia   Chapter-Corporate Recruitment Chair – 2002 and 2003 Walk to Cure Diabetes, Chairman of the Board (1992-1995),  Treasurer (1978-1981, 1982-1984, 2002 - 2004) , National Telethon, 1983 and1985, Treasurer and Member of Steering Committee, Philadelphia Chapter Board (various years 1976 to 2008), Philadelphia Board of Chancellors – 2008, Online Diabetes Support Team (2001 to the present)

Penn State University Smeal School of Business Student Mentoring Program (2001-present)

Drexel University School of Medicine – Mini Medical School –Fall 2004, Fall 2005

Pennsylvania Institute of Certified Public Accountants, Greater Philadelphia Chapter, Executive Committee (2003 - 2006)

Pennsylvania Diabetes Tax Force, Appointed by Governor Robert Casey (1991-1995)

Curriculum Vitae
David H. Glusman, CPA
Page 10

Pennsylvania Diabetes Academy -
   Member of Board of Directors (1985-1988)
   Member of Executive Committee (1986-1988)
   Treasurer (1986-1988)
Lower Merion Township (Pennsylvania) Community Watch Member
Member – American College of Forensic Examiners and member of the Editorial Review
   Board, *The Forensic Examiner* (2006 – present)
City of Philadelphia, Joint Committee of Philadelphia Chapter of Pennsylvania Institute
   of CPA's and Philadelphia Bar Association - Member of Osage Avenue Assistance
   Committee (1987)
Golden Slipper Club, Audit Committee (1984 and 1986)
Federation-Allied Jewish Appeal Philadelphia – (list edited), Board of Trustees -
   (September 1991 to August 1995), Vice-Chairman, Special Gifts (1991 Campaign)
   Vice-Chairman Super Sunday (1991, 1992, 1993)
Main Line Reform Temple - Beth Elohim, Board of Trustees, (1997 - 2003), Co-chairman
   Development Committee (1997-1999)
Philadelphia Festival Theatre for New Plays, (1994-1996), Board Member and Member
   of the Executive Committee,
Interact Theatre, Advisor, 2000-2002.
Woodlynde School, Chairman, Annual Giving Committee, (1994-1996) (Chair 2006)
Member - Editorial Advisory Board, Harcourt Brace's *The Health
   Niche Advisor* (1987- Approx 2005)
Member - Editorial Advisory Board, *The Litigation Support Advisor* (1987 to 1992)
Member - Foundation for the Development of Health Care Management
Member - International Association of Financial Planning
Chairman, Forensic and Litigation Services Conference - Sponsored
   by the PICPA Foundation for Education & Research, (1993)

**Special Mention:**

2001, Pennsylvania Institute of Certified Public Accountants, **Distinguished Public
   Service Award**, presented June 29, 2001 at the Ritz Hotel, Philadelphia, PA
Included in various Who's Who Editions, 1990-2003
Included in the 1992 Fifteenth Edition of the Men of Achievement 1993 Campaign
   Award - Special Award Given by the Jewish Federation of Greater Philadelphia

Appendix B

## Documents Considered

### Brennan v. Community Bank, N.A. No. 13-CV-2939 (MEM).

1. Amended Class Action Complaint dated July 15, 2014 with attachments
2. Amended Class Action Settlement Agreement and Release dated March 25, 2015
3. Objections dated June 8, 2015
4. Brief in Support of Objections dated September 12, 2015
5. Second Objection, dated January 8, 2016;  Notice to Appear at Fairness Hearing and Objection to Settlement from Donald Lenherr
6. Affidavits of John McGovern dated January 27, 2015 and September 11, 2015
7. Amended order of preliminary determination on class certification, preliminarily approving class settlement and directing the issuance of notice to the class dated July 14, 2015
8. Brief of Nicole Urban and other objectors in support of their motion to intervene pursuant to Fed.R.CIV.P.24 filed September 12, 2015
9. Expert Affidavit of John J. McGovern, Jr. executed January 24, 2015
10. Objection of Nicole Urban and Other Objectors to Approval of Class Settlement
11. Objection of Nicol Urban, Eleanor Sickler, Linda Avramidis, Jacob Laird and Donald Lenherr to Plaintiff's Renewed Motion for Preliminary Approval of Class Settlement
12. Supplemental Affidavit of Attorney John J. McGovern, Jr. in Support of Objections to Approval of Class Settlement

# Exhibit

# A

Checkpoint Contents
  Federal Library
    Federal Source Materials
      Code, Regulations, Committee Reports & Tax Treaties
        Final, Temporary, Proposed Regulations & Preambles
          Final, Temporary & Proposed Regulations
            Regs. §§ 1.6050A-1 thru 31.6051-4
              Reg §1.6050P-1 Information reporting for discharges of indebtedness by certain
entities.

# Federal Regulations

# Reg §1.6050P-1. Information reporting for discharges of indebtedness by certain entities.

**Caution:** The Treasury has not yet amended Reg § 1.6050P-1 to reflect changes made by P.L. 106-170

**Effective:** July 15, 2014. For dates of applicability see §§1.6042-4(g), 1.6043-4 (i), 1.6044-5(d), 1.6045-2(i), 1.6045-3(g), 1.6045-4(s) , 1.6045-5(h), 1.6049-6(e)(5), 1.6050A-1(e), 1.6050E-1(m), 1.6050N-1(e) , 1.6050P-1(h), 1.6050S-1(f), 1.6050S-3(g), and 301.6109-4(c).

**(a) Reporting requirement.**

*(1) In general.* Except as provided in paragraph (d) of this section, any applicable entity (as defined in section 6050P(c)(1)) that discharges an indebtedness of any person (within the meaning of section 7701(a)(1)) of at least $600 during a calendar year must file an information return on Form 1099-C with the Internal Revenue Service. Solely for purposes of the reporting requirements of section 6050P and this section, a discharge of indebtedness is deemed to have occurred, except as provided in paragraph (b)(3) of this section, if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date on which the identifiable event has occurred. The return must include the following information—

(i) The name, address, and taxpayer identification number (TIN), as defined in section 7701(a)(41), of each person for which there was an identifiable event during the calendar year;

(ii) The date on which the identifiable event occurred, as described in paragraph (b) of this section;

(iii) The amount of indebtedness discharged, as described in paragraph (c) of this section;

(iv) An indication whether the identifiable event was a discharge of indebtedness in a bankruptcy, if known; and

(v) Any other information required by Form 1099-C or its instructions, or current revenue procedures.

*(2) No aggregation.* For purposes of reporting under this section, multiple discharges of indebtedness of less than $600 are not required to be aggregated unless such separate discharges are pursuant to a plan to evade the reporting requirements of this section.

*(3) Amounts not includible in income.* Except as otherwise provided in this section, discharged indebtedness must be reported regardless of whether the debtor is subject to tax on the discharged debt under sections 61 and 108 or otherwise by applicable law.

*(4) Time and place for reporting.*

(i) In general. Except as provided in paragraph (a)(4)(ii) of this section, returns required by this section must be filed with the Internal Revenue Service office designated in the instructions for Form 1099-C on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the identifiable event occurs.

(ii) Indebtedness discharged in bankruptcy. Indebtedness discharged in bankruptcy that is required to be reported under this section must be reported for the later of the calendar year in which the amount of discharged indebtedness first becomes ascertainable, or the calendar year in which the identifiable event occurs.

**(b) Date of discharge.**

*(1) In general.* Solely for purposes of this section, except as provided in paragraph (b) (3) of this section, indebtedness is discharged on the date of the occurrence of an identifiable event specified in paragraph (b)(2) of this section.

*(2) Identifiable events.*

(i) In general. An identifiable event is—

(A) A discharge of indebtedness under title 11 of the United States Code (bankruptcy);

(B) A cancellation or extinguishment of an indebtedness that renders a debt unenforceable in a receivership, foreclosure, or similar proceeding in a federal or State court, as described in section 368(a)(3)(A)(ii) (other than a discharge described in paragraph (b)(2)(i)(A) of this section);

(C) A cancellation or extinguishment of an indebtedness upon the expiration of the statute of limitations for collection of an indebtedness, subject to the limitations described in paragraph (b)(2)(ii) of this section, or upon the expiration of a statutory period for filing a claim or commencing a deficiency judgment proceeding;

(D) A cancellation or extinguishment of an indebtedness pursuant to an election of foreclosure remedies by a creditor that statutorily extinguishes or bars the creditor's right to pursue collection of the indebtedness;

(E) A cancellation or extinguishment of an indebtedness that renders a debt unenforceable pursuant to a probate or similar proceeding;

(F) A discharge of indebtedness pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full consideration;

(G) A discharge of indebtedness pursuant to a decision by the creditor, or the application of a defined policy of the creditor, to discontinue collection activity and discharge debt; or

(H) In the case of an entity described in section 6050P(c)(2)(A) through (C), the expiration of the non-payment testing period, as described in Sec. 1.6050P-1(b)(2)(iv).

(ii) Statute of limitations. In the case of an expiration of the statute of limitations for collection of an indebtedness, an identifiable event occurs under paragraph (b)(2)(i)(C) of this section only if, and at such time as, a debtor's affirmative statute of limitations defense is upheld in a final judgment or decision of a judicial proceeding, and the period for appealing the judgment or decision has expired.

(iii) Decision to discontinue collection activity; creditor's defined policy. For purposes of the identifiable event described in paragraph (b)(2)(i)(G) of this section, a creditor's defined policy includes both a written policy of the creditor and the creditor's established business practice. Thus, for example, a creditor's established practice to discontinue collection activity and abandon debts upon

expiration of a particular non-payment period is considered a defined policy for purposes of paragraph (b)(2)(i)(G) of this section.

(iv) Expiration of non-payment testing period. There is a rebuttable presumption that an identifiable event under paragraph (b)(2)(i)(H) of this section has occurred during a calendar year if a creditor has not received a payment on an indebtedness at any time during a testing period (as defined in this paragraph (b)(2)(iv)) ending at the close of the year. The testing period is a 36-month period increased by the number of calendar months during all or part of which the creditor was precluded from engaging in collection activity by a stay in bankruptcy or similar bar under state or local law. The presumption that an identifiable event has occurred may be rebutted by the creditor if the creditor (or a third-party collection agency on behalf of the creditor) has engaged in significant, bona fide collection activity at any time during the 12-month period ending at the close of the calendar year, or if facts and circumstances existing as of January 31 of the calendar year following expiration of the 36-month period indicate that the indebtedness has not been discharged. For purposes of this paragraph (b)(2)(iv) —

>    (A) Significant, bona fide collection activity does not include merely nominal or ministerial collection action, such as an automated mailing;
>
>    (B) Facts and circumstances indicating that an indebtedness has not been discharged include the existence of a lien relating to the indebtedness against the debtor (to the extent of the value of the security), or the sale or packaging for sale of the indebtedness by the creditor; and
>
>    (C) In no event will an identifiable event described in paragraph (b)(2)(i)(H) of this section occur prior to December 31, 1997.

(v) Special rule for certain entities required to file in a year prior to 2008. In the case of an entity described in section 6050P(c)(1)(A) or (c)(2)(D) required to file an information return in a tax year prior to 2008 due to an identifiable event described in paragraph (b)(2)(i)(H) of this section, and who failed to so file, the date of discharge is the first event, if any, described in paragraphs (b)(2)(i)(A) through (G) of this section that occurs after 2007.

*(3) Permitted reporting.* If a discharge of indebtedness occurs before the date on which an identifiable event occurs, the discharge may, at the creditor's discretion, be reported under this section.

**(c) Indebtedness.** For purposes of this section and §1.6050P-2, indebtedness means any amount owed to an applicable entity, including stated principal, fees, stated interest,

penalties, administrative costs and fines. The amount of indebtedness discharged may represent all, or only a part, of the total amount owed to the applicable entity.

**(d)** Exceptions from reporting requirement.

*(1) Certain bankruptcy discharges.*

(i) In general. Reporting is required under this section in the case of a discharge of indebtedness in bankruptcy only if the creditor knows from information included in the reporting entity's books and records pertaining to the indebtedness that the debt was incurred for business or investment purposes as defined in paragraph (d)(1)(ii) of this section.

(ii) Business or investment debt. Indebtedness is considered incurred for business purposes if it is incurred in connection with the conduct of any trade or business other than the trade or business of performing services as an employee. Indebtedness is considered incurred for investment purposes if it is incurred to purchase property held for investment, as defined in section 163(d)(5).

*(2) Interest.* The discharge of an amount of indebtedness that is interest is not required to be reported under this section.

*(3) Non-principal amounts in lending transactions.* In the case of a lending transaction, the discharge of an amount other than stated principal is not required to be reported under this section. For this purpose, a lending transaction is any transaction in which a lender loans money to, or makes advances on behalf of, a borrower (including revolving credits and lines of credit).

*(4) Indebtedness of foreign debtors held by foreign branches of U.S. financial institutions.*

(i) Reporting requirements. [Reserved]

(ii) Definition. An indebtedness held by a foreign branch of a U.S. financial institution is described in this paragraph (d)(4) only if—

(A) The financial institution is engaged through a branch or office in the active conduct of a banking or similar business outside the United States;

(B) The branch or office is a permanent place of business that is regularly maintained, occupied, and used to carry on a banking or similar financial business;

(C) The business is conducted by at least one employee of the branch or office who is regularly in attendance at such place of business during normal working hours;

(D) The indebtedness is extended outside of the United States by the branch or office in connection with that trade or business; and

(E) The financial institution does not know or have reason to know that the debtor is a United States person.

