IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CAROL A. BRENNAN, ANTHONY COLINO, and COURTNEY BELLOMO, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>     v.<br><br>COMMUNITY BANK, N.A.<br><br>        Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br><br>No. 13-CV-02939-MEM<br><br>Hon. Malachy E. Mannion<br><br>Filed by Objectors and Prospective Intervenors |

**BRIEF IN OPPOSITION TO MOTION FOR
<u>FINAL APPROVAL OF CLASS SETTLEMENT</u> [1]**

AND NOW COME Objectors and prospective Intervenors Urban, Sickler,

Laird, and Lenherr (collectively, "Objectors"), by and through their undersigned

counsel, who file this Response in Opposition to Motion for Final Approval of

Class Settlement, stating as follows:

**I.      THE CONFLICT AMONG THE SUBCLASSES
        PRIMARILY REVEALS A LACK OF ADEQUACY,
        <u>AND SECONDARILY A LACK OF REASONABLENESS</u>**

Plaintiffs appear to harbor a fundamental misunderstanding of Objectors'

concern regarding the conflict among sub-classes. They state in their Response to

---

[1] This brief replaces in entirety the pleading which was mistakenly filed on February 22, 2016, preserving all objections.

Objection of Nicole Urban and other Objectors (Doc. 128) (hereinafter "Brief"),

that "the Objectors do not in their papers contest class certification under Rule 23.

The Objectors do challenge whether the settlement is fair and reasonable." (*Id.* at

1-2). The second statement is correct, the first is not.

Fed.R.Civ.P. 23(a)(4) requires that the representative parties fairly and

adequately protect the interests of the class. Thus, a challenge to the adequacy of

a representative plaintiff is a challenge to class certification under Rule 23.

Concerning the issue of the intra-class conflicts present in this case, on June 8,

2015, Objectors wrote:

> Significantly, the allocation of the Settlement Fund creates an
> inherent conflict of interest among class members, which, in turn,
> calls into question the adequacy of the class representatives and
> renders the proposed Settlement suspect. In *In re Community Bank,*
> 622 F.3d 275, 305 (3d Cir. 2010), the Third Circuit framed the issue,
> apropos to the present matter, as follows:
>
>> As noted, the adequacy requirement is designed
>> "to uncover conflicts of interest between named
>> parties and the class they seek to represent." ....
>> Here, there is an obvious and fundamental intra-
>> class conflict of interest...the named plaintiffs'
>> claims....are untimely, and they must rely on
>> equitable tolling to save them. Notwithstanding
>> that substantial hurdle to their claims, they seek
>> to represent a sizeable subgroup of the
>> class....with timely claims. *Cf. McAnaney v.
>> Astoria Fin. Corp.,* No. 04–CV–1101, 2007 WL
>> 2702348, at *12 (E.D.N.Y. Sept. 12,
>> 2007)(holding that named plaintiffs in a TILA
>> class action were inadequate representatives
>> because their claims were time-barred).

2

> [6]22 F.3d at 303. Applying the reasoning of the Third Circuit, <u>the</u>
> *Brennan* <u>representatives</u>, given their probable lack of standing, <u>are not</u>
> <u>adequate representatives of all the New York class members.</u>

(Doc. 90 at 10-11) (underline added) (footnote omitted).

Similarly, in their Objection to Approval of the Class Settlement (Doc. 100),

Objectors explained that:

> [A]s set forth below, this problem [the intra-class conflict] is more
> than merely an issue of the relative probability of recovery associated
> with the claims of various subclasses.   More fundamentally, it
> involves a <u>serious question as to whether the Plaintiffs can fairly and</u>
> <u>adequately represent all three subclasses in this case, as required by</u>
> <u>Fed.R.Civ.P. 23(a)(4).</u>

(*Id.* at 5) (emphasis added).  After again discussing *Community Bank*, Objectors

concluded that, "in the present case, there is no New York representative plaintiff

whose claims are less than 3 years old.  Without that, the existing representative

plaintiffs cannot fairly and adequate represent the interests of the 'New York recent

claim' subclass and approval of the proposed Settlement must be denied on this

basis." (*Id.* at 6-7)

Accordingly, contrary to Plaintiffs' contention that "the Objectors do not in

their papers contest class certification under Rule 23," Objectors' papers are replete

with explanations of why Plaintiffs are not adequate representatives, which means

the Class cannot be certified.

### A. This Settlement Cannot be Approved if Plaintiffs are not Adequate Representatives

Plaintiffs' exclusive focus on the alleged fairness and reasonableness of the settlement is improper.  In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)), the Supreme Court "noted the special problems encountered with settlement classes.  Although as a general matter it approved the certification of classes for settlement purposes only, the Supreme Court cautioned that the certification inquiry is still governed by Rule 23(a) and (b), and that '[f]ederal courts ... lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper.'" *In re Prudential Insurance Company Sales Practices Litigation*, 148 F.3 283, 308 (3d Cir. 1998); *See, also, In re Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 174 (E.D. Pa. 2000)(court "may not even reach the fairness question if there is not a proper class and may not substitute the fairness inquiry for the Rule 23(a) an (b) inquiry.").

### B.    *In re Community Bank* is Directly on Point and Demonstrates that Plaintiffs are not Adequate Representatives

Although perhaps not recognizing its significance, Plaintiffs, nevertheless, try to distinguish *Community Bank* from the case at bar.   They point out that in that case, the representative plaintiffs had claims that were older than the limitations period and relied on equitable tolling to save them from being time-

4

barred—concededly a long shot.  Plaintiffs correctly point out that, in contrast, in the present case, the "old New York" claims are not unquestionably stale—because the New York limitations period is not settled. This is, however, the proverbial distinction without a difference.