*(5) Acquisition of indebtedness by related party.* No reporting is required under this section in the case of a deemed discharge of indebtedness under section 108(e)(4) (relating to the acquisition of an indebtedness by a person related to the debtor), unless the disposition of the indebtedness by the creditor was made with a view to avoiding the reporting requirements of this section.

*(6) Releases.* The release of a co-obligor is not required to be reported under this section if the remaining debtors remain liable for the full amount of any unpaid indebtedness.

*(7) Guarantors and sureties.* Solely for purposes of the reporting requirements of this section, a guarantor is not a debtor. Thus, in the case of guaranteed indebtedness, reporting under this section is not required with respect to a guarantor, whether or not there has been a default and demand for payment made upon the guarantor.

**(e) Additional rules.**

*(1) Multiple debtors.*

(i) In general. In the case of indebtedness of $10,000 or more incurred on or after January 1, 1995, that involves more than one debtor, a reporting entity is subject to the requirements of paragraph (a) of this section for each debtor discharged from such indebtedness. In the case of indebtedness incurred prior to January 1, 1995, and indebtedness of less than $10,000 incurred on or after January 1, 1995, involving multiple debtors, reporting under this section is required only with respect to the primary (or first-named) debtor. Additionally, only one return of information is required under this section if the reporting entity knows, or has reason to know, that co-obligors were husband and wife living at the same address when an indebtedness was incurred, and does not know or have reason to know that such circumstances have changed at the date of a discharge of the indebtedness. This paragraph (e)(1) applies to discharges of indebtedness after December 31, 1994.

(ii) Amount to be reported. In the case of multiple debtors jointly and severally liable on an indebtedness, the amount of discharged indebtedness required to be reported under this section with respect to each debtor is the total amount of indebtedness discharged. For this purpose, multiple debtors are presumed to be jointly and severally liable on an indebtedness in the absence of clear and convincing evidence to the contrary.

(2) Multiple creditors.

(i) In general. Except as otherwise provided in this paragraph (e)(2), if indebtedness is owned (or treated as owned for federal income tax purposes) by more than one creditor, each creditor that is an applicable entity must comply with the reporting requirements of this section with respect to any discharge of indebtedness of $600 or more allocable to such creditor. A creditor will be considered to have complied with the requirements of this section if a lead bank, fund administrator, or other designee of the creditor complies on its behalf in any reasonable manner, such as by filing a single return reporting the aggregate amount of indebtedness discharged, or by filing a return with respect to the portion of the discharged indebtedness allocable to the creditor. For purposes of this paragraph (e)(2)(i), any reasonable method may be used to determine the portion of discharged indebtedness allocable to each creditor.

(ii) Partnerships. For purposes of paragraph (e)(2)(i) of this section, indebtedness owned by a partnership is treated as owned by the partners.

(iii) Pass-through securitized indebtedness arrangement.

(A) Reporting requirements. [Reserved]

(B) Definition. For purposes of this paragraph (e)(2)(iii), a pass-through securitized indebtedness arrangement is any arrangement whereby one or more debt obligations are pooled and held for twenty or more persons whose interests in the debt obligations are undivided co-ownership interests that are freely transferrable. Co-ownership interests that are actively traded personal property (as defined in section 1.1092(d)-1) are presumed to be freely transferrable and held by twenty or more persons.

(iv) REMICs. [Reserved]

(v) No double reporting. If multiple creditors are considered to hold interests in an indebtedness for purposes of this paragraph (e)(2) by virtue of holding ownership interests in an entity, and the entity is required to report a discharge of that indebtedness under paragraph (e)(5) of this section, then the multiple creditors are not required to report the discharge of indebtedness.

*(3) Coordination with reporting under section 6050J.* If, in the same calendar year, a discharge of indebtedness reportable under section 6050P occurs in connection with a transaction also reportable under section 6050J (relating to foreclosures and abandonments of secured property), an applicable entity need not file both a Form 1099-A and a Form 1099-C with respect to the same debtor. The filing requirements of section 6050J will be satisfied with respect to a borrower if, in lieu of filing Form 1099-A, a Form 1099-C is filed in accordance with the instructions for the filing of that form. This paragraph (e)(3) applies to discharges of indebtedness after December 31, 1994.

*(4) Direct or indirect subsidiary.* For purposes of section 6050P(c)(2)(C), the term direct or indirect subsidiary means a corporation in a chain of corporations beginning with an entity described in section 6050P(c)(2)(A), if at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of all classes of stock, of such corporation is directly owned by the entity described in section 6050P(c)(2)(A), or by one or more other corporations in the chain.

*(5) Entity formed or availed of to hold indebtedness.* Notwithstanding §1.6050P-2(b) (3), if an entity (the transferee entity) is formed or availed of by an applicable entity (within the meaning of section 6050P(c)(1)) for the principal purpose of holding indebtedness acquired (including originated) by the applicable entity, then, for purposes of section 6050P(c)(2)(D), the transferee entity has a significant trade or business of lending money.

*(6) Use of magnetic media.* Any return required under this section must be filed on magnetic media to the extent required by section 6011(e) and the regulations thereunder. A failure to file on magnetic media when required constitutes a failure to file an information return under section 6721. Any person not required by section 6011 (e) to file returns on magnetic media may request permission to do so under applicable regulations and revenue procedures.

*(7) TIN solicitation requirement.*

   *(i) In general.* For purposes of reporting under this section, a reasonable effort must be made to obtain the correct name/taxpayer identification number (TIN) combination of a person whose indebtedness is discharged. A TIN obtained at the time an indebtedness is incurred satisfies the requirement of this section, unless the entity required to file knows that such TIN is incorrect. If the TIN is not obtained prior to the occurrence of an identifiable event, it must be requested of the debtor for purposes of satisfying the requirement of this paragraph (e)(7).

(ii) *Manner of soliciting TIN.* Solicitations made in the manner described in section 301.6724-1(e)(1)(i) and (2) of this chapter will be deemed to have satisfied the reasonable effort requirement set forth in paragraph (e)(7)(i) of this section. A TIN solicitation made after the occurrence of an identifiable event must clearly notify the debtor that the Internal Revenue Service requires the debtor to furnish its TIN, and that failure to furnish such TIN may subject the debtor to a $50 penalty imposed by the Internal Revenue Service. A TIN provided under this section is not required to be certified under penalties of perjury.

(8) *Recordkeeping requirements.* Any applicable entity required to file a return with the Internal Revenue Service under this section must also retain a copy of the return, or have the ability to reconstruct the data required to be included on the return under paragraph (a)(1) of this section, for at least four years from the date such return is required to be filed under paragraph (a)(4) of this section.

(9) *No multiple reporting.* If discharged indebtedness is reported under this section, no further reporting under this section is required for the amount so reported, notwithstanding that a subsequent identifiable event occurs with respect to the same amount. Further, no additional reporting or Form 1099-C correction is required if a creditor receives a payment of all or a portion of a discharged indebtedness reported under this section for a prior calendar year.

**(f) Requirement to furnish statement.**

(1) *In general.* Any applicable entity required to file a return under this section must furnish to each person whose name is shown on such return a written statement that includes the following information—

(i) The information required by paragraph (a)(1) of this section. An IRS truncated taxpayer identifying number (TTIN) may be used as the TIN of the person for whom there was an identifiable event in lieu of the identifying number appearing on the information return filed with the Internal Revenue Service. For provisions relating to the use of TTINs, see §301.6109-4 of this chapter (Procedure and Administration Regulations);

(ii) The name, address, and TIN of the applicable entity required to file a return under paragraph (a) of this section;

(iii) A legend identifying the statement as important tax information that is being furnished to the Internal Revenue Service; and

(iv) Any other information required by Form 1099-C or its instructions, or current revenue procedures.

*(2) Furnishing copy of form 1099-C.* The requirement to provide a statement to the debtor will be satisfied if the applicable entity furnishes copy B of the Form 1099-C or a substitute statement that complies with the requirements of the current revenue procedure for substitute Forms 1099.

*(3) Time and place for furnishing statement.* The statement required by this paragraph (f) must be furnished to the debtor on or before January 31 of the year following the calendar year in which the identifiable event occurs. The statement will be considered furnished to the debtor if it is mailed to the debtor's last known address.

**(g) Penalties.** For penalties for failure to comply with the requirements of this section, see sections 6721 through 6724.

**(h) Effective/applicability date.** This section applies to discharges of indebtedness after December 31, 2013. For discharges of indebtedness before January 1, 2014, §1.6050P-1 (as contained in 26 CFR part 1, revised April 2013) shall apply.

---

T.D. 8654, 1/4/96, amend T.D. 8895, 8/17/2000, T.D. 9160, 10/22/2004, T.D. 9430, 11/7/2008, T.D. 9461, 9/17/2009, T.D. 9675, 7/14/2014.

---

END OF DOCUMENT -

© 2015 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit

# B

Checkpoint Contents
  Federal Library
    Federal Source Materials
      Federal Tax Decisions
        American Federal Tax Reports
        American Federal Tax Reports (Prior Years)
          1990
            AFTR 2d Vol. 66
              66 AFTR 2d 90-5694 (909 F.2d 784) - 66 AFTR 2d 90-5479 (912 F2d 230)
                ZARIN v. COMM., 66 AFTR 2d 90-5679 (916 F2d 110), Code Sec(s) 61; 108,
(CA3), 10/10/1990

American Federal Tax Reports

# ZARIN v. COMM., Cite as 66 AFTR 2d 90-5679 (916 F2d 110), Code Sec(s) 61, (CA3), 10/10/1990

David & Louise ZARIN, APPELLANTS v. COMMISSIONER of Internal Revenue, APPELLE.

## Case Information:

[pg. 90-5679]

| | |
|---|---|
| **Code Sec(s):** | 61 |
| **Court Name:** | U.S. Court of Appeals, Third Circuit, |
| **Docket No.:** | No. 90-1240, |
| **Date Decided:** | 10/10/1990 |
| **Prior History:** | 92 TC 1084 (No.68) (opinion by Cohen, *J.*) reversed. |
| **Tax Year(s):** | Years 1980, 1981. |
| **Disposition:** | Decision for Taxpayer. |
| **Cites:** | 66 AFTR 2d 90-5679, 916 F2d 110, 90-2 USTC P 50530. |

# HEADNOTE

**1. OTHER EXCLUSIONS—Income from discharge of indebtedness—other rules applicable to all debtors.** Taxpayer recognized no income on settlement of outstanding gambling debt at deep discount from face value. Debt didn't meet either prong of two-prong statutory test: (1) because debt was unenforceable under state law, taxpayer had no liability for debt, and (2) casino chips weren't property held for debt, but were merely medium of exchange having no use or value outside casino. Court analyzed transaction as disputed debt or contested liability that became fixed in amount only on settlement with casino. Unenforceability of debt cast doubt on both liability and amount involved. Tax Court's conclusion that chips received by taxpayer as credit represented cash ignored reality that taxpayer would have to satisfy outstanding liabilities before receiving cash in exchange for chips.

*Reference(s):* PH Fed 2d ¶1085.05(5); ¶615.129(5). Code Sec. 61; Code Sec. 108.

# OPINION

William M. Goldstein, Theodore P. Seto, Drinker, Biddle & Reath, Broad and Chestnut Streets, 1100 PNB Bldg., Philadelphia, Pa., Attys. for Appellants.

Bruce Ellisen, Gary R. Allen, Attys., Tax Div., Dept. of Justice, Wash., D.C., for Appellee.

**On Appeal from the United States Tax Court (No. 21371-86).**

Before STAPLETON, COWEN and WEIS, Circuit Judges.

**Judge:** COWEN, Circuit Judge:

# Opinion of the Court

David Zarin ("Zarin") appeals from a decision of the Tax Court holding that he recognized $2,935,000 of income from discharge of indebtedness resulting from his gambling activities, and that he should be taxed on the income. [1]  This Court has jurisdiction to review the Tax Court's decision under ▤section 7482 of the Internal Revenue Code (1954) (the "Code"). After considering the issues raised by this appeal, we will reverse.

I

Zarin was a professional engineer who participated in the development, construction, and management of various housing projects. A resident of Atlantic City, New Jersey, Zarin

occasionally gambled, both in his hometown and in other places where gambling was legalized. To facilitate his gaming activities in Atlantic City, Zarin applied to Resorts International Hotel ("Resorts") for a credit line in June, 1978. Following a credit check, Resorts granted Zarin $10,000 of credit. Pursuant to this credit arrangement with Resorts, Zarin could write a check, called a marker,[2] and in return receive chips, which could then be used to gamble at the casino's tables.

Before long, Zarin developed a reputation as an extravagant "high roller" who routinely bet the house maximum while playing craps, his game of choice. Considered a "valued gaming patron" by Resorts, Zarin had his credit limit increased at regular intervals without any further credit checks, and was provided a number of complimentary services and privileges. By November, 1979, Zarin's permanent line of credit had been raised to $200,000. Between June, 1978, and December, 1979, Zarin lost $2,500,000 at the craps table, losses he paid in full.