It doesn't matter that in one case, the uncertainty as to the timeliness of the claim depended on the application of a tolling principle, while in the other it was due to doubt as to the correct statute of limitations.  What counts is that, in both cases, the viability of the claim was unclear and this, in turn, rendered holders of such claims inadequate representatives of those whose claims did not suffer from this flaw.  This Court should reject Plaintiffs' superficial distinction, hold that *Community Bank* controls here, and deny certification of the class.

Moreover, Plaintiffs have unintentionally conceded that the present Settlement runs afoul of *Community Bank*.  First, Plaintiffs state that "[i]t is therefore possible (Class Counsel asserts otherwise, but it is certainly possible) that the Court agrees with the Bank that the statute of limitations is three years." (Brief at 6-7).  They then continue: "In such a case, no New York Plaintiff would remain and that could doom recovery for the entire New York class of consumers, old and new." (Brief at 7).  However, this is *precisely* what the Third Circuit held was a fatal conflict of interest in *Community Bank*. "Here, there is an obvious and fundamental intra-class conflict of interest...the named plaintiffs' claims....are

untimely, and they must rely on equitable tolling to save them.  Notwithstanding

that substantial hurdle to their claims, they seek to represent a sizeable subgroup

of the class....with timely claims."  622 F.3d at 303.

Plaintiffs then formulate the following non sequitur:  The New York

"recent" claimants are represented by Colino and Bellomo, who have claims that—

depending on the New York statute of limitations—might be time-barred.  Because

their representative claimants' claims might be time-barred, the New York "recent"

claimants, have a lower probability of succeeding on their claims than do the

Pennsylvania claimants, and therefore, it is acceptable to discount the value of the

New York "recent" claims vis-à-vis the Pennsylvania claims.

The flaw in this reasoning is the notion that the diminished probability of
the New York "recent" claims succeeding justifies the reduced payment on those
claims.  There is nothing *inherent* in the New York "recent" claims that makes
them any less likely to succeed than the Pennsylvania claims.[2]  The only reason
these claims are less likely to succeed is *extrinsic* to the claim itself—i.e. the
weakness of the representative plaintiffs.  However, far from justifying a
markdown of the claims, *Community Bank* teaches that such a defect in the claims
of the representative plaintiffs results in their failure to be adequate representatives
as required by Rule 23(a)(4).

The obvious solution to this fatal defect in the Settlement is to add a New

York representative plaintiff whose claim is less than 3 years old.  Objectors have

suggested that Objector Eleanor Sickler is such an individual.  Assailing this

---

[2] Notwithstanding Plaintiffs' tortured efforts to conjure something up.  *See, infra*. Section
I. C.

suggestion as a "brash display of self-interest [that] should give the Court pause in considering the bona fides of—and the real motivation behind—these Objections" (Brief at 11), Plaintiffs cynically denounce this idea as merely an attempt by Ms. Sickler to obtain a representative service award.   In order to dispense with this unwarranted disparagement, Ms. Sickler is willing to relinquish any entitlement to such an incentive award. An amended consolidated pleading would cure this fatal defect. Objectors' counsel will honor the attorney-fee allocation agreement made at the mediation on September 30, 2013. *See*, *infra*., Section IV.

### C.   Plaintiffs' Reasons for Discounting the New York "Recent" Claims are Transparent Rationalizations

In addition to arguing the non-applicability of *Community Bank*, Plaintiffs attempt to otherwise justify the disparity between the settlement's treatment of the Pennsylvania claims and the New York "recent Claims."  They do this by ginning up some new reasons why all the New York claims, as distinct from only the old New York claims, have more risk than the Pennsylvania claims.

For example, Plaintiffs contend that New York's CPL 901(b) would bar New York residents from bringing a class action, like the present one, to recover statutory damages under Section 9-625 of the New York UCC.   From this, they conclude that the claims of all New York residents are less likely to succeed and, therefore, are properly discounted vis-à-vis the claims of Pennsylvania residents. Quixotically, they take this position notwithstanding their concession that "CPLR

901(b)'s restriction on minimum recoveries does not apply to class actions [like the present one] brought in federal court pursuant to diversity jurisdiction." (Brief at 4).

Plaintiffs also argue that the New York claims are less valuable because there is no well-established body of New York law for the UCC claims, as there is under Pennsylvania law.   This is patently false.   *See, e.g. Coxall v. Clover Commercial Corp.*, 4 Misc.3d 654 (N.Y. Civ. Ct. 2004) (notices of repossession failed to provide all information required by UCC); *Ford Motor Credit Company, Inc. v. Racwell Construction, Inc.* 24 A.D.3d 500, 501 (N.Y. App. Div. 2005) (Plaintiff "bore the burden of establishing that all aspects of the sale of the vehicle were commercially reasonable (*see* UCC 9-626[a][2])"); *HSBC Bank USA, National Association v. Amagli*, 18 Misc.3d 139(A) (N.Y. Sup. Ct. 2008) ("plaintiff failed to establish that the notice of sale was reasonable (UCC 9-613) and that the vehicle, as collateral, was disposed of in a commercially reasonable manner."); *Mack Financial Corporation v. Knoud*, 98 A.D.2d 713 (N.Y. App. Div. 1983) (reversing summary judgment on deficiency claim in favor of lender, where lender failed to satisfy its burden of showing that sale was made in a commercially reasonable manner); *Central Budget Corp. v. Garrett*, 48 A.2d 825 (N.Y. App. Div. 1975)(creditor cannot obtain deficiency judgment in absence of showing that disposition was commercially reasonable).