Responding to allegations of credit abuses, the New Jersey Division of Gaming Enforcement filed with the New Jersey Casino Control Commission a complaint against Resorts. Among the 809 violations of casino regulations alleged in the complaint of October, 1979, were 100 pertaining to Zarin. Subsequently, a Casino Control Commissioner issued an Emergency Order, the effect of which was to make further extensions of credit to Zarin illegal.

Nevertheless, Resorts continued to extend Zarin's credit limit through the use of two different practices: "considered cleared" credit and "this trip only" credit.[3] [pg. 90-5680]Both methods effectively ignored the Emergency Order and were later found to be illegal.[4]

By January, 1980, **Zarin** was gambling compulsively and uncontrollably at Resorts, spending as many as sixteen hours a day at the craps table.[5] During April, 1980, Resorts again increased **Zarin's** credit line without further inquiries. That same month, **Zarin** delivered personal checks and counterchecks to Resorts which were returned as having been drawn against insufficient funds. Those dishonored checks totaled $3,435,000. In late April, Resorts cut off **Zarin's** credit.

Although **Zarin** indicated that he would repay those obligations, Resorts filed a New Jersey state court action against **Zarin** in November, 1980, to collect the $3,435,000. **Zarin** denied liability on grounds that Resort's claim was unenforceable under New Jersey regulations intended to protect compulsive gamblers. Ten months later, in September, 1981, Resorts and **Zarin** settled their dispute for a total of $500,000.

The **Commissioner** of Internal Revenue ("**Commissioner**") subsequently determined deficiencies in **Zarin's** federal income taxes for 1980 and 1981, arguing that **Zarin** recognized $3,435,000 of income in 1980 from larceny by trick and deception. After **Zarin** challenged that claim by filing a Tax Court petition, the **Commissioner** abandoned his 1980 claim, and argued instead that **Zarin** had recognized $2,935,000 of income in 1981 from the cancellation of indebtedness which resulted from the settlement with Resorts.

Agreeing with the **Commissioner**, the Tax Court decided, eleven judges to eight, that **Zarin** had indeed recognized $2,935,000 of income from the discharge of indebtedness, namely the difference between the original $3,435,000 "debt" and the $500,000 settlement. **Zarin** v. **Commissioner,** 📄 92 T.C. 1084 (1989). Since he was in the seventy percent tax bracket, **Zarin's** deficiency for 1981 was calculated to be $2,047,245. With interest to April 5, 1990, **Zarin** allegedly owes the Internal Revenue Service $5,209,033.96 in additional taxes. **Zarin** appeals the order of the Tax Court.

## II

[1] The sole issue before this Court is whether the Tax Court correctly held that **Zarin** had income from discharge of indebtedness.[6]  Section 108 and section 61(a)(12) of the Code set forth "the general rule that gross income includes income from the discharge of indebtedness." 📄I.R.C. §108(e)(1). The **Commissioner** argues, and the Tax Court agreed, that pursuant to the Code, **Zarin** did indeed recognize income from discharge of gambling indebtedness.

Under the **Commissioner's** logic, Resorts advanced **Zarin** $3,435,000 worth of chips, chips being the functional equivalent of cash. At that time, the chips were not treated as income, since **Zarin** recognized an obligation of repayment. In other words, Resorts made **Zarin** a tax-free loan. However, a taxpayer does recognize income if a loan owed to another party is cancelled, in whole or in part. 📄I.R.C. §§61(a)(12),📄 108(e). The settlement between **Zarin** and Resorts, claims the **Commissioner**, fits neatly into the cancellation of indebtedness provisions in the Code. **Zarin** owed $3,435,000, paid $500,000, with the difference constituting income. Although initially persuasive, the **Commissioner's** position is nonetheless flawed for two reasons.

## III

Initially, we find that sections 108 and 61(a)(12) are inapplicable to the **Zarin**/Resorts transaction. Section 61 does not define indebtedness. On the other hand, section 108(d)(1),

which repeats and further elaborates on the rule in section 61(a)(12), defines the term as any indebtedness "(A) for which the taxpayer is liable, or (B) subject to which the taxpayer holds property." 📄I.R.C. §108(d)(1). In order to bring the taxpayer within the sweep of the discharge of indebtedness rules, then, the IRS must show that one of the two prongs in the section 108(d)(1) test is satisfied. It has not been demonstrated that Zarin satisfies either.[pg. 90-5681]

Because the debt Zarin owed to Resorts was unenforceable as a matter of New Jersey state law, [7] it is clearly not a debt "for which the taxpayer is liable." 📄I.R.C. §108(d)(1)(A). Liability implies a legally enforceable obligation to repay, and under New Jersey law, Zarin would have no such obligation.

Moreover, Zarin did not have a debt subject to which he held property as required by section 108(d)(1)(B). Zarin's indebtedness arose out of his acquisition of gambling chips. The Tax Court held that gambling chips were not property, but rather, "a medium of exchange within the Resorts casino" and a "substitute for cash." Alternatively, the Tax Court viewed the chips as nothing more than "the opportunity to gamble and incidental services ..." Zarin, 92 T.C. at 1099. We agree with the gist of these characterizations, and hold that gambling chips are merely an accounting mechanism to evidence debt.

Gaming chips in New Jersey during 1980 were regarded "solely as evidence of a debt owed to their custodian by the casino licensee and shall be considered at no time the property of anyone other than the casino licensee issuing them." N.J. Admin. Code tit. 19k, §19:46-1.5(d) (1990). Thus, under New Jersey state law, gambling chips were Resorts' property until transferred to Zarin in exchange for the markers, at which point the chips became "evidence" of indebtedness (and not the property of Zarin).

Even were there no relevant legislative pronouncement on which to rely, simple common sense would lead to the conclusion that chips were not property in Zarin's hands. Zarin could not do with the chips as he pleased, nor did the chips have any independent economic value beyond the casino. The chips themselves were of little use to Zarin, other than as a means of facilitating gambling. They could not have been used outside the casino. They could have been used to purchase services and privileges within the casino, including food, drink, entertainment, and lodging, but Zarin would not have utilized them as such, since he received those services from Resorts on a complimentary basis. In short, the chips had no economic substance.

Although the Tax Court found that theoretically, Zarin could have redeemed the chips he received on credit for cash and walked out of the casino, Zarin, 92 T.C. at 1092, the reality of

the situation was quite different. Realistically, before cashing in his chips, Zarin would have been required to pay his outstanding IOUs. New Jersey state law requires casinos to "request patrons to apply any chips or plaques in their possession in reduction of personal checks or Counter Checks exchanged for purposes of gaming prior to exchanging such chips or plaques for cash or prior to departing from the casino area." N.J. Admin. Code tit. 19k, §19:45-1.24(s) (1979) (currently N.J. Admin. Code tit. 19k, §19:45-1.25(o) (1990) (as amended)). Since his debt at all times equalled or exceeded the number of chips he possessed, redemption would have left Zarin with no chips, no cash, and certainly nothing which could have been characterized as property.

Not only were the chips non-property in Zarin's hands, but upon transfer to Zarin, the chips also ceased to be the property of Resorts. Since the chips were in the possession of another party, Resorts could no longer do with the chips as it pleased, and could no longer control the chips' use. Generally, at the time of a transfer, the party in possession of the chips can gamble with them, use them for services, cash them in, or walk out of the casino with them as an Atlantic City souvenir. The chips therefore become nothing more than an accounting mechanism, or evidence of a debt, designed to facilitate gambling in [pg. 90-5682]casinos where the use of actual money was forbidden. [8] Thus, the chips which Zarin held were not property within the meaning of I.R.C. §108(d)(1)(B). [9]

In short, because Zarin was not liable on the debt he allegedly owed Resorts, and because Zarin did not hold "property" subject to that debt, the cancellation of indebtedness provisions of the Code do not apply to the settlement between Resorts and Zarin. As such, Zarin cannot have income from the discharge of his debt.

# IV

Instead of analyzing the transaction at issue as cancelled debt, we believe the proper approach is to view it as disputed debt or contested liability. Under the contested liability doctrine, if a taxpayer, in good faith, disputed the amount of a debt, a subsequent settlement of the dispute would be treated as the amount of debt cognizable for tax purposes. The excess of the original debt over the amount determined to have been due is disregarded for both loss and debt accounting purposes. Thus, if a taxpayer took out a loan for $10,000, refused in good faith to pay the full $10,000 back, and then reached an agreement with the lendor that he would pay back only $7000 in full satisfaction of the debt, the transaction would be treated as if the initial loan was $7000. When the taxpayer tenders the $7000 payment, he will have been deemed to have paid the full amount of the initially disputed debt. Accordingly, there is no tax consequence to the taxpayer upon payment.

The seminal "contested liability" case is N. Sobel, Inc. v. Commissioner, 📄 40 B.T.A. 1263 (1939). In Sobel, the taxpayer exchanged a $21,700 note for 100 shares of stock from a bank. In the following year, the taxpayer sued the bank for recision, arguing that the bank loan was violative of state law, and moreover, that the bank had failed to perform certain promises. The parties eventually settled the case in 1935, with the taxpayer agreeing to pay half of the face amount of the note. In the year of the settlement, the taxpayer claimed the amount paid as a loss. The Commissioner denied the loss because it had been sustained five years earlier, and further asserted that the taxpayer recognized income from the discharge of half of his indebtedness.

The Board of Tax Appeals held that since the loss was not fixed until the dispute was settled, the loss was recognized in 1935, the year of the settlement, and the deduction was appropriately taken in that year. Additionally, the Board held that the portion of the note forgiven by the bank "was not the occasion for a freeing of assets and that there was no gain ..." Id. at 1265. Therefore, the taxpayer did not have any income from cancellation of indebtedness.

There is little difference between the present case and Sobel. Zarin incurred a $3,435,000 debt while gambling at Resorts, but in court, disputed liability on the basis of unenforceability. A settlement of $500,000 was eventually agreed upon. It follows from Sobel that the settlement served only to fix the amount of debt. No income was realized or recognized. When Zarin paid the $500,000, any tax consequence dissolved. [10]

Only one other court has addressed a case factually similar to the one before us. In United States v. Hall, 📄307 F.2d 238 [📄10 AFTR2d 5465] (10th Cir. 1962), the taxpayer owed an unenforceable gambling debt alleged to be $225,000. Subsequently, the taxpayer and the creditor settled for $150,000. The taxpayer then transferred cattle valued at $148,110 to his creditor in satisfaction of the settlement agreement. A jury held that the parties fixed the debt at $150,000, and that the taxpayer recognized income from cancellation of indebtedness equal to the difference between the[pg. 90-5683] $150,000 and the $148,110 value affixed to the cattle. Arguing that the taxpayer recognized income equal to the difference between $225,000 and $148,000, the Commissioner appealed.

The Tenth Circuit rejected the idea that the taxpayer had any income from cancellation of indebtedness. Noting that the gambling debt was unenforceable, the Tenth Circuit said, "The cold fact is that taxpayer suffered a substantial loss from gambling, the amount of which was determined by the transfer." Id. at 241. In effect, the Court held that because the debt was unenforceable, the amount of the loss and resulting debt cognizable for tax purposes were

fixed by the settlement at $148,110. Thus, the Tenth Circuit lent its endorsement to the contested liability doctrine in a factual situation strikingly similar to the one at issue. [11]

The **Commissioner** argues that Sobel and the contested liability doctrine only apply when there is an unliquidated debt; that is, a debt for which the amount cannot be determined. See Colonial Sav. Ass'n v. **Commissioner**, 📄 85 T.C. 855, 862-863 (1985) (Sobel stands for the proposition that "there must be a liquidated debt"), aff'd, 📄854 F.2d 1001 [📄62 AFTR2d 88-5420] (7th Cir. 1988). See also N. Sobel, Inc. v. **Commissioner**, 40 B.T.A. at 1265 (there was a dispute as to "liability and the amount" of the debt). Since **Zarin** contested his liability based on the unenforceability of the entire debt, and did not dispute the amount of the debt, the **Commissioner** would have us adopt the reasoning of the Tax Court, which found that **Zarin's** debt was liquidated, therefore barring the application of Sobel and the contested liability doctrine. **Zarin**, 92 T.C. at 1095 (**Zarin's** debt "was a liquidated amount" and "[t]here is no dispute about the amount [received].").

We reject the Tax Court's rationale. When a debt is unenforceable, it follows that the amount of the debt, and not just the liability thereon, is in dispute. Although a debt may be unenforceable, there still could be some value attached to its worth. This is especially so with regards to gambling debts. In most states, gambling debts are unenforceable, and have "but slight potential ..." United States v. Hall, 📄307 F.2d 238, 241 [📄10 AFTR2d 5465] (10th Cir. 1962). Nevertheless, they are often collected, at least in part. For example, Resorts is not a charity; it would not have extended illegal credit to Zarin and others if it did not have some hope of collecting debts incurred pursuant to the grant of credit.

Moreover, the debt is frequently incurred to acquire gambling chips, and not money. Although casinos attach a dollar value to each chip, that value, unlike money's, is not beyond dispute, particularly given the illegality of gambling debts in the first place. This proposition is supported by the facts of the present case. Resorts gave Zarin $3.4 million dollars of chips in exchange for markers evidencing Zarin's debt. If indeed the only issue was the enforceability of the entire debt, there would have been no settlement. Zarin would have owed all or nothing. Instead, the parties attached a value to the debt considerably lower than its face value. In other words, the parties agreed that given the circumstances surrounding Zarin's gambling spree, the chips he acquired might not have been worth $3.4 million dollars, but were worth something. Such a debt cannot be called liquidated, since its exact amount was not fixed until settlement.