8

Moreover, it is noteworthy that when they moved for Preliminary Approval of the Settlement, (Doc. 88) Plaintiffs relied *exclusively* on the disputed-limitations-period justification for the difference between Pennsylvania claims and New York recent claims (*Id.* at 13-14).  Even after Objectors first questioned the validity of this explanation (Doc. 90 at 7-11), Plaintiffs stuck to their guns in their Supplemental Brief (Doc. 94) and insisted that the doubt about the New York limitations period is what made even those New York claims having absolutely no uncertainty as to timeliness, less valuable than Pennsylvania claims (*Id.* at 8-9). Similarly, the Class Notice mentions only the limitations justification. It is only now, when the weakness of their previous position has become obvious, that Plaintiffs have belatedly invented a series of post hoc rationalizations for the disparity.

## II.  THE POINTLESS ISSUANCE OF 1099-C's HARMS THE CLASS TO AN EXTENT THAT PREVENTS THE SETTLEMENT FROM BEING REASONABLE

### A.  The Holding in *Zarin*

Drawing another distinction without a difference, Plaintiffs contend that the Third Circuit's decision in *Zarin* is inapposite because it dealt with gambling losses, not financial institutions.  As Objectors explained in their Objection, the holding in *Zarin* is that in situations where a taxpayer, in good faith, disputes the validity or amount of a debt, the amount of a subsequent settlement of the dispute

9

should be treated as the amount of debt cognizable for tax purposes and the excess of the original debt over the amount determined to have been due is disregarded for both loss and debt accounting purposes.  In the present case, the settlement amount is zero and the "excess" is, therefore, the full deficiency balance, which must be disregarded.  This analysis applies whether it involves a gambling debt, a defaulted car loan, or any other contested liability.  The basis for this holding is the Third Circuit's holding that "[i]nstead of analyzing the transaction at issue as *cancelled debt*, we believe the proper approach is to view it as disputed debt or *contested liability*."  916 F.2d at 115 (emphasis added).

Relying on Treas. Reg. § 1.6050P-1(a)(3), Plaintiffs blithely argue that Objectors have confused the issue of what is includable in gross income with the issue of exclusions from gross income.  Objectors have confused nothing.  As quoted by Plaintiffs in their Brief, this regulation provides: *"[D]ischarged indebtedness* must be reported regardless of whether the debtor is subject to tax on the discharged debt under sections 61 and 108 or otherwise by applicable law." (emphasis added).  However, Plaintiffs have apparently failed to grasp that this regulation does not apply, because, as set forth above, *Zarin* holds that what is at play here is not "discharged indebtedness," but rather, is the "settlement of a contested liability."  Under *Zarin*, the Bank does not have a duty to issue 1099-C's.

## B.   *Zarin* Controls Here

Plaintiffs' apparent criticism that that Objectors' position is based solely on the authority of *Zarin* completely misses the mark, because *Zarin* is the controlling authority here.   *Thornwood Associates v. Greater New York Savings Bank (In re Thornwood Associates)*, 162 B.R. 438, 440 n. 3 (M.D. Pa. 1993) ("decisions of the Third Circuit are binding on this Court and we must apply the law as that court interprets it. We are not free to ignore Third Circuit holdings if we disagree with them.").  Moreover, as set forth in the Objection, the contrary private letter rulings are not authoritative.  This is because "there is no precedential value to private letter rulings and those rulings are not binding on any court."   *In re Comp*, 134 B.R. 544, 556 (Bankr. M.D. Pa. 1991). "Title 26 U.S.C. § 6110(j)(3) provides that unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent." *Id.*

Plaintiffs argue that private letter rulings enable skilled tax practitioners to discern the IRS's views on issues.  This statement, like the PRL's themselves, is irrelevant, because the IRS's view of this issue is not binding on this Court, while *Zarin* is. Plaintiffs have not and cannot cite to authority that instructs this Court to disregard controlling authority for non-precedential private letter rulings to discern the IRS's views.

Plaintiffs similarly point out that during the January 27, 2015 Status Conference, this Court remarked that it was not agreeing with Objectors' counsel on the 1099 issue. While true that in responding to Objectors' 1099 argument, the Court stated, "[w]ell, *I'm not sure* I'm buying your argument on that," the Court went on to made clear that "this is a status conference, so this is not a legal determination on my part." (Transcript at 28). Similarly, the Court remarked "….I don't agree with Mr. Shenkan's concerns, *off the top of my head*. (Transcript at 34). The Court's reluctance to express any stronger view of the law is appropriate, given that at that point it had not yet received any briefing on the 1099-C issue.

Either because they don't fully appreciate Objectors' argument regarding the 1099-C's, or because they are trying to mischaracterize it, Plaintiffs contend that neither they nor the Bank are responsible for the contents of the Internal Revenue Code and that neither party has the power to alter the tax regulations.[3] To be clear, Objectors' position is based entirely on the existing provisions of the IRS Code and implementing regulations. Objectors do not seek to make Plaintiffs or the Bank responsible for the applicable statutory provisions. They also do not need to

---

[3] Plaintiffs have truly missed the point when they cite *Clark v. C.I.R.*, T.C. Memo. 2015-175, 110 T.C.M. (CCH) 257 (2015) for the proposition that "the nonreceipt of a Form 1099-C, however, does not convert taxable income into nontaxable income." Objectors are concerned with the converse -- that the improper issuance of Forms 1099-C here, will effectively convert the nontaxable settlement of a disputed liability into a taxable cancellation of indebtedness.