To summarize, the transaction between **Zarin** and Resorts can best be characterized as a disputed debt, or contested liability. **Zarin** owed an unenforceable debt of $3,435,000 to

Resorts. After **Zarin** in good faith disputed his obligation to repay the debt, the parties settled for $500,000, which **Zarin** paid. That $500,000 settlement fixed the amount of loss and the amount of debt cognizable for tax purposes. Since **Zarin** was deemed to have owed $500,000, and since he paid Resorts $500,000 no adverse tax consequences attached to **Zarin** as a result. [12]   [pg. 90-5684]

## V

In conclusion, we hold that Zarin did not have any income from cancellation of indebtedness for two reasons. First, the Code provisions covering discharge of debt are inapplicable since the definitional requirement in I.R.C. section 108(d)(1) was not met. Second, the settlement of Zarin's gambling debts was a contested liability. We reverse the decision of the Tax Court and remand with instructions to enter judgment that Zarin realized no income by reason of his settlement with Resorts.

**Judge:** STAPLETON, Circuit Judge, dissenting.

I respectfully dissent because I agree with the Commissioner's appraisal of the economic realities of this matter.

Resorts sells for cash the exhilaration and the potential for profit inherent in games of chance. It does so by selling for cash chips that entitle the holder to gamble at its casino. Zarin, like thousands of others, wished to purchase what Resorts was offering in the marketplace. He chose to make this purchase on credit and executed notes evidencing his obligation to repay the funds that were advanced to him by Resorts. As in most purchase money transactions, Resorts skipped the step of giving Zarin cash that he would only return to it in order to pay for the opportunity to gamble. Resorts provided him instead with chips that entitled him to participate in Resorts' games of chance on the same basis as others who had paid cash for that privilege. [1]   Whether viewed as a one or two-step transaction, however, Zarin received either $3.4 million in cash or an entitlement for which others would have had to pay $3.4 million.

Despite the fact that Zarin received in 1980 cash or an entitlement worth $3.4 million, he correctly reported in that year no income from his dealings with Resorts. He did so solely because he recognized, as evidenced by his notes, an offsetting obligation to repay Resorts $3.4 million in cash. See, e.g., Vukasovich, Inc. v. Commissioner, 790 F.2d 1409 [58 AFTR2d 86-5107] (9th Cir. 1986); United States v. Rochelle, 384 F.2d 748 [20 AFTR2d 5630] (5th Cir. 1967), cert. denied, 390 U.S. 946 (1968); Bittker and Thompson, Income From the Discharged Indebtedness: The Progeny of United States v. Kirby Lumber Co., 66 Calif. L.

Rev. 159 (1978). In 1981, with the delivery of **Zarin's** promise to pay Resorts $500,000 and the execution of a release by Resorts, Resorts surrendered its claim to repayment of the remaining $2.9 million of the money **Zarin** had borrowed. As of that time, **Zarin's** assets were freed of his potential liability for that amount and he recognized gross income in that amount. **Commissioner** v. Tufts, 📄 461 U.S. 300 [📄51 AFTR2d 83-1132] (1983); United States v. Kirby Lumber Company, 📄284 U.S. 1 [📄10 AFTR 458] (1931); Vukasovich, Inc. v. **Commissioner**, 📄790 F.2d 1409 [📄58 AFTR2d 86-5107] (9th Cir. 1986). But see United States v. Hall, 📄307 F.2d 238 [📄10 AFTR2d 5465] (10th Cir. 1962). [2]

The only alternatives I see to this conclusion are to hold either (1) that Zarin realized $3.4 million to income in 1980 at a time when both parties to the transaction thought there was an offsetting obligation to repay or (2) that the $3.4 million benefit sought and received by Zarin is not taxable at all. I find the latter alternative unacceptable as inconsistent with the fundamental principle of the Code that anything of commercial value received by a taxpayer is taxable unless expressly excluded from gross income. [3] Commissioner v. Glenshaw [pg. 90-5685]Glass Co., 📄348 U.S. 426 [📄47 AFTR 162] (1955); United States v. Kirby Lumber Co., supra. I find the former alternative unacceptable as impracticable. In 1980, neither party was maintaining that the debt was unenforceable and, because of the settlement, its unenforceability was not even established in the litigation over the debt in 1981. It was not until 1989 in this litigation over the tax consequences of the transaction that the unenforceability was first judicially declared. Rather than require such tax litigation to resolve the correct treatment of a debt transaction, I regard it as far preferable to have the tax consequences turn on the manner in which the debt is treated by the parties. For present purposes, it will suffice to say that where something that would otherwise be includable in gross income is received on credit in a purchase money transaction, there should be no recognition of income so long as the debtor continues to recognize an obligation to repay the debt. On the other hand, income, if not earlier recognized, should be recognized when the debtor no longer recognizes an obligation to repay and the creditor has released the debt or acknowledged its unenforceability. [4]

In this view, it makes no difference whether the extinguishment of the creditor's claim comes as a part of a compromise. Resorts settled for 14 cents on the dollar presumably because it viewed such a settlement as reflective of the odds that the debt would be held to be enforceable. While Zarin should be given credit for the fact that he had to pay 14 cents for a release, I see no reason why he should not realize gain the same manner as he would have if Resorts had concluded on its own that the debt was legally unenforceable and had written it off as uncollectible. [5]

I would affirm the judgment of the Tax Court.

[1]   David Zarin's wife, Louise, is also a party to this appeal, since she filed a joint return with her husband. When the term "Zarin" is used in this opinion, however, it will refer only to David Zarin.

[2]   A "marker" is a negotiable draft payable to Resorts and drawn on the marker's bank.

[3]   Under the "considered cleared" method, Resorts would treat a personal check as a cash transaction, and would therefore not apply the amount of the check in calculating the amount of credit extended Zarin. "This trip only" credit allowed Resorts to grant temporary increases of credit for a given visit, so long as the credit limit was lowered by the next visit.

[4]   On July 8, 1983, the New Jersey Casino Control Commission found that Resorts violated the Emergency Order at least thirteen different times, nine involving **Zarin**, and fined Resorts $130,000.

[5]   **Zarin** claims that at the time he was suffering from a recognized emotional disorder that caused him to gamble compulsively.

[6]   Subsequent to the Tax Court's decision, **Zarin** filed a motion to reconsider, arguing that he was insolvent at the time Resorts forgave his debt, and thus, under ▤I.R.C. section 108(a)(1)(B), could not have income from discharge of indebtedness. He did, not, however, raise that issue before the Tax Court until after it rendered its decision. The Tax Court denied the motion for reconsideration. By reason of our resolution of this case, we do not need to decide whether the Tax Court abused its discretion in denying **Zarin's** motion.

[7]   The Tax Court held that the Commissioner had not met its burden of proving that the debt owed Resorts was enforceable as a matter of state law. Zarin, 92 T.C. at 1090. There was ample evidence to support that finding. In New Jersey, the extension of credit by casinos "to enable [any] person to take part in gaming activity as a player" is limited. N.J. Stat. Ann. §5:12-101(b) (1988). Under N.J. Stat. Ann. §5:12-101(f), any credit violation is "invalid and unenforceable for the purposes of collection ..." In Resorts Int'l Hotel, Inc. v. Salomone, 178 N.J. Super. 598, 429, A.2d 1078 (App. Div. 1981), the court held that "casinos must comply with the Legislature's strict control of credit for gambling

purposes. Unless they do, the debts reflected by players' checks will not be enforced ...."
Id. at 607, 429 A.2d at 1082.

With regards to the extension of credit to Zarin after the Emergency Order of October, 1979, was issued, Resorts did not comply with New Jersey regulations. The Casino Control Commission specifically stated in 1983 "that Resorts was guilty of infractions, violations, improprieties, with the net effect that [Zarin] was encouraged to continue gambling long after, one, his credit line was reached, and exceeded; two, long after it became apparent that the gambler was an addicted gambler; three, long after the gambler had difficulty in paying his debts; and four, Resorts knew the individual was gambling when he should not have been gambling." Appendix at 325-326. It follows, therefore, that under New Jersey law, the $3,435,000 debt Zarin owed Resorts was totally unenforceable.

[8]   Although, as noted above, Zarin would not have been able to leave the casino with cash or chips, and probably would not have used the chips for services, these facts do not change the character of the chips. Despite the aforementioned limitations upon Zarin's use of the chips, they remain an accounting mechanism or evidence of a debt. Resorts' increased interest in Zarin's chips does not rise to the level of a property interest, since Zarin still has dominion over the chips within the casino.

[9]   The parties stipulated before the Tax Court that New Jersey casino "chips are property which are not negotiable and may not be used to gamble or for any other purpose outside the casino where they were issued." It could be argued that we are bound by this stipulation to accept the proposition that chips are property. We do not dispute the notion that chips are property, but as discussed above, they are only property in the hands of the casino. The stipulation is consistent with this idea. In fact, both parties agreed in their briefs that chips are property of the casino. Moreover, during oral arguments, both parties agreed that chips were not property when held by the gambler.

[10]   Had Zarin not paid the $500,000 dollar settlement, it would be likely that he would have had income from cancellation of indebtedness. The debt at that point would have been fixed, and Zarin would have been legally obligated to pay it.

[11]   The Commissioner argues that the decision in Hall was based on United States Supreme Court precedent since overruled, and therefore Hall should be disregarded. Indeed, the Hall court devoted a considerable amount of time to Bowers v. Kerbaugh-Empire Co., 271 U.S. 170, [5 AFTR 6014] 46 S.Ct. 449 (1926), a case whose

validity is in question. We do not pass on the question of whether or not Bowers is good law. We do note that Hall relied on Bowers only for the proposition that " 'a court need not in every case be oblivious to the net effect of the entire transaction.' " United States v. Hall, 307 F.2d at 242, quoting Bradford v. Commissioner, 📄 233 F.2d 935, 939 [📄49 AFTR 1358] (6th Cir. 1956). Hall's reliance on Bowers did not extend to the issue of contested liability, and even if it did, the idea that "Courts need not apply mechanical standards which smother the reality of a particular transaction," Id. at 241, is hardly an exceptional concept in the tax realm. See **Commissioner** v. Tufts, 📄461 U.S. 300, [📄 51 AFTR2d 83-1132] 103, S.Ct. 1826 (1983); Hillsboro Nat'l Bank v. **Commissioner,**📄 460 U.S. 370, [📄51 AFTR2d 83-874] 📄103 S.Ct. 1134 (1983).

[12]  The **Commissioner** argues in the alternative that **Zarin** recognized $3,435,000 of income in 1980. This claim has no merit. Recognition of income would depend upon a finding that **Zarin** did not have cancellation of indebtedess income solely because his debt was unenforceable. We do not so hold. Although unenforceability is a factor in our analysis, our decision ultimately hinges upon the determination that the "disputed debt" rule applied, or alternatively, that chips are not property within the meaning of 📄I.R.C. section 108.

[1]  I view as irrelevant the facts that Resorts advanced credit to Zarin solely to enable him to patronize its casino and that the chips could not be used elsewhere or for other purposes. When one buys a sofa from the furniture store on credit, the fact that the proprietor would not have advanced the credit for a different purpose does not entitle one to a tax-free gain in the event the debt to the store is extinguished for some reason.

[2]  This is not a case in which parties agree subsequent to a purchase money transaction that the property purchased has a value less than thought at the time of the transaction. In such cases, the purchase price adjustment rule is applied and the agreed-upon value is accepted as the value of the benefit received by the purchaser; see e.g., Commissioner v. Sherman, 📄135 F.2d 68 [📄30 AFTR 1378] (6th Cir. 1943); Commissioner v. N. Sobel, Inc., 📄40 B.T.A. 1263 (1939). Nor is this a case in which the taxpayer is entitled to rescind an entire purchase money transaction, thereby to restore itself to the position it occupied before receiving anything of commercial value. In this case, the illegality was in the extension of credit by Resorts and whether one views the benefit received by Zarin as cash or the opportunity to gamble, he is no longer in a position to return that benefit.

<sup>3</sup> As the court's opinion correctly points out, this record will not support an exclusion under §108(a) which relates to discharge of debt in an insolvency or bankruptcy context. Section 108(e)(5) of the Code, which excludes discharged indebtedness arising from a "purchase price adjustment" is not applicable here. Among other things, §108(e)(5) necessarily applies only to a situation in which the debtor still holds the property acquired in the purchase money transaction. Equally irrelevant is §108(d)'s definition of "Indebtedness relied upon heavily by the court. Section 108(d) expressly defines that the term solely for the purposes of §108 and not for the purposes of §61(a)(12).

<sup>4</sup> Cf. Bear Manufacturing Co. v. United States, ▤430 F.2d 152 [▤26 AFTR2d 70-5315] (7th Cir. 1970) (termination of a liability for tax purposes turns not on running of applicable statute of limitations, but on conduct of the parties), cert. denied, 400 U.S. 1021 (1971).