12

change the regulations, only to follow them, consistent with their interpretation by

the governing authority in this Circuit.[4]

### C. The Deficiency Balances are Unquestionably a Disputed Liability

Plaintiffs also refer to a Report by their expert, David Glusman, (Doc. 126-

14). Therein, Mr. Glusman opines that the *Zarin* holding does not apply in this

case, because the deficiency balances are not disputed and cannot, therefore, be the

subject of the settlement of a contested liability, as was present in *Zarin*. He states

that "'disputed debt' applies only to debt that isn't certain and where the dispute

centers on the debt's validity or enforceability." (*Id.* at 5). He then continues,

"[t]axpayers' debt isn't 'disputed' where they merely contest the amount of interest

charged and never challenged the original amount of the debt." (*Id.*).[5]

---

[4] In similar litigation pending in state Court also involving a bank's alleged non-compliance with post-repossession notices sent to consumers, the Court recently entered an Order (attached hereto as Exhibit 1), in which it specifically adopted the controlling language of *Zarin v. Commissioner of Internal Revenue*, 916 F.2d 110 (3d Cir. 1990) and, accordingly, ordered that the defendant bank need not issue Form 1099-C's to the class ("FNCB Litigation"). In the FNCB Litigation, Attorney Cary Flitter (counsel for Plaintiffs in *Brennan*) and Attorneys Howard Rothenberg and Richard Shenkan (counsel for *Urban* and the Objectors in *Brennan*) joined forces to effectuate a global settlement.

Here, Flitter's priority is to thwart any additional benefit which Objectors could confer on the class instead of simply trying to seek the same tremendous benefit to this class as was accomplished in the FNCB Litigation – which *also* would significantly benefit Community Bank by insulating it from penalty. Prior to the beginning of the contested hearing, Objectors respectfully request the opportunity to meet with Your Honor and all counsel to discuss the viability of such a solution of an FNCB-like order.

[5] Mr. Glusman relies on *Exchange Security Bank v. U.S.*, 45 F.Supp. 486 (S.D. Ala. 1972). The Court should know that this decision was reversed by the 5th Circuit. *See*, 492 F.2d 1096 (5th Cir. 1974).

Mr. Glusman's opinion is inapplicable to the issue at hand, because both Objectors and the Brennan plaintiffs have disputed the validity and enforceability of the deficiency balances.  In Count 3 of her Class Action Complaint, Objector Urban alleges that the deficiency balances are, in fact, void and that the Bank violated the FCEUA because it collected amounts from class members in respect of such unenforceable obligations. (*See, e.g.* Paragraph 75): "Upon information and belief, Defendant has (and continues to be) actively engaged in the collection of invalid deficiencies of Class Members, despite their [sic] knowledge that such deficiencies are exempt by law."  One of the elements of relief sought in Count 3 is an injunction against the collection of such invalid deficiency balances.

Further, the Amended Complaint filed by Plaintiff Brennan in this case, contains multiple averments that the Bank's deficient notices were not commercially reasonable, resulting in a repossession and resale process that was not commercially reasonable. *See, e.g. Id.* at ¶¶ 52, 56, 87 and 92.  The Brennan Amended Complaint further requests "such other and further relief as may be deemed just and proper" under Counts I and III (alleging defective repossession notices for the NY and PA classes), under which falls an injunction against the collection of invalid deficiency balances.

As set forth in her Brief in Support of Motion for Class Certification, the basis of Objector Urban's position that the deficiency balances are void is that the

14

defective repossession notices utilized by the Bank rendered each vehicle repossession and resale per se unreasonable. The Brennan Complaint also makes the claim that the repossession notices render the repossessions unreasonable.

It is well-settled under both Pennsylvania law and New York law that when a creditor violates the UCC and fails to act in a commercially reasonable manner as to *all* aspects of the sale of a repossessed vehicle, the value of the collateral is deemed to equal the indebtedness secured, thereby extinguishing the indebtedness. *Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 78 (1983); *Coxall v. Clover Commercial Corp.*, 4 Misc.3d 654 (2004). *Id.* at 11. Taking this position clearly represents a dispute as to the validity and enforceability of all of the deficiency balances and just as clearly brings this matter within the purview of *Zarin.*

As set forth above, under *Savoy* and *Coxall,* the Bank's failure to act in a commercially reasonable manner as to *all* aspects of the sale of a repossessed vehicle results in the value of the collateral being regarded as equalling the underlying indebtedness. This effectively voids the indebtedness under both Pennsylvania and New York law.

Thus, if Plaintiffs were to prevail on their argument that the notices were deficient, they would be entitled to extinguish the deficiency claims, relief that falls within their prayer for "such other and further relief as may be deemed just and

proper," as asserted in all four Counts of their Amended Complaint.  Contrary to Mr. Glusman's opinion, the deficiency balances are obviously disputed, and, under *Zarin*, their settlement is not a "discharge of indebtedness."  Plaintiffs are correct that "*Zarin* does not trump §6050P, nor does it purport to."  (Brief at 22).  What *Zarin* does accomplish is that it interprets Section 6050P, holding that it is inapplicable to the deficiency waivers in the present case because the liability is disputed.