<sup>5</sup> A different situation exists where there is a bona fide dispute over the amount of a debt and the dispute is compromised. Rather than require tax litigation to determine the amount of income received, the Commission treats the compromise figure as representing the amount of the obligation. I find this sensible and consistent with the pragmatic approach I would take.

END OF DOCUMENT -

© 2016 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit

# C

Checkpoint Contents
  Federal Library
    Federal Source Materials
      Code, Regulations, Committee Reports & Tax Treaties
        Internal Revenue Code
          Current Code
            Subtitle F Procedure and Administration §§6001-7874
              Chapter 61 INFORMATION AND RETURNS §§6001-6117
                Subchapter A Returns and Records §§6001-6096
                  Part III INFORMATION RETURNS §§6031-6060
                    Subpart B Information Concerning Transactions With Other Persons §§6041-6050W
                      §6050P Returns relating to the cancellation of indebtedness by certain entities.

## Internal Revenue Code

## § 6050P Returns relating to the cancellation of indebtedness by certain entities.

### (a) In general.

Any applicable entity which discharges (in whole or in part) the indebtedness of any person during any calendar year shall make a return (at such time and in such form as the Secretary may by regulations prescribe) setting forth—

**(1)**

the name, address, and TIN of each person whose indebtedness was discharged during such calendar year,

**(2)**

the date of the discharge and the amount of the indebtedness discharged, and

**(3)**

such other information as the Secretary may prescribe.

**(b) Exception.**

Subsection (a) shall not apply to any discharge of less than $600.

**(c) Definitions and special rules.**

For purposes of this section—

**(1) Applicable entity.**

The term "applicable entity" means—

(A) an executive, judicial, or legislative agency (as defined in section 3701 (a)(4) of title 31, United States Code ), and

(B) an applicable financial entity.

**(2) Applicable financial entity.**

The term "applicable financial entity" means—

(A) any financial institution described in section 581 or 591(a) and any credit union,

(B) the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the National Credit Union Administration, and any other Federal executive agency (as defined in section 6050M ), and any successor or subunit of any of the foregoing,

(C) any other corporation which is a direct or indirect subsidiary of an entity referred to in subparagraph (A) but only if, by virtue of being affiliated with such entity, such other corporation is subject to supervision and examination by a Federal or State agency which regulates entities referred to in subparagraph (A) , and

(D) any organization a significant trade or business of which is the lending of money.

**(3) Governmental units.**

In the case of an entity described in paragraph (1)(A) or (2)(B) , any return under this section shall be made by the officer or employee appropriately designated for the purpose of making such return.

**(d) Statements to be furnished to persons with respect to whom information is required to be furnished.**

Every applicable entity required to make a return under subsection (a) shall furnish to each person whose name is required to be set forth in such return a written statement showing—

**(1)**

the name and address of the entity required to make such return, and

**(2)**

the information required to be shown on the return with respect to such person.

The written statement required under the preceding sentence shall be furnished to the person on or before January 31 of the year following the calendar year for which the return under subsection (a) was made.

**(e) Alternative procedure.**

In lieu of making a return required under subsection (a) , an agency described in subsection (c)(1)(A) may submit to the Secretary (at such time and in such form as the Secretary may by regulations prescribe) information sufficient for the Secretary to complete such a return on behalf of such agency. Upon receipt of such information, the Secretary shall complete such return and provide a copy of such return to such agency.

END OF DOCUMENT -

© 2016 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit

# D

Checkpoint Contents
  Federal Library
    Federal Source Materials
      IRS Rulings & Releases
        Private Letter Rulings & TAMs, FSAs, SCAs, CCAs, GCMs, AODs & Other FOIA Documents
          Private Letter Rulings & Technical Advice Memoranda (1950 to Present)
            2012
              PLR/TAM 201217028 - 201217001
                PLR 201217001 -- IRC Sec(s). 6050P, 04/27/2012

**Private Letter Rulings**

# Private Letter Ruling 201217001, 04/27/2012, IRC Sec(s). 6050P

**UIL No.** 6050P.00-00

# Information reporting for discharges of indebtedness—settlement agreements—identifiable events.

## Headnote:

Financial institution was required to file Forms 1099-C with respect to write-off of balances and charges pursuant to its settlement agreement because discharge was result of identifiable event listed in Reg § 1.6050P-1(b)(2) , and not by operation of state law.

*Reference(s):* ¶ 60,50P5.01(20); Code Sec. 6050P;

## Full Text:

Number: **201217001**

Release Date: 4/27/2012

Index Number: 6050P.00-00

Third Party Communication: None

Date of Communication: Not Applicable

Person To Contact: [Redacted Text]

[Redacted Text], ID No.

Telephone Number: [Redacted Text]

Refer Reply To:

CC:PA:02

PLR-120765-11

Date:

January 27, 2012

## Legend:

Entity 1 =

Entity 2 =

Asset =

State X =

Date 1 =

Date 2 =

Date 3 =

Collection Remedy =

Dear [Redacted Text]:

This letter responds to the letter dated May 6, 2011, as supplemented by the letter dated August 9, 2011, submitted on behalf of Entity 1, requesting the following ruling:

Entity 1 is not required to file forms 1099-C with respect to the write-off of balances and charges pursuant to its settlement agreement because the discharge was not the result of an

"identifiable event" listed in 🖹Treasury Regulation § 1.6050P-1(b)(2), but rather was required by operation of state law.

## Facts

Entity 1 is a financial institution chartered by State X that provides its members with thrift services such as checking and savings accounts, certificates of deposit, a source of credit, and other financial services. Entity 2 was a service company that offered retail sale installment contracts from Asset dealers to financial institutions for the financing of the Assets and serviced those contracts including, when necessary, initiating default proceedings on behalf of the financial institution that held a security interest in the Asset. Entity 1 acquired various Asset loan installment contracts and retained Entity 2 for servicing, collection and enforcement of those contracts.

On Date 1, consumers in State X filed a class action lawsuit against Entity 1 in the Circuit Court of State X alleging violations of State X law, including that the notices related to the Collection Remedy did not meet statutory notice requirements. The case was later removed to U.S. District Court, Western District of State X. On Date 2, the court denied Entity 1's Motion for Summary Judgment, and held that available remedies if the plaintiffs eventually prevailed included a bar against collecting deficiency judgments and the receipt of statutory damages. On Date 3, Entity 1 and class plaintiffs signed a Settlement and Release Agreement ("Agreement") settling the entire class action lawsuit. The Agreement provides, among other things, that Entity 1 shall close all accounts and write off any balances owed or claimed remaining as any deficiency on the loans, including judgment balances, that were the subject of the litigation. The Agreement provides for payments from Entity 1 to the class members out of the "Net Distributable Settlement Fund" provided by Entity 1. The Agreement further provides that all class members shall be responsible for paying any and all federal taxes due on payments made to them pursuant to the settlement. The Agreement provides that Entity 1 will request a Private Letter Ruling from the IRS supporting the parties' position that Entity 1 is not required to file information returns relating to the terms of the Agreement. The Notice of Proposed Class Action Settlement that Entity 1 sent to the class members states that the request for Private Letter Ruling would be made by Entity 1 in support of the parties' position that the class members are not obligated to report the amount of the deficiency write-off or judgment write-off received as part of the settlement.

## Law & Analysis

🖹Section 6050P of the Internal Revenue Code requires that an applicable entity report any discharges (in whole or in part) of indebtedness of any person in excess of $600.00 The report is to include the name, address and TIN of each person whose indebtedness is discharged, the date of the discharge and the amount of indebtedness discharged. In addition, 🖹section

1.6050P-1(b)(2) of the Treasury Regulations provides that a discharge of indebtedness occurs if one of the following "identifiable events" takes place:

(A) A discharge of indebtedness under title 11 of the United States Code (bankruptcy);

(B) A cancellation or extinguishment of an indebtedness that renders a debt unenforceable in a receivership, foreclosure, or similar proceeding in a federal or state court, as described in 📄section 368(a)(3)(A)(ii) (other than a discharge described in paragraph (b) (2)(i)(A) of this section);

(C) A cancellation or extinguishment of an indebtedness upon the expiration of the statute of limitations for collection of an indebtedness, subject to the limitations described in paragraph (b)(2)(ii) of this section, or upon the expiration of a statutory period for filing a claim or commencing a deficiency judgment proceeding;

(D) A cancellation or extinguishment of an indebtedness pursuant to an election of foreclosure remedies by a creditor that statutorily extinguishes or bars the creditor's right to pursue collection of the indebtedness;

(E) A cancellation or extinguishment of an indebtedness that renders a debt unenforceable pursuant to a probate or similar proceeding;

(F) A discharge of indebtedness pursuant to an agreement between an applicable financial entity and a debtor to discharge indebtedness at less than full consideration;

(G) A discharge of indebtedness pursuant a decision by the creditor, or the application of a defined policy of the creditor, to discontinue collection activity and discharge debt; or

(H) The expiration of the non-payment testing period, as described in paragraph (b)(2)(iv) of this section.

Out of the above events, only two have a potential bearing on the requested ruling. The first possible event, 📄 section 1.6050P-1(b)(2)(F), provides that an identifiable event exists if the applicable financial entity and debtor agree to discharge the indebtedness for less than full consideration. To establish consideration, there must be a performance or a return promised which has been bargained for by the parties. Restatement (Second) Contracts 📄§ 71(1) (1981). In this case, Entity 1 and the debtor-class members agreed to the entry of a judgment, approved and supervised by the court, that incorporates the parties' Agreement by which Entity 1 will write off all remaining debt balances as part of the overall settlement of the pending litigation. This appears, on its face, to be the identifiable event described in subsection (F) of the regulations. The request for the PLR submitted on behalf of Entity 1, however, argues that the Agreement does not reflect a mere agreement of the parties. Entity 1 argues instead that the Agreement reflects the operation of the law of State X. The law of State X provides that, in a case where the Collection Remedy did not strictly comply with notice requirements, there is an absolute bar on collection of any remaining deficiency balances. The class members alleged that Entity X violated various aspects of the notice requirements in the three types of notices that Entity X sent to the class members as part of its Collection Remedy. Entity 1 never specifically admitted to violating the notice requirements, however, and the Agreement

contains a statement that Entity 1 is not making any admission or concession with respect to the claims or defenses alleged in the litigation, including any alleged violation of federal, state or local law. Thus, although the law of State X does provide for "strict compliance" in observing the requirements for sufficiency of notices to debtors, Entity 1 has not established, nor do the terms of the Agreement provide, that the notices were, in fact, deficient.

The request for the ruling argues that the law of State X required the bar on the recovery balances due to the defective notices, and the only real issue once the court had certified the class action lawsuit was the amount of damages to be awarded to the class members. The Agreement contains an acknowledgement that the class members' claims are premised on the state law bar on recovery of deficiency balances, and that the amounts of the individual settlement awards would be determined by application of state law; however, there is no definitive finding or admission in any documents related to the case that the notices were defective. The court's Order on Date 2 by which it denied Entity 1's Motion for Summary Judgment specifically states that "one of the main issues to be decided in this case is whether Defendant [Entity 1] gave Plaintiff [class representative] the notice statutorily required." [1]

Entity 1 did admit, for purposes of opposing the Plaintiff's Motion for Class Certification, that it "*may be*" barred from obtaining a deficiency judgment "*if* it failed to give notice required by the UCC" (emphasis added). The closest thing to an admission by Entity 1 that some of its notices may have been deficient is the statement in its Suggestions In Opposition to Plaintiff's Motion For Class Certification that "each of the seventy-six (76) proposed class members who received a `pre-sale' notice sent after May 2005 received a notice that clearly satisfied the requirements of the law of the state governing their UCC claim." Entity 1 made a similar statement in support of its motion for leave to file an amended answer and counterclaim. This appears to be a tacit admission that the notices sent to the other 28 class members might have been defective. In its Motion for Summary Judgment, filed after the court certified the class, Entity 1 admitted, solely for purposes of the motion, that it "assumes *arguendo* that the `pre-sale' notice sent to plaintiff does not comply with 📄section 9-614 of the [State X] UCC. However, [Entity 1] maintains that the pre-sale notices sent to the majority of the 103 other proposed class members do comply with the requirements of the UCC applicable to each of them." This admission solely for purposes of resolving a potential factual dispute so that the court could rule on the Motion for Summary Judgment falls short of an actual admission that the notices were defective and that recovery was barred by state law. As stated above, the court denied the motion and explicitly held that the issue of the adequacy of the notices remained in dispute.

The Agreement states that it was reached for the purpose of "avoiding the burdens, expense, and risk of further litigation." The court approved the Agreement without taking any further action. It did not make any ruling as to the adequacy of the notices.

The request for PLR is essentially asking the IRS to make a determination that the notices to the debtors were inadequate and that Entity 1 was therefore barred by statute from collecting

the balances owed. The request alleges that the parties to the lawsuit agreed among themselves that, at the time of the settlement, there was in fact no legal dispute about whether the application of state law would bar the recovery of the deficiency balances and that the allegedly defective "pre-sale" notices had acted to bar all future collection activity.