Plaintiffs make much of the fact that the unjust enrichment claim in the *Urban* complaint is absent from their own Amended Complaint and that "the *Urban* case is not under review here."  They will undoubtedly stake out the same position vis-à-vis her claim that the deficiency balances are void.  Objectors have a clear responses to this myopic view: the classes in this case and in *Urban* are largely the same, so a claim asserted on behalf of the class in *Urban* has also been raised on behalf of the members of the class in this case.[6]

---

[6] The Bank's counsel informed the Court that "[T]he two classes in two actions essentially completely overlap not 100%, but they essentially overlap.  So if I reach a resolution in the Brennen case, we will be coming to the Court with a stipulated class that Your Honor will have to approve.  Your Honor will have to approve the terms of the settlement, but that would essentially preclude the Urban case from going forward as a class should Your Honor approve it."  (Transcript of September 12, 2014 Case Management Conference (Doc. 66 at 7).  If the two cases have an identity of classes for purposes of settlement, they certainly have an identity of classes for purposes of determining the claims asserted against the Bank.

### D. Plaintiffs (and the Bank) are not Really that Concerned About the Bank's Duty to Issue Forms 1099-C

At page 18 of their Brief, Plaintiffs explain that the reporting requirements for discharged debt under Section 6050P of the Internal Revenue Code and its implementing regulations are triggered by any of eight "identifiable events." They go on to state that the particular "identifiable event" that they believe obligates the Bank to issue 1099-C's to the Class in this case is one made "pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full consideration," as set forth in 26 C.F.R. 1.0605P-1(b)(2)(i)(F). However, it is impossible to understand how they (or, for that matter, the Bank) can take this position, given that the Settlement Agreement, itself, specifically provides that "[n]othing in this Agreement shall be construed as creating a cancellation of debt or of itself giving rise to an 'identifiable event' under *inter alia* the Internal Revenue Code or Treasury Regulations, §1.6050P." (*Id.* at 36, Section 7.11(a)). This Court's approval of the Settlement would ratify this no-identifiable-event provision, after having previously approved a class notice that informs the members of the class that "the Settlement Administrator expects to inform the Internal Revenue Service ("IRS") about the amount of your Auto Loan Deficiency waived (if more than $600 is waived)." (*Id.* at 5, Answer to Question 13).

It is quite likely that debt forgiveness pursuant to one of the other "identifiable events" has occurred with respect to many class members in tax years

*prior* to 2016, the presumed date of the Settlement of this case.  Based on conversations with the Bank's counsel, the Bank has yet to issue any Form 1099-C to any class members, apparently, working under the assumption that, to date, no triggering "event" for debt-forgiveness has occurred.

If the Bank failed to issue Forms 1099-C in prior years despite the existence of triggering events, then the deficiencies of perhaps hundreds of class members, have already been forgiven. The statute of limitations for IRS assessments is three (3) years after the return was filed. Therefore, if the class member failed to report the cancellation of indebtedness (when such was due) in 2008, 2009, 2010, 2011 or 2012, then the statute of limitations for the IRS to collect the tax has likely lapsed.

In this regard, a huge number of class members will have a valid defense to a tax claim that is based on a pre-2016 debt forgiveness event, even though no Form 1099-C was issued for that tax year.  In contrast, if the Bank were to issue, in blanket-form, Form 1099-Cs to all class members for tax year 2016, despite fact that the debt that was actually forgiven in 2008-2012 when the 1099-C should have been sent, the class member is unnecessarily harmed because s/he will be inordinately more difficult for the class member to assert the 3-year limitations period as a defense.

As set forth above, Objectors believe that the Bank should not be issuing 1099-C's in connection with the deficiency waivers, at all.  However, if the Court holds that it is proper for the Bank to issue them, it is Objectors' position that the Bank must issue the Form 1099-C's for the tax year when the triggering event actually occurred – as clearly required by regulation. To do otherwise would be to unnecessarily deprive class members of a potentially valid defense to a stale-dated tax assessment and/or to be faced with a tax when such tax is (or was) not due. This additional step is easily effectuated by the Bank as the stage of collection efforts, payments received, or the lack of any collection / payment activity is readily ascertainable.

> The existence of an individual inquiry does not preclude class treatment where all class members face the necessity of proving the same fraudulent scheme. *See, e.g., Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 (stating that even though mass accident cases are likely to present significant individual questions of liability and damages, such cases "may, depending upon the circumstances, satisfy the predominance requirement"). *In re Sch. Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986). This is even more true in a settlement-only class action, where the court certifying the class need not examine issues of manageability. *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231.

*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3rd Cir. 2005).

The net result of not doing this – potentially hundreds of class members will be assessed a tax *for the wrong year*. Approving this settlement, in its present form, will likely deprive class members of their defense to a tax liability and, in effect, serve to ratify potentially improper procedures of the Bank relating to the issuance

19

of 1099-C forms. Sending blanket 1099-C's to all class members serves to immunize the Bank from liability while burdening class members with the challenge to defend against a tax which they don't owe.

### E.    A Settlement in which 1099-C's are Issued is Unreasonable

As set forth above, this Court may not even reach the question of the fairness and reasonableness of the Settlement if the requirements of Rule 23 have not been satisfied. *Prudential Insurance Company Sales Practices Litigation*, 148 F.3 283, 308 (3d Cir. 1998). Thus, Plaintiffs' contention that the Settlement is reasonable even if the Bank issues 1099-C's, is relevant if and only if they can overcome the problem with the adequacy of their representative plaintiffs. However, even if it is relevant, it is wrong.

As explained above, pursuant to the controlling authority, the Bank will have no obligation to issue 1099-C's as part of the settlement. The issuance of these forms will result in an aggregate income tax liability for the class amounting to approximately $2 million dollars (applying the 15% tax rate [7] of $13.85M of deficiency balances) because, by the issuance of 1099-C's, the Bank will have classified the deficiency amounts as "cancelled debt" subject to taxation rather than

---

[7]  The 15% tax rate applies to single, individuals with taxable income from $9,276 to $37,650; married, filing jointly from $18,551 to $75,300; married, filing separately from $9,276 to $37,650; and head-of-household from $13,251 to $50,400. Objectors' counsel reasonably believes that the majority of class members are at this tax rate.