The court overseeing the class action lawsuit did not make a determination as to the sufficiency of the notices, however, and it is not within the purview of the IRS to do so in this private letter ruling. The actions of the court in overseeing the litigation, including certifying the class, ruling on parties' motions, and approving the class action settlement, do not serve to convert the forgiveness of the debt from being entered into voluntarily to one forced by operation of state law. The Agreement should be taken on its face as an agreement between Entity 1 and the debtors to discharge the indebtedness at less than full consideration. Thus, 📄 section 1.6050P-1(b)(2)(F) applies.

The second possible event, 📄 section 1.6050P-1(b)(2)(G), provides that a discharge of indebtedness exists if a creditor discontinues collection activity pursuant to a decision by the creditor or a defined policy of the creditor. According to 📄section 1.6050P- 1(b)(2)(iii), a creditor's defined policy includes both a written policy and the creditor's established business practice. In this case, the cancellation of indebtedness does not appear to have been as a result of any defined policy or business practice of Entity 1, but rather by its decision to discontinue collection action as part of settling the litigation. This decision appears to fall within subsection (G). In any event, regardless of whether subsection (G) of the regulation applies, the event set forth in regulation subsection (F), as set forth above, does apply and the 📄 section 6050P reporting requirements must be met.

## Conclusion

Based solely on the information provided and the representations made, we conclude that Entity 1 is required to file Forms 1099-C with respect to the write-off of balances and charges pursuant to its settlement agreement because the discharge was the result of an identifiable event listed in 📄section 1.6050P-1(b)(2) and not by operation of state law.

Except as expressly provided herein, no opinion is expressed or implied concerning the tax consequences of any aspect of any transaction or item discussed or referenced in this letter.

To the extent that this ruling is in conflict with other factually similar rulings that were previously issued, the prior rulings are limited to their recipients and have no precedential value. This ruling is directed only to the taxpayer requesting it. 📄 Section 6110(k)(3) of the Code provides that it may not be used or cited as precedent.

In accordance with the Power of Attorney on file with this office, a copy of this letter is being sent to your authorized representative.

The rulings contained in this letter are based upon information and representations submitted by the taxpayer and accompanied by a penalty of perjury statement executed by an appropriate party. While this office has not verified any of the material submitted in support of the request for rulings, it is subject to verification on examination.

Sincerely,

Ashton P. Trice

Chief, Branch 2

(Procedure & Administration)

Enclosures (2)

---

1

The Order also decided a conflict of laws issue in holding that the law of State X did not apply, but rather that the law of another state would apply. The Order determined, however, that laws of both jurisdictions provided for the same available remedies.

END OF DOCUMENT -

© 2015 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit

# E

Checkpoint Contents
  Federal Library
    Federal Source Materials
      IRS Rulings & Releases
        Private Letter Rulings & TAMs, FSAs, SCAs, CCAs, GCMs, AODs & Other FOIA Documents
          Private Letter Rulings & Technical Advice Memoranda (1950 to Present)
          2014
            PLR/TAM 201408035 - 201408001
              PLR 201408001 -- IRC Sec(s). 6050P, 02/21/2014

## Private Letter Rulings

# Private Letter Ruling 201408001, 02/21/2014, IRC Sec(s). 6050P

**UIL No.** 6050P.00-00

# Information reporting for discharges of debt—settlement agreements—identifiable events.

## Headnote:

Entity was required to file Forms 1099-C with respect to write-off of balances and charges pursuant to its settlement agreement because discharge was result of identifiable event listed in Reg § 1.6050P-1(b)(2) .

*Reference(s):* ¶ 60,50P5.01(20); Code Sec. 6050P;

## Full Text:

Number: **201408001**

Release Date: 2/21/2014

Index Number: 6050P.00-00

Third Party Communication: None

Date of Communication: Not Applicable

Person To Contact: [Redacted Text]

[Redacted Text], ID No.

Telephone Number: [Redacted Text]

Refer Reply To:

CC:PA:02

PLR-109624-13

Date:

November 13, 2013

## TY:

## Legend

Entity 1 =

Entity 2 =

State X =

Date 1 =

Date 2 =

Date 3 =

Date 4 =

Date 5 =

Collection Remedy =

Dear [Redacted Text]:

This letter responds to the letter dated February 19, 2013, submitted on behalf of Entity 1, requesting a ruling that Entity 1 is not required to file Forms 1099-C with respect to the write-off

of balances and charges pursuant to its settlement agreement because the discharge was not the result of an "identifiable event" listed in 📄Treasury Regulation § 1.6050P-1(b)(2), but rather was required by operation of state law. For the reasons set forth below, we conclude that Entity 1 is required to comply with the reporting requirements of 📄I.R.C. § 6050P because the discharge of indebtedness was the result of an identifiable event listed in 📄Treas. Reg. § 1.6050P-1(b)(2).

## Facts

Entity 1 is a financial institution chartered by State X engaged in, among other activities, the business of extending credit to consumers for the purchase of certain assets. Entity 1 is the successor by merger to another financial institution that had engaged in similar consumer credit activities as Entity 1 and which, prior to the merger, entered into an agreement with Entity 2 to engage in certain remedies for collection and enforcement of the retail sale installment contracts relating to the consumer loans.

Entity 1 filed a complaint in the Circuit Court of State X on Date 1 to recover a deficiency balance remaining on a consumer credit account after Collection Remedy had been taken. The defendant filed a motion to dismiss the complaint. The court on Date 2 issued an order dismissing the complaint. Also on Date 2, the defendant filed a counterclaim, which she later amended, that became the basis for the continuing litigation. On Date 3, the defendant/counterclaimant filed a Motion for Class Certification. The parties entered into a Settlement and Release Agreement ("Agreement") on Date 4 and, on the same date, filed with the court a Joint Motion for Preliminary Approval of Class Action Settlement Agreement. The following day, the court entered an Order Preliminarily Approving Class Action Settlement ("Preliminary Order"). On Date 5, the court entered an Order Finally Approving Class Action Settlement and Certifying a Class for Settlement Purposes ("Final Order") and also entered its Final Judgment in the case.

The Preliminary Order states that the parties have "executed the Agreement in order to settle and resolve the Litigation as between them and the proposed Settlement Class." The Preliminary Order states that the "Court finds preliminarily...that under [State X] law, [Entity 1] would not accrue any deficiency balance or collect any deficiency judgment...[regarding] `presale notices' that failed to comply with the [State X] UCC." The Preliminary Order further states that Entity 1 would be permitted to "offset deficiency balances and judgments against damages claimed" by the counterclaimant or class action members, under the law of State X. The Preliminary Order specifies that its findings are "[p]ursuant to the Agreement, and for purposes of the Settlement only." The Final Order incorporates the Preliminary Order and the parties' Agreement. The terms of the Agreement specified the creation of a qualified settlement fund, and the distribution from the fund to the class members and their counsel. The Agreement also specified that Entity 1 would submit a request for a private letter ruling to the IRS requesting a ruling that Entity 1 is not required to file information returns relating to distributions from the settlement fund.

## Law and Analysis

Section 6050P of the Internal Revenue Code requires that an applicable entity report any discharges (in whole or in part) of indebtedness of any person in excess of $600.00. The report is to include the name, address and taxpayer identification number of each person whose indebtedness is discharged, the date of the discharge and the amount of indebtedness discharged. In addition, section 1.6050P-1(b)(2) of the Treasury regulations provides that a discharge of indebtedness occurs if one of eight "identifiable events" that the regulation defines takes place.

Of the identifiable events, only two have a potential bearing on the requested ruling. The first possible event, section 1.6050P-1(b)(2)(F), provides that an identifiable event exists when the applicable financial entity and debtor agree to discharge the indebtedness for less than full consideration. To establish consideration, there must be a performance or a return promised which has been bargained for by the parties. Restatement (Second) Contracts § 71(1) (1981). In this case, Entity 1 and the debtor-class members agreed to the entry of a judgment, approved and supervised by the court, which incorporates the parties' Agreement by which Entity 1 will write off all remaining debt balances as part of the overall settlement of the pending litigation. This appears, on its face, to be the identifiable event described in subsection (F) of the regulations.

The request for PLR submitted on behalf of Entity 1 argues that the Agreement does not reflect a mere agreement of the parties, or any other identifiable event, but rather is simply a recognition that the write-off of the deficiency balances was required under the law of State X. The law of State X provides that, in a case where the Collection Remedy did not strictly comply with notice requirements, there is an absolute bar on collecting any remaining deficiency balances. The defendant's motion to dismiss filed in response to Entity 1's complaint, and the defendant's counterclaim, alleged that Entity 1 violated various aspects of the notice requirements in the presale notices sent to the class members as part of the Collection Remedy. The settlement Agreement acknowledges that the "claims are premised on state law which bars the recovery of deficiency balances in certain circumstances" and "[t]he settlement consideration provided in the Agreement is determined by application of state law." The Agreement contains no admission or concession by Entity 1 with respect to the claims or defenses alleged in the class action counterclaim. The Agreement contains a specific denial of liability in paragraph 1, which denial of liability was incorporated into the Preliminary Order and Final Order. The Final Order recites that by entering into the settlement Agreement, the parties shall not be deemed to have admitted or conceded liability with respect to any of the pending claims or defenses alleged.

Entity 1 contends that the order granting the defendant's motion to dismiss, coupled with the Preliminary and Final Orders approving the settlement, constitutes a substantive ruling that the presale notices were defective and the deficiencies, therefore, were not legally accrued or collectible. The original order dismissing the defendant from the case, however, was a one-

sentence order with no substantive findings or memorandum opinion, issued simultaneously with the filing of the defendant's counterclaim. The Preliminary Order approving the class action settlement specifically states that the findings are "Pursuant to the Agreement, and for the purposes of the Settlement only." The Preliminary Order was drafted by the parties and submitted to the court for signature, rather than an order that resulted from an independent judicial investigation into the allegations and defenses of the parties. Entity 1 has never made any admission regarding the alleged inadequacy of the presale notices. It vigorously pursued the litigation, including filing a Motion for Summary Judgment, throughout the pendency of the case. It was only by entering into a settlement agreement with the class members that Entity 1 gave up its disputed claims to deficiency amounts.

Although the application of the law of State X regarding the adequacy of the presale notices may have been a factor in the parties' decision to settle the litigation, such considerations are typical of parties' assessment of litigation hazards in arriving at a negotiated settlement. As the Preliminary Order states, the parties entered into the Agreement "which memorializes the Parties' negotiations and agreed-upon settlement" of the litigation. The Agreement states that Entity 1 entered into the Agreement because Entity 1 "desires to settle the claims being asserted against it in the Litigation...for the purpose of avoiding the burden, expense, and uncertainty of continuing litigation." The fact that the terms of the Agreement were approved and incorporated into the Circuit Court's Preliminary Order or Final Order does not serve to covert the discharge of the debt from being entered into voluntarily to one forced by operation of state law. The Settlement and Release Agreement should be taken on its face, as an agreement between Entity 1 and the debtors to discharge the indebtedness at less than full consideration for the purpose of resolving the pending litigation. Therefore, 📄section 1.6050P-1(b)(2)(F) applies.

The second possible event, 📄section 1.6050P-1(b)(2)(G), provides that a discharge of indebtedness exists where a creditor discontinues collection activity pursuant to a decision by the creditor or a defined policy of the creditor. According to 📄section 1.6050P-1(b)(2)(iii), a creditor's defined policy includes both a written policy and the creditor's established business practice. In this case, the cancellation of indebtedness is not a result of any defined policy or business practice of Entity 1, but rather by its decision to discontinue collection action as part of settling the litigation. This decision therefore may fall within 📄subsection (G). In any event, even if 📄subsection (G) of the regulation did not apply, the event set forth in regulation 📄subsection (F), as set forth above, does apply and the 📄section 6050P reporting requirements must be met.

## Conclusion

Based solely on the information provided and the representations made, Entity 1 is required to file Forms 1099-C with respect to the write-off of balances and charges pursuant to its settlement agreement because the discharge was the result of an identifiable event listed in 📄section 1.6050P-1(b)(2).

Except as expressly provided herein, no opinion is expressed or implied concerning the tax consequences of any aspect of any transaction or item discussed or referenced in this letter.

This ruling is directed only to the taxpayer requesting it. 📄Section 6110(k)(3) of the Code provides that it may not be used or cited as precedent.

In accordance with the Power of Attorney on file with this office, a copy of this letter is being sent to your authorized representatives.

The rulings contained in this letter are based upon information and representations submitted by the taxpayer and accompanied by a penalty of perjury statement executed by an appropriate party. While this office has not verified any of the material submitted in support of the request for rulings, it is subject to verification on examination.

Sincerely,

Ashton P. Trice

Chief, Branch 2

(Procedure & Administration)

Enclosures: (1) Copy of letter for 📄section 6110 purposes

(2) Notice of Intention to Disclose, 📄Notice 437

cc: [Redacted Text]

END OF DOCUMENT -

© 2015 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit

# F

Checkpoint Contents
　Federal Library
　　Federal Source Materials
　　　Federal Tax Decisions
　　　　American Federal Tax Reports
　　　　　American Federal Tax Reports (Prior Years)
　　　　　　1972
　　　　　　　AFTR 2d Vol. 30
　　　　　　　　30 AFTR 2d 72-5120 - 30 AFTR 2d 71-5001
　　　　　　　　　EXCHANGE SECURITY BK., ET AL. v. U.S., 30 AFTR 2d 72-5002 (345 F. Supp. 486), (DC-AL), 06/07/1972

American Federal Tax Reports

# EXCHANGE SECURITY BK., ET AL. v. U.S., Cite as 30 AFTR 2d 72-5002 (345 F. Supp. 486), (DC-AL), 06/07/1972

**EXCHANGE SECURITY BANK**, ET AL., PLAINTIFFS v. U.S., DEFENDANT. Ellen Gregg Ingalls, et al, PLAINTIFFS v. U.S., DEFENDANT.