"disputed debt" not subject to taxation. Additionally, the class members will likely have to pay hundreds of thousands of dollars in fees to hire tax professionals to defend against the improper categorization (via the 1099-C's) of the untaxable settlement of disputed liability as taxable cancellation of debt. The Bank's non-issuance of these forms would provide a $2 million benefit[8] to the class, *at no cost whatsoever to the Bank*. It is Objectors' position that any settlement that provides for the issuance of these forms in the face of the foregoing reality is *per se* unreasonable.

Again, the easiest and most effective way for *all* parties to avoid this tax issue would be for the Court to issue an order acknowledging that the deficiency is, indeed, a disputed debt, as was done in the FNCB litigation.

## III.  OBJECTORS' BENEFITS TO THE CLASS ARE PALPABLE

### A.   It is Specious for Plaintiffs to Contend that Objectors are not Responsible for the Present Opt-Out Structure for the Deficiency waivers

Plaintiffs dispute that Objectors should get any credit for benefitting the class in connection with the change in the structure of the deficiency waiver benefit from an opt-in provision to an opt-out benefit. First, they contend that the Objectors had nothing to do with this change, that it was the Court that was

---

[8]  This estimate does not account for the existence of class members that might avoid tax liability as a result of insolvency or bankruptcy discharge.

responsible for it and that "[i]t is merely fortuitous that the Urban Objectors happen to agree with the Court on this point." (Brief at 25). To support this position, they extensively quote the Court's comments during the January 27, 2015 hearing, discussing the reasoning behind the switch to an opt-out structure. (Brief at 25-6, *quoting* transcript at 34-5, 43.)

However, contrary to Plaintiffs' contention, the quoted language does not show that the Court initiated the switch. Rather, when read in the context of the entire transcript, it shows that by that point in the hearing, Objectors' counsel had persuaded the Court of the wisdom for such a switch. Starting at the bottom of page 17 of the transcript and continuing to page 26, the Court, the Bank's counsel and Objectors' counsel have a discussion, during which Objectors' counsel explains his concerns with the existing opt-in set-up.

> THE COURT:   Tell me what the remaining concerns are. Now I'm not talking about the formatting of the notice, okay, I'm talking about, tell me what the substantive concerns - - I understand there's the 1099, whether it needs to or doesn't need to be issued by the bank is a concern, right?
>
> MR. SHENKAN:  Yes, Your Honor.
>
> THE COURT:   Debt forgiveness. I'm not quite understanding. The bank says, We're willing to give debt forgiveness. So what's the issue there?
>
> MR. SHENKAN:  The issue is this: if I can do it illustratively, because I think that's the easiest way to do it.
>       If a class member gets the notice and does nothing with the notice, just throws it in the garbage, that class member, let's assume if

> that class member is in the four-year statute back in New York is going to get a check for $287, $300 approximately. If that person has a deficiency judgment [sic] of $7,000, the bank can then sue them.

(Transcript at 17-18).

> THE COURT:     Is he [Objectors' counsel] correct? Can you make a determination that, after you've gotten you check for 200 or 500, I don't care what the number is, that you've got an outstanding balance, even though we have corrected it, we are now going to sue you for that?

> MR. FELLOWS:  Correct, Judge. It's optional for the class member, whether they want to exercise their right to that benefit.

(Transcript at 23).

> THE COURT:     So you don't get it [debt forgiveness] unless you opt in?

> MR. FELLOWS:   Correct.

> THE COURT:     You get the other two, but don't get debt forgiveness unless you opt in?

> MR. FELLOWS:   Yes.

> THE COURT:     So those that decide not to opt in, meaning, that they don't even affirmatively decide to opt out, they just don't - - they throw it away, they don't opt in, then, those people are not getting debt forgiveness and not getting a 1099 from the bank, and so the bank, in theory, could sue those people?

> MR. FELLOWS:   Absolutely, Judge.

> THE COURT:     So Mr. Shenkan's original statement that someone gets a check for whatever, and then they accept the check, and the bank can come back and sue them for whatever the balance is on the deficiency, if they threw it away, if they haven't affirmatively opted in?

> MR. FELLOWS:   Correct.

23

THE COURT:        All right.  I see a problem with that.  Next.  What's the next issue?

(Transcript at 25-6).

Inasmuch as Plaintiffs' counsel was present at the hearing when the foregoing discussion took place, it is unclear what could possibly be the basis, besides baldly attempting to discredit Objectors, for Plaintiffs' claim that it is merely fortuitous that Objectors happen to agree with a conclusion already reached by the Court.[9]

### B.     The Opt-In / Opt-Out Switch is a Multi-Million Dollar Benefit to the Class

Plaintiffs claim that Objectors have "provided no evidence of the effect of anything they did." (Brief at 27).  Having shown that Objectors were the driving force behind the opt-in/opt-out change, it remains only to quantify the benefit in order to complete the refutation of Plaintiffs' contention.  This is easily done.

It is well-known that response rates for class members are generally quite low.  *See, e.g.* Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt–Outs*

---

[9] Even the Bank gives credit where credit is due and acknowledges that Objectors caused this improvement in settlement.  "Initially, counsel for Ms. Brennan and Community Bank negotiated a settlement in which class members would have to affirmatively elect debt forgiveness....Attorney Shenkan objected to this provision, and insisted that all class members should be afforded debt relief.  Following a conference with the Court, Community Bank and Ms. Brennan agreed to modify this term." (Bank Brief (Doc. 127) at 10).