## Case Information:

[pg. 72-5002]

| Code Sec(s): | |
|---|---|
| Court Name: | U.S. District Court, Northern Dist. of Alabama, S. Div., |
| Docket No.: | Civ Nos. 66-684, 68-389, |
| Date Decided: | 06/07/1972 |
| Tax Year(s): | Year 1960 |
| Disposition: | Decision in part for taxpayer, in part for Govt. |
| Cites: | 30 AFTR 2d 72-5002, 345 F Supp 486, 72-2 USTC P 9509. |

# HEADNOTE

**1. INCOME—Discharge of indebtedness—in general—stockholder's debt to corporation.** Taxpayer's income included debts cancelled by corp. Income was realized when cancellation became clear and virtually certain, not in prior year when litigation cast doubt on debt, nor in later year when formal entry of cancellation was made on corporation's books. Taxpayer was entitled to partial refund as dividend received credit.

*Reference(s):* 1972 P-H Fed. ¶5840; 7315(5); 7336(25).

# OPINION

Robert McD. Smith, Allen D. Rushton, Lange, Simpson, Robinson& Somerville, 1800 City Federal Bldg., Birmingham, Ala., Attys. for Plaintiffs.

Wayman G. Sherrer, U.S. Atty., Henry I. Frohsin, Asst. U.S. Atty., Federal Courthouse, Birmingham, Ala., Jack D. Warren, Atty., Tax Div., Dept. of Justice, Wash., D.C., for Defendant.

**Judge:** POINTER, Judge:

# Memorandum Of Opinion

[1] These actions, consolidated for trial, have been brought under 28 U.S.C. §1346(a)(1) for the refund of income taxes collected on the 1960 incomes of Ellen Gregg Ingalls (CA 66-684) and of the Estate of Robert I. Ingalls Sr., deceased (CA 68-389).[1] According to the assessments Mrs. Ingalls and her late husband's estate realized income in 1960 to the extent of $44,942.14 and $188,532.83, respectively, from the cancellation in that year by Ingalls Iron Works Company of debts owed by them to the company. The cancellation is said to have arisen as an incident of an agreement which settled part of a bitter intra-family dispute which had been going on for more than a decade, even the settlement of which spawned its own court battles.[2] With good reason no effort is made to claim a gratuitous forgiveness under Helvering v. American Dental Co., 318 U.S. 322 [30 AFTR 397] (1943) or insolvency on the part of the debtors per Mertens, Law of Federal Income Taxation, §11.22.

The family conflict erupted in 1948 when Mr. Ingalls Sr. opposed the marital plans of his son, Robert I. Ingalls Jr. Mr. Ingalls Sr., the founder and chief executive officer of Ingalls Iron Works Company, controlled its affairs; although, due to outright gifts and the establishment of family trusts, he no longer had a majority of the stock in his own name. Mr. Ingalls Jr. was, as

President and Vice [pg. 72-5003]Chairman, second in command of the company, as well as its largest individual stockholder. When the son went forward with the marriage, he soon found himself neither an officer nor a director of the company. Mr. Ingalls Sr. died in 1951, and by 1953 the son had managed to become the chief corporate executive, although his position was hardly secure in view of the some thirty separate lawsuits which were filed in the state and federal courts by one or another of the interested parties and companies. The focal point was a case in the state court in which Mrs. Ingalls was contesting, and her son was supporting, the company's belated exercise of an option to redeem the 2,287 shares of stock owned by Mr. Ingalls Sr. at the time of his death, shares which otherwise would have gone into testamentary trusts over which Mrs. Ingalls had significant powers.

While the son was in control, the company instituted in this court two "collection" suits: one seeking to recover from the Estate of Mr. Ingalls Sr. a principal indebtedness of $188,532.83 (of which $120,000 was evidenced by his promissory note and the balance reflected in an open account on the company's books); and the other seeking to collect from Mrs. Ingalls $52,165.93 [3] allegedly due from her by account stated. As is not unusual with closely held family corporations, the company over the years had paid various personal bills and tax liabilities of Mr. and Mrs. Ingalls Sr., reflecting the same as accounts receivable, with credits being made against the accounts principally from company dividends and from their personal "outside" income being collected by the company as their agent.

The Estate formally denied any indebtedness, and counterclaimed for some $541,000 in unpaid dividends on the 2,287 shares of stock which were the subject of the redemption dispute. Mrs. Ingalls denied any indebtedness on her own part, specifically denying any "account stated," and counterclaimed for $141,051.17. According to her counterclaim, the company had erroneously charged her account with $193,217.10 in taxes paid by it to state and federal agencies. These taxes, she said, should have been charged to Mr. Ingalls' account by virtue of an agreement made years earlier between the two of them whereby, in consideration for using her income to pay household expenses, he agreed to pay her tax liabilities. It is apparent that the formal denials of indebtedness were designed in large part to put the company to potentially insurmountable evidentiary problems. [4]

The case against Mrs. Ingalls was tried in 1957 (on the theory of an account stated), resulting in a verdict and judgment favorable to the company for the amount claimed by it plus interest. 152 F.Supp. 523 (N.D. Ala. 1957). The Fifth Circuit reversed, concluding that Mrs. Ingalls' response to an auditor's inquiry was insufficient to convert what had been an open account into an account stated. 258 F.2d 750 (5th Cir. 1958). After the remand the complaint was

amended to add counts charging an open account, and Mrs. Ingalls parried by adding the defense of the Alabama three-year statute of limitations.

The retrial was scheduled for the March 1959 docket. Among the lawsuits then still pending were the company's case in this court against the Estate of Mr. Ingalls Sr. (which cause had apparently lain dormant) and the case in the state court challenging the stock redemption (which was back in the trial court after an interlocutory appeal to the Alabama Supreme Court).

While waiting for the case against Mrs. Ingalls to be reached on the trial docket the parties commenced negotiations looking to a broader resolution of their multi-faceted dispute. An accord was reached, the terms of which were entered of record by this court on March 10, 1959. The terms of the settlement, briefly summarized, were as follows:

> The stock redemption of Mr. Ingalls' 2,287 shares was set aside, such shares being recognized as part of his Estate and in turn divided between the two trusts established under his will. One of the trusts was a "marital" trust for the benefit of Mrs. Ingalls during her lifetime, coupled with a general testamentary power of appointment, which she agreed to exercise in favor of her two granddaughters. [5] It was agreed that the shares placed in the other trust (for the benefit of a family foundation) were to be subject, at Mrs. Ingalls' death, to an option to purchase for a stipulated price, the granddaughters having a priority over the company regarding such option. The Estate's claim for back [pg. 72-5004] dividends was waived except to the extent of $175,000, which was to be paid to its attorneys as fees. The company's suits on the accounts were to be dismissed with prejudice, as were the counterclaims therein. Mrs. Ingalls was to be returned to the Board of Directors and to be elected to a corporate office at a compensation of at least $10,000 per year.

Shortly thereafter the company sought to renege on the settlement, contending that those representing it lacked authority to make such an agreement and that certain of the obligations undertaken by the other parties to the settlement were beyond their legal power. The company's contentions were rejected by this court in August 1959 (see 177 F.Supp. 151) and by the Fifth Circuit in August 1960 (see 280 F.2d 423). In September 1960 the company's Board of Directors adopted a resolution accepting, and directing immediate compliance with, the settlement, and in the same month final docket entries disposing of the company's "collection" suits were entered in this court. [6] In May 1961 entries were made on the company's books charging off against retained earnings, as of December 31, 1960, the two accounts.

The government has taken the position in its assessments and in these actions that Mrs. Ingalls and the Estate of Mr. Ingalls realized income [7] by the cancellation in 1960 of debts owed by them to the company in the amounts of $44,942.14 and $188,532.83, respectively. I.R.C. §61(a)(12). Plaintiffs' suits for refunds are premised upon contentions which deny the debts, deny their cancellation, assert the lack of any enrichment thereby, and assert that in any event a year other than 1960 would be the correct period for inclusion. The burden is on the plaintiffs to prove one of their contentions; they are not excused from that responsibility by showing the difficulty or impossibility of that task. Burnet v. Houston, 283 U.S. 223 [9 AFTR 1430] (1931); Allen v. Comm'r, 117 F.2d 364 [26 AFTR 406] (1st Cir. 1941).

This case presents a question not clearly answered by reported tax cases: Under what circumstances does D realize cancellation of indebtedness income when he settles a disputed collection suit brought against him by P for less than the amount P claims is owing? It is sometimes said that the compromise of a disputed debt does not give rise to income to the debtor. See, e.g., Mertens, Law of Federal Income Taxation, §11.19. And certainly the dismissal by a plaintiff without any payment of a spurious collection suit for a debt which never existed or was never a legal obligation of the defendant should not create income. See United States v. Hall, 307 F.2d 238 [10 AFTR 2d 5465] (10th Cir. 1962); Autenreitch v. Comm'r, 115 F.2d 856 [25 AFTR 1084] (3rd Cir. 1950). Nor should the result be different if, to save the time and expense of defending the suit or to avoid the hazards inherent in almost all litigation, D is willing to make some payment to P. That there is no income in such situations may be understood either on the basis that no "debt" is being cancelled or that the nominal debtor in reality is not enriched thereby. Cf. United States v. Kirby Lumber Co., 284 U.S. 1 [10 AFTR 458] (1931).

On the other hand D may actually owe the debt; and yet P, confronted with a denial of liability, may be willing to settle, saving the time and expense of litigation, by accepting a much smaller payment than that actually owing. Where there are serious problems of proof or of collectibility, or when P is confronted with unusual policy considerations, he may even be willing to dismiss the suit without any payment. In such situations it seems clear that D would thereby realize cancellation of indebtedness income subject to the "insolvency" and "gift" exceptions.

The conclusion which must be reached is that the settlement of a disputed debt may or may not result in cancellation-type income. The institution of a collection suit by a purported creditor does not establish that a debt[pg. 72-5005] exists or has existed, but essentially is only evidence that the plaintiff so contends; likewise, a defendant's denial of liability does not

establish that a debt does not exist or is no longer enforceable, but essentially is only evidence that the purported debtor so contends. The terms of the agreement settling the litigation are of probative value (though not conclusive) in determining the relative merits of the two parties' positions—for example, the payment of no or only nominal consideration by the purported debtor tends to support the conclusion that at least one of its defenses is well taken. These are matters of evidence; the trial court in a tax case involving alleged cancellation-type income must, it appears, determine the underlying, critical facts, e.g., the actual amount (if any) of the debt. See Gibbs v. Tomlinson, 📄 362 F.2d 394 [📄 17 AFTR 2d 1251] (5th Cir. 1966).

The defenses tendered by Mrs. Ingalls and her husband's Estate in the collection suits had essentially two aspects. First, there were denials of the existence of the debts; i.e., whether the company had paid the items debited to the two accounts; whether such items were for the benefit of Mr. or Mrs. Ingalls or otherwise authorized by them; whether there was an express or implied undertaking by either of them [8] to repay such items (rather than, for example, have them treated as dividends or additional compensation at the time of the company's payment); and whether there were repayments of such items via applied dividends, etc. Secondly, the denials challenged the judicial enforcement of such debts; e.g., lack of underlying documentation; Dead Man's statute; and ultimately (by special pleading) the statute of limitations.

For the reasons previously indicated this court is in accord with the proposition that, if the purported debts were never legal obligations of the Ingalls or had previously been paid in full (the "first" aspect of their denials), then the formal recognition of that fact by dismissals of the lawsuits would not have resulted in cancellation-type income. But—and this is the critical point—whereas in the collection suits the company had the burden of presenting evidence to establish those debts, in this case for tax refund the burden is on the taxpayers to disprove those debts. The plaintiffs here have essentially done nothing more than present the pleadings on file and the settlement agreement, an agreement which in the light of all circumstances is due to be treated (insofar as the cancellation of the two accounts is concerned) as a recognition of the "second" aspect of their denials of liability rather than any admission that the debts never existed. The plaintiffs have failed to demonstrate by credible evidence that the debts were not (at least at some point in time) legal obligations of the Ingalls in the amounts claimed by the company. The presumptive validity attending the government's assessment, one element of which is that the taxpayers did owe these debts, remains undisturbed and must be given effect by the court.

Moreover, the evidence before this court tends, if anything, to support the conclusion that Mr. and Mrs. Ingalls owed these accounts to the company. The accounts were shown on the books of the company and not written off while Mr. and Mrs. Ingalls were in control of its affairs. His executors did not deny that Mr. Ingalls had executed shortly before his death the promissory note representing the larger part of the company's claim against his estate, and they listed the full amount claimed by the company on the estate tax return as a deductible debt of the decedent. [9] Mrs. Ingalls did not deny having signed or initialed an auditor's request that she confirm the balance of her account as of the close of 1951 (at a figure in excess of $52,000). The evidence presented at a trial in 1957 was sufficient to convince a jury, with the approval of a district judge, that Mrs. Ingalls was indebted to the company for some $48,000 (plus interest), albeit on the incorrect theory of an account stated (rather than a potentially barred open account).