24

*and Objectors in Class Action Litigation: Theoretical and Empirical Issues* (Mar. 23, 2004) (unpublished manuscript) (testing scholars' conclusions against empirical data and reporting that "[o]pt-out rates vary by case type," with consumer class actions having a relatively low mean opt-out rate of less than 0.2 percent).

The class notice in this case states that the aggregate deficiency balance across all members of the class is $16,326,236. (*Id.* at 4). If the original opt-in structure had remained, it could conservatively be expected that only about 15% of the class would have opted in, leaving approximately 85% of the class not receiving this benefit.[10] The value of the deficiency waivers lost by this group of class members is approximately 85% of $16.3 million which is $13.85 million. By switching to an opt-out structure for the deficiency waiver, it likely recaptured this $13.85 million in deficiency waivers for the benefit of the class and resulted in the Bank's agreement not to sue class members for deficiencies. [11] This is the approximate value of the benefit to the class resulting from the change in the settlement that was urged by Objectors.

---

[10] The Court could assume a response rate of 10% or 30%, just as well. It does not alter the fact that a large majority of the class was benefitted by the change to an opt-out.

[11] Plaintiffs fail to acknowledge the additional benefit conferred on class members that they will now not be sued by Community Bank. Compare, the opt-in structure agreed-to by Brennan's counsel which expressly permitted the Bank to sue class members for the deficiency balances. See Doc. 90, incorporated herein.

25

## C.   The Opposition to the Opt-In Feature has been Consistent

In a further effort to convince the Court that Objectors should be given no credit at all for this improvement in the Settlement, Plaintiffs claim that Objectors had originally agreed with the deficiency waiver opt-in provision, and had subsequently "flip-flopped." This is simply not true.[12] From the very first time Objectors were aware of the opt-in provision, they opposed it.   During the January 27, 2015 status conference, Plaintiffs' counsel recounted to the Court that right after the mediation with Judge Welsh, he spent 10-12 days drafting the settlement documents and then sent them to Objectors' counsel for review. About 10 days later, he had a conference call with them (Transcript at 10-11), during which:

> They voiced some concerns about the substantive issues and about some lesser issues.  They voiced some concern about, for example, the physical appearance of the election form and some of the language in CINTAX that was used.  *But at that point, they raised an issue about whether it should be, you know, an opt in or opt out. And by that, of course, I'm referring to the debt waiver…..*

(Transcript at 11). (emphasis). (Transcript excerpts Exhibit 2).

---

[12] To support this incorrect contention, Plaintiffs cite a footnote in Document 72 filed by Plaintiffs.  That footnote is nothing more than Plaintiffs assertion that Objectors do not wish to be a party to the settlement as then constituted—i.e. with the opt-in provision.   In the absence of showing that Objectors had previously agreed with the deficiency waiver opt-in, this hardly shows any "flip-flopping."

Thus, it is crystal clear that from the very first time they saw a draft of the settlement agreement containing the opt in provision, up to the present day, Objectors have *consistently* opposed it.  There has *never* been a flip-flop.

> ### D.   Whether they are Considered "objectors"
> ### or not, Objectors have Conferred a Benefit
> ### on the Class with the Opt-In / Opt-Out Switch

Plaintiffs also cite *In re Cendant Corp. Securities Litigation*, 404 F.3d 173 (3d Cir. 2005) for the proposition that simply doing work on behalf of the class does not create a right to compensation.  However, the complete sentence in the Third Circuit's opinion from which Plaintiffs plucked this sentiment is: "The cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class." (*Id.* at   191) (italics in original) (underline added).  In context, the proposition is not as Plaintiffs assert.  Additionally, as discussed above, by any measure, Objectors have already provided a significant benefit to the class.

Plaintiffs go so far as to argue that Objectors don't get credit for the opt-in switch, because Urban was not an objector at the time the Court considered the Motion for Preliminary approval on January 27, 2015.  Although not stated, it appears that Plaintiffs assume—without any support—that one cannot benefit a class unless one has filed a written objection.  Plaintiffs are wrong.

The substantial benefit doctrine enunciated in *Mills v. Elec. Auto–Lite Co.,* 396 U.S. 375, 393 (1970), entitles counsel who confer a benefit on an ascertainable group through litigation efforts to the payment of attorneys' fees, even if that benefit is realized in a different action. *See, e.g., In re Linerboard Antitrust Litig.,* 292 F.Supp.2d 644, 668–69 (E.D.Pa.2003) (court prospectively sequestered a percentage of funds from future settlements or judgments in tag-along actions to compensate class counsel for the substantial benefits the tag-along plaintiffs would obtain from class counsel's work); *Joy Mfg. Corp. v. Pullman–Peabody Co.,* 729 F.Supp. 449, 453 (W.D.Pa.1989) ("where [a] party has by his or her effort and expense through litigation created a benefit for others a fee award is appropriate whether or not the litigation is mooted before judgment and regardless of whether there is a monetary fund created from which fees may be paid."). Accordingly, Objectors' alleged "non-objector status" is no impediment to their receiving credit for the benefit that have brought to the class.

Similarly, Plaintiffs claim that Objectors have clouded, rather than sharpened the issues by challenging, without basis, the merits of the settlement. Inasmuch as the Court, itself, appears to have adopted Objectors' position on the

opt-in/opt-out issue,[13] Plaintiffs are hard-pressed to characterize that position as being "without basis."