The taxpayers argue persuasively that there was little, if any, consideration flowing from the Ingalls for the dismissal of the company's two collection suits. [10] Hence, the argument[pg. 72-5006] goes, the debts were essentially without value in 1960 and therefore there was nothing in 1960 to cancel. Only as a very weak and unconvincing alternative argument do the taxpayers attempt to escape taxation on the theory of a transfer of property in exchange for (i.e. in payment of) the alleged debts, and even so the contention assumes a greatly depreciated value of the accounts below their face amounts. [11]

The court concludes, as urged by the plaintiffs, that these debts had by 1959 become of limited value in the hands of the company—not because they were not bona fide legal obligations earlier, but rather because time had created almost insurmountable barriers to their collection against unwilling debtors, e.g., due to the loss of underlying evidence, the Dead Man's Statute, and the Statute of Limitations. The plaintiffs therefore contend that the debts could not have been discharged in 1960 or, in what is essentially the same argument, that they were not enriched in 1960. Their position, if sustained, would however be but a temporary reprieve; for the necessary consequence would be a holding that the discharge or enrichment had taken place, albeit in some earlier year or years. [12]

The question of when income should be treated as realized, significant largely due to the graduated tax brackets and the concept of annual accounting, is a thorny one, with the courts indicating a concern both for economic realities and for administrative difficulties. With rare exceptions the search is for an identifiable event, thereby leading taxpayers and taxing authorities to the same year for any dispute they may have. Realization of income from cancellation of indebtedness should be in the year in which it becomes clear and virtually certain—something more than probable, yet not necessarily awaiting absolute certainty—that

the debt will never have to be repaid; and in finding such a year the authorities should look to the actions of the two parties to see if there is a point at which they themselves have accepted that conclusion. It should be noted that the incidence of taxation is not the debt becoming worthless (compare I.R.C. §166), but its discharge (often referred to as "cancellation"), suggesting that taxation of the debtor should await either his judicial release or some positive giving up by the creditor.

In the present cases there is nothing to indicate that the company had given up on its claims against the Ingalls prior to 1959; despite the setback in the Court of Appeals in 1958 on the "account stated" theory, the company announced ready for trial in March 1959 against Mrs. Ingalls notwithstanding her plea of the statute of limitations. The running of the statute of limitations does not extinguish the debt; it only affects the remedy—it may not even be raised by the debtor; and, if raised, there may be questions about whether it has been tolled or waived or, (as here), which statute is applicable and whether the claim can be proved in a different form (e.g., account stated) with a longer period. The court concludes that Mrs. Ingalls' discharge from the indebtedness did not occur when, as to one form of the claim, the limitations period may have run or when she first asserted the statute as a defense thereto. Cohen [pg. 72-5007]v. Comm'r, 77 F.2d 184 [ 15 AFTR 1370] (6th Cir. 1935), cert. denied, 296 U.S. 610 (1935); Mertens, Law of Federal Income Taxation, §11.19. For like reason—and not unmindful of the additional uncertainties such a rule would generate—the court rejects the contention that cancellation of the accounts should be deemed to occur when the creditor's evidentiary problems reached the point of rendering the accounts unlikely of judicial collection, that is, absent his assent thereto. The court should be very reluctant, moreover, to adopt a rule that would result in a taxpayer being confronted by the government's claim of cancellation of indebtedness income while he was still defending in court against the creditor's action for payment.

In March 1959 the company agreed to dismiss the suits (i.e., to discharge the debts); but there were actions to be taken by the other parties to the settlement and while such steps were being completed the company attempted to repudiate the agreement. An agreement to cancel in the future is hardly an agreement of cancellation (particularly where the party denies the binding nature of such agreement), Walker v. Comm'r, 88 F.2d 170 [ 19 AFTR 99] (5th Cir. 1937), at least until all that remains is a mere formality by a fully willing creditor, U.S. v. Ingalls, 399 F.2d 143 [ 22 AFTR 2d 5297] (5th Cir. 1968).

It was in September 1960—following an adverse decision by the Fifth Circuit—that the company finally capitulated on these accounts. The suits were dismissed with prejudice in the courts, and the directors of the company adopted a resolution acceding to the terms of the

settlement and directing forthwith compliance by their employees. The fact that the formal entry charging the debts off the company's book did not come until Spring of the following year—but at that, entered as of the close of 1960—cannot change the reality of the situation; namely, that the cancellation of these debts occurred in 1960. The government's selection of the year 1960 as the year of taxation is fully supported by the evidence.

In summary the court concludes that the taxpayers realized income in 1960 from the cancellation of their debts to the company in the amounts shown in the assessment, and that the taxpayers have failed to carry their burden of proving otherwise. Taxpayers are, however, due a partial refund for the dividends received credit which should have been, but was not, allowed to them on such income items. See footnote 7, supra. The amount of that refund [13] is as follows: to the Executors of Mrs. Ingalls' Estate, $1,797.69; to the surviving Trustees of the Robert I. Ingalls' Testamentary Trust # 2, $7,541.31; each with interest from dates of payment respectively.

Judgment is to be entered accordingly upon the expiration of ten days from this memorandum, [14] each party to bear its own costs.

[1] **Exchange Security Bank**, Sam M. Boykin Jr., and James E. Simpson, as Executors, were substituted as plaintiffs in CA 66-684 following Mrs. Ingalls' death in 1969. Plaintiffs in CA 68-389 are the **Exchange Security Bank** and James A. Simpson, the surviving testamentary trustees under the will of Robert I. Ingalls Sr. At the time of instituting CA 68-389 Mrs. Ingalls was a third trustee and plaintiff. In this memorandum the terms "plaintiffs" and "taxpayers" may for convenience be used interchangeably notwithstanding the technical differences.

[2] Litigation over the efficacy of the settlement agreement is recorded in 177 F.Supp. 151 (N.D.Ala. 1959), aff'd 280 F.2d 423 (5th Cir. 1960). Summaries of the dispute may be found in the opinions at 266 Ala. 656, 98 So.2d 30 (1957) and at 158 F.Supp. 627 [ 1 AFTR 2d 785(2)] (N.D.Ala. 1958). Of particular interest in the instant case are the opinions on the original trial and appeal in action CA 8450, brought by the company against Mrs. Ingalls, 152 F.Supp. 523 (N.D.Ala. 1957), rev'd 258 F.2d 750 (5th Cir. 1958).

[3] The court eliminated $188.79 from the claim, and the company acknowledged a creditable offset of $3,517.50 for the June 1956 dividend on her stock, reducing the claim to $48,459.64. The September 1956 dividend was subsequently applied to the account, reducing finally the claim to $44,942.14.

[4] The company's problem (except as to the amount evidenced by Mr. Ingalls' note) was that it had no voucher records for individual transactions prior to 1950 and before 1934 did not even have ledger records. In its case against the Estate it further was faced with Alabama's Dead Man's Statute.

[5] They had ultimately sided with their grandmother, rather than their father, in the dispute.

[6] Post-judgment sparring over later dividends continued into December 1960. See United States v. Ingalls, 📄 399 F.2d 143 [ 22 AFTR 2d 5297] (5th Cir. 1968), for later developments in the overall settlement of the dispute.

[7] Preliminarily the government had proposed to tax the income as dividends (thereby entitling the taxpayers to a dividends received credit, reducing somewhat their potential liability). "The cancellation of indebtedness of a shareholder by a corporation shall be treated as a distribution of property [for purposes of 📄 I.R.C. §301, the section dealing with taxation of dividends]." Regs. §1.301-1(m). The final assessment, on which the tax here in controversy was paid, did not however allow the dividends received credit, apparently as a response to an alternate argument advanced by taxpayers to the effect that the debts could be considered as satisfied by the transfer from taxpayers of other property. Since this decision of the court upholds taxation on the theory of a cancellation of indebtedness (of a stockholder's debt), it is clear that under the regulation the income should receive treatment as a dividend, and thus the credit allowed. At first blush the utilization of 📄 I.R.C. §301 might seem to give additional support for taxpayers' arguments directed to the minimal value of the accounts in 1960 since under §301(b)(1)(A) the amount of a dividend to a non-corporate shareholder paid other than in cash is the fair market value of the property distributed. The conclusion seems to have been adopted however that the discharge of a stockholder's indebtedness should be considered as equivalent to a cash distribution and hence measured by the face amount of the debt rather than its value. See Gibbs v. Tomlinson, 📄 362 F.2d 394 [📄 17 AFTR 2d 1251] (5th Cir. 1966). If taxpayers were successful in establishing that the §301 income were limited to the value of the debt, they then would find the difference between that value and the face amount being taxed as ordinary income (without the dividend credit) under United States v. Kirby Lumber Co., 📄 284 U.S. 1 [📄 10 AFTR 458] (1931).

[8] A major contention by Mrs. Ingalls was that the items charged to her account were really the obligation of her husband. Had this been proved to the satisfaction of this court, it would have meant that the income realized on cancellation of her account was

that of her husband's estate rather than her own. Such a decision presumably would constitute a "determination" leading to a belated assessment of an additional deficiency against his Estate under 📄 I.R.C. §§1311, 📄 1312(3)(A), 1313(c)(4). The question could also arise as to the tax consequences where a person's tax liabilities are paid by another.

[9] It is no answer to say that the government disallowed the deduction. 📄 I.R.C. §2053 (a)(3) limits the deduction to such claims "as are allowable by the laws of" Alabama, making the estate tax deduction dependent not only upon the existence of the debt, but also upon its legal provability and enforcement.

[10] Mrs. Ingalls gave up directly in the settlement (in which her rights, quite valuable, to the stock in question were accepted) two things: (1) an agreement to exercise her general testamentary power of appointment over such stock (i.e., the half in the marital trust) in favor of her two granddaughters (who were, after all, the "natural" objects of her bounty at that point), an agreement which provided only remote benefit to the company itself; and (2) a dismissal of her "tax" counterclaim against the company. For aught appearing, this counterclaim, which was premised upon an oral agreement years earlier to which the company was not even a party and which had been ignored over twenty years, had no real substance and was but a tactic employed by her attorneys to emphasize the hazards of litigation. Moreover, the recognition of this "tax" counterclaim would have effectively meant that someone else was paying tax liabilities, which can give rise to a realization of income in its own stead. The Estate (and indirectly, due to her life estate therein, Mrs. Ingalls) gave in the settlement (in which its rights to the valuable stock were recognized, together with some $175,000 in back dividends) likewise two forms of consideration: (1) an agreement to have half the stock subject to redemption by the company at Mrs. Ingalls' death; and (2) a waiver of its claim for an additional $366,000 in back dividends. It is questionable how much "detriment" the Estate suffered in granting the redemption agreement since (as contrasted with the redemption agreement outstanding at Mr. Ingalls' death) it covered only half the stock, at more than double the price per share, and was exercisable only if declined by the granddaughters. Of course the waiver of the additional $366,000 in back dividends was of substantial value; however, if such release had been the quid pro quo for the cancellation of the accounts, it would certainly have constituted dividend income just as did the $175,000 in fact paid.

[11] Actually the taxpayers emphasize that the dismissal of the lawsuits was but part of a larger settlement package and this certainly must be conceded. They go on, moreover,

to say that it is improper to match up the respective considerations or even investigate the effects of the dismissals—that this would be ignoring the remaining (and more significant) parts of the settlement. The court agrees that the total settlement must be analyzed, but it categorically rejects any insinuation that the constituent elements should in the process be held as non-existent. This is not, however, a case where the debts cancelled can be traced to the earlier acquisition of presently depreciated property. See Hirsch v. Comm'r, 📄 115 F.2d 656 [📄 25 AFTR 1038] (7th Cir. 1940). Nor can the cancellation realistically be viewed as the consideration paid for the acquisition of any specific properties, or conversely, viewed as paid by the transfer of any specific properties.

[12]   A determination to such effect would no doubt trigger otherwise barred assessments by the Commissioner for the earlier years under 📄 I.R.C. §1311 et seq. Of course there might be some advantage to the taxpayers if their brackets were lower in the earlier years. It should be noted that, in view of the court's findings that the debts were valid obligations (arising when corporate assets were used for their personal benefit), there has been "enrichment" (upon the freeing of assets from repayment liability) at some point in time, if not in 1960 then in an earlier year and not a mere diminution of a loss. *Cf.* Bowers v. Kerbaugh-Empire Co., 📄 271 U.S. 170 [📄 5 AFTR 6014] (1926).

[13]   The refund is 4% of the increased dividend. The limits are factually inapplicable in both cases.

[14]   Much of the evidence tendered at the trial consisted of pleadings, orders and opinions from other cases. The court accepted these not as proof of the underlying facts, but as evidence of the positions taken therein and the results thereof. Recognizing the possibility that it might inadvertently rely on some such document as proof of the underlying matter recited therein, the court indicated at the close of the evidence that the parties would be given an opportunity to raise such objections before the opinion became final. The failure of either party to make such an exception within the next ten days is not, of course, to constitute any waiver of their right to appeal erroneous findings or conclusions by the court.

END OF DOCUMENT -

© 2016 Thomson Reuters/Tax & Accounting. All Rights Reserved.