### E. Objectors' Efforts have Resulted In Additional Benefits to the Class

Although more difficult to quantify its value, the reference to IRS Form 982 in the Class Notice is also attributable to Objectors.  That form is the mechanism by which a taxpayer notifies the IRS that he/she is insolvent, and therefore not liable for taxes on discharged debt.  It was Objectors that first suggested the reference to this Form (Transcript at 29).  In terms of benefit to the class, notifying class members of this form is a distant second to preventing the issuance of 1099-C's, but is nevertheless of great value if the 1099-C's are issued. *See*, Supplemental Affidavit of John McGovern (Doc. 100-3 at 2, ¶ 4), incorporated herein.

Additionally, the class has been benefitted by Objectors' having pointed out that, in the first instance, co-borrowers had not been sent class notices.  Plaintiffs attempt, in multiple ways, to minimize the importance of this benefit.  First they claim that this issue is now moot because supplemental notices were, in fact, sent to 652 co-borrowers, a significant fraction of the class.  The fact that it is now moot, does not in any way diminish its value to the class.  After all, the opt-in /

---

[13] In Plaintiffs' own words: "the Court's strong preference for presumptive debt forgiveness."  (Brief at 26)

opt- out switch is now moot, as well, and the value of that change to the settlement is undisputed.

Second, they claim that Objectors could have simply contacted plaintiffs' counsel shortly after the August 4, 2015 mailing to correct the problem. However, Objectors counsel did not become aware of this error until they learned that their co-borrower client had not received class notice, which was not shortly after the mailing.

Finally they claim that this correction did not increase the common fund. This contention not only ignores the value of correcting the due process flaw in the Settlement engendered by this error, but it ironically disregards that Plaintiffs, themselves, have taken credit for "over $16.3 million in debt forgiveness, and valuable credit report correction" (Doc. 126 at 36),[14] neither of which increases the common fund, either.

## F. The *Urban* Case Increased the Settlement Fund at Mediation

At the mediation, the Bank agreed to pay more money towards settlement as a result of the Bank's understanding that the *Urban* matter would be settled with the *Brennan* matter. Community Bank's counsel, explained: "In mid-afternoon, Judge Welsh came to me with a number and said, This is basically Plaintiff's

---

[14] The $16.3 million of debt forgiveness would have been considerably less, were it not for Objectors' insistence on an opt-out provision.

bottom line, and if you can get there, Mr. Shenkan has signed off on that number. I didn't ask her where that information came from, she gave it to me. I said, We're pleased, *this allows us, maybe, to negotiate a little further, because Mr. Shenkan is in, and we reached a settlement at 2.8 that afternoon.*" (See, Transcript at p. 10, l. 4-11). Only days after the mediation, Plaintiffs' counsel disclosed to the Objector's counsel the troublesome deficiency waiver feature which expressly permitted the Bank to sue (and continue litigation against) class members for deficiencies despite settlement.

Plaintiffs' position that Objectors have brought no benefit to the class is untenable.

### IV.   OBJECTORS ARE ENTITLED TO AN AWARD OF ATTORNEY FEES

The Settlement Agreement that the Court has preliminarily approved provides for the payment of attorney fees from the Settlement Fund in an amount not to exceed $1.092 million dollars. As part of their Motion for Final Approval, Plaintiffs' Counsel has sought to be paid the entirety of that amount.

For the reasons set forth above and in their Objection to Approval of Class Settlement (Doc. 100), Objectors believe that the Settlement in this case should not be approved. If the Court, nevertheless, enters an Order approving the Settlement, that Settlement will have been significantly improved through the efforts of Objectors. In that event, Objectors believe that these benefits should entitle

31

Objectors to a share of the common fund and agree to limit their fees to a reasonable share of those attorney fees which Plaintiffs' counsel has now claimed exclusively for themselves.

As was reported to the Court during the January 27, 2014 Status Conference, Plaintiffs' and Objectors' counsel initially agreed to an allocation of the gross attorney fees on a percentage basis, as between them at the mediation of September 30, 2014. (*See* Transcript at 5, 7). The agreed-to allocation was 80% to Brennan's counsel and 20% to Urban's counsel. The Court should note that this agreement preceded the switch precipitated by Objectors, from an opt-in for the deficiency waiver to an opt-out, which represents an additional significant benefit to the Class for which Objectors are responsible, likely approximately an additional $13.8M in additional benefit conferred on the class plus the extinguishment of the Bank's right to sue class members. Notwithstanding that substantial change in circumstances, Objectors will honor the 20% percent share of the gross attorney fees awarded, as was agreed, along with reimbursement of costs. If Plaintiffs' counsel continue to maintain that the Objectors should not receive the agreed-to allocation, then Objectors respectfully request that the Court bifurcate the attorney fee issue and escrow all attorney fees and costs for a subsequent adjudication relating solely to attorney fees. Objector's counsel agree to do whatever is

reasonably necessary to ensure that the attorney-fee issues are not intertwined with the resolution of the substantive class issues.

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.

_____
Richard Shenkan
P.O. Box 7255
New Castle, PA  16107
T: (800) 601-0808
F:  (888) 769-1774

Howard Rothenberg
Howard Rothenberg and Associates
345 Wyoming Ave., Suite 210
Scranton, PA  18503
T: (570) 207-2889
F: (570) 207-3991

*Attorneys for Nicole Urban and Other Objectors / Prospective Intervenors*

## CERTIFICATE OF SERVICE

I certify that all parties' counsel subscribe to the ECF system and, as such, received notice of this pleading on February 23, 2016.

SHENKAN INJURY LAWYERS, LLC.

_____
Richard Shenkan
*Attorneys for Nicole Urban and Other Objectors / Prospective Intervenors